**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | Case No. 3:24-cv-722 (BJB) |
| LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, | |
| *Defendant.* | |

**MEMORANDUM IN SUPPORT OF HERITAGE FOUNDATION'S & HERITAGE FOUNDATION OVERSIGHT PROJECT EXECUTIVE DIRECTOR MIKE HOWELL'S MOTION TO PARTICIPATE AS *AMICI CURIE***

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

    I.  *AMICI* PARTICIPATION IS APPROPRIATE HERE. ....................................... 3

    II.  ARGUMENTS HERITAGE INTENDS TO PRESENT. ...................................... 5

        A.  The Proposed Consent Decree Presents Grave Legal Concerns.................................. 6

        B.  Even On Cursory Review, the Proposed Consent Decree is Neither In the Public Interest, Nor Is It "Fair, Adequate, and Reasonable." ................................................ 13

CONCLUSION.................................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**

*Benalcazar v. Genoa Township, Ohio*, 1 F.4th 421 (6th Cir. 2021) ................................................. 8

*Brown v. Giles*, 95 F.4th 436 (6th Cir. 2024) .............................................................. 12

*Clinton v. Jones*, 520 U.S. 681 (1997) ....................................................................... 3

*District of Columbia v. Potomac Elec. Power Co.*, 826 F.Supp.2d 227 (D.D.C. 2011) ................. 4

*Faller v. DOJ*, No. 3:23-cv-526 (BJB), 2024 WL 4369902 (W.D. Ky. Sept. 30, 2024) ................ 3

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004) ..................................................... 9

*In re Search Warrant No. 5165*, 470 F.Supp.3d 715 (E.D. Ky. 2020) ................................ 4

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*, No. 1:15-cv-1191, 2017 WL 11454764
   (W.D. Mich. Oct. 30, 2017) ......................................................................... 3, 4

*Landis v. North Am. Co.*, 299 U.S. 24 (1936) ............................................................ 3

*Lexington Ins. Co. v. Ambassador Group, LLC*, 581 F.Supp.3d 863 (W.D. Ky. 2021) ..... 1, 5, 6, 7
*North Coast Rivers Alliance v. U.S. Dep't of the Interior*, No. 16-cv-307 (DAD) (SKO), 2021
   WL 1721698 (Apr. 29, 2021) ....................................................................... 3

*Pedreira v. Sunrise Childres's Servs., Inc.*, 802 F.3d 865 (6th Cir. 2015) .................................. 8

*Penn. Env. Def. Found. v. Bellefonte Borough*, 718 F.Supp. 431 (M.D. Penn. 1989) .................. 4

*Snyer v. United States*, 626 F.Supp. 1374 (D.D.C. 1986) (3 Judge Court) .................................. 10

*United States v. Baltimore Police Dep't.*, 249 F.Supp.3d 816 (D. Md. 2017) ............................... 6

*United States v. Bd. of Cnty. Comm'rs of Hamilton*, 937 F.3d 679 (6th Cir. 2019) ..................... 8

*United States v. City of Hialeah*, 140 F.3d 968 (11th Cir. 1998) .................................................. 17

*United States v. City of Seattle*, 474 F.Supp.3d 1181 (W.D. Wash. 2020) .................................... 9

*United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484 (6th Cir. 2010) ....... 1, 6, 8, 14

*United States v. Michigan*, 68 F.4th 1021 (6th Cir. 2023) .................................................... 1, 5, 7

*United States v. Pioneer Nat. Resources Co.*, 452 F.Supp.3d 1005 (D. Colo. 2020) .................. 12

*United States v. U.S. Steel Corp.*, No. 2:18-cv-127 (JD), 2021 WL 869941 (N.D. Ind. Mar. 3, 2021) ............................................................................................................................. 4

*Vanguard of Cleveland v. City of Cleveland*, 23 F.3d 1013 (1994) .............................................. 8

*Webster v. Fall*, 266 U.S. 507 (1925) ........................................................................................... 8

*Whiteman-Walker Clinic, Inc. v. HHS*, No. 20-cv-1630 (JEB), 2021 WL 2033072 (D.D.C. Sept. 03, 2021) ................................................................................................................................... 3

**Other Authorities**

David Mattingly, *LMPD recruiting numbers hit new low* (Aug. 30, 2024), WAVE News, https://www.wave3.com/2024/08/30/lmpd-recruiting-numbers-hit-new-low/ ........................ 14

*Memorandum from the Attorney General to Heads of Civil Litigating Components* (Nov. 7, 2018) ........................................................................................................................... 2, 3

Memorandum in Support of Motion to Terminate Consent Decree by City of New Orleans, *United States v. The City of New Orleans*, 2:12-cv-1924 (SM) (DPC) (E.D. La) (Aug. 18, 2022) (ECF No. 629-1) .......................................................................................................... 16

Memorandum of Hearing, *Lexington Ins. Co. v. Amb. Group LLC*, No. 3:20-cv-330 (BJB) (W.D. Ky. Oct. 25, 2021) (ECF No. 135) .................................................................................... 4

Michael W. McConnell, *Why Hold Elections—Using Consent Decrees to Insulate Policies from Political Change*, 1987 University of Chicago Legal Forum 295 (1987) .................................. 9

Reyna Katko, *Louisville's 911 Crisis Call Diversion Program now available 24 hours a day* (Jun. 27, 2024), WDRB News, https://www.wdrb.com/news/louisvilles-911-crisis-call-diversion-program-now-available-24-hours-a-day/article_63ff4c30-347d-11ef-9d1f-4b3ffa637e70.html ............................................................................................................. 15

## INTRODUCTION

The actions of the Department of Justice and Louisville Jefferson County Metro Government ("Louisville") are extraordinary. Via a sweeping proposed consent decree (ECF No. 4-1) ("Proposed Consent Decree"), the Department and Louisville seek to nationalize the core local functions of policing. The Proposed Consent Decree imposes any number of policing standards which almost certainly would not be available as relief in a contested case. It seeks to replace the elected and appointed City leadership with this Court and a Monitor that exists in a state of perpetual suspension as an agent of the Court that is somehow not subject to the Court's supervision and control. The questions as to the legal propriety of that action are as obvious as they are grave. *See, e.g.*, *United States v. Michigan*, 68 F.4th 1021, 1023 n.2 (6th Cir. 2023) (Thapar, J.); *Lexington Ins. Co. v. Ambassador Group, LLC*, 581 F.Supp.3d 863, 866 (W.D. Ky. 2021) (Beaton, J.). Add to these legal questions the core factual issue of whether it is even possible to run a functioning police Department in a high-crime urban environment with 786 paragraphs of legalese, plus the anticipated pages and pages of supplemental agreements (*see, e.g.*, ECF No. 5), and regular back and forth with the Monitor and this Court. *See, e.g.*, ECF No. 4-2 at 3 ("Joint Motion" or "Joint Mot.") (arguing "'Proposed Consent Decree must be "fair, adequate, and reasonable as well as consistent with the public interest'" (citing *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010)). It is not possible as an adversarial evidentiary presentation will show.

And why must this Proposed Consent Decree be entered *now* when President Donald J. Trump is days away from re-taking Office and has dramatically different views on legal policy than the Biden Administration? After all, President Trump's prior Department of Justice vastly restricted the use of consent decrees and the Proposed Consent Decree here flunks those standards.

*See Memorandum from the Attorney General to Heads of Civil Litigating Components* (Nov. 7, 2018) ("Sessions Memorandum") (Exhibit 1 to the Declaration of Eric Neal Cornett (Dec. 20, 2024) ("Cornett Decl.")).   During a December 17, 2024 Community Listening Session the Department said the quiet part out loud.  This Proposed Consent Decree must be rushed through now because the experts in the Department are somehow entitled to co-opt the judicial power of this court in an end run around the more than 77 million voters who cast their ballots for President Trump:

> "[A]n interesting thing about Proposed Consent Decrees is that when we submit them to the court and the court enters them as an order, it really becomes the court's order.  And we are parties before the court, who are there to defend and implement that order?  And so it does sort of take it out of the hands, a little bit of, the sort of back and forth.  And part of the reason we use Proposed Consent Decrees is that we anticipate that the changes that are going to be necessary may take some time.  And so it's a way to make sure that there is consistency and the approach towards that change across different administrations and in the city and the federal government, and that we can just keep on, moving these things forward.

Cornett Decl. Ex. 2 at 8–9.  But there is more.  In the Department's unvarnished presentation to the affected community, this Court is *required* to lend its coercive power to the Department to potentially subvert the electorate's will and in the process run a police Department for at least five years.  It is not a question of *if* this Court approves the decree, but merely of *when*.  Again, the Department said the quiet part out loud:

> So last Thursday, Louisville Metro and our team at the DOJ, we jointly filed this Proposed Consent Decree with the court in the Western District of Kentucky. And now the immediate next step is for the court to review the filing and enter the decree as an order of the court.

*Id.* at 7; *accord id.* at 2 ("Once the court reviews and approves the Proposed Consent Decree, the next step is for the parties to select an independent monitor to recommend to the court.").[1]

---

[1]  This Court of course has the inherent authority to stay proceedings in this matter pending review by the new Administration.  "[T]he power to stay proceedings is incidental to the power inherent

This is a case where the parties are in complete agreement. There are no claims for the Court to decide, no legal disputes to resolve, and no factual questions to answer. Indeed, the Department's Complaint was filed contemporaneously with the Joint Motion for Entry of Proposed Consent Decree. *See* ECF No. 1; ECF No. 4-1. Because of the complete lack of adversity here, this Court should allow the Heritage Foundation & Heritage Foundation Oversight Project Executive Director Mike Howell's ("Heritage") full *amici* participation in this case, complete with expert reports and *amici* participation at a full fairness hearing, in order to allow this Court to fully evaluate the profound and deeply concerning legal and factual questions raised by this Proposed Consent Decree.

## I.    *AMICI* PARTICIPATION IS APPROPRIATE HERE.

This Court has previously articulated the standard it applies to *amicus* participation:

> "The Federal Rules of Civil Procedure do not address motions for leave to appear as amicus curiae in a federal district court, and the decision to allow an appearance as amicus curiae falls under the district court's inherent authority." *E.g.*, *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, No. 1:15-cv-1191, 2017 WL 11454764, at *1 (W.D. Mich. Oct. 30, 2017) (cleaned up). When deciding whether to allow such participation in another's case, district courts consider the timeliness and usefulness of the brief. *Id.*

*Faller v. DOJ*, No. 3:23-cv-526 (BJB), 2024 WL 4369902, at *7 (W.D. Ky. Sept. 30, 2024)

(Beaton, J.). The Court has "broad discretion" in making this determination. *Kollaritsch v.*

---

in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 24, 254–55 (1936). Thus, "[t]he District Coast has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). Courts have entered such stays to allow a new Administration to reconsider a prior Administration's position. *See, e.g.*, *Whiteman-Walker Clinic, Inc. v. HHS*, No. 20-cv-1630 (JEB), 2021 WL 2033072, at *1–*2 (D.D.C. Sept. 03, 2021); *North Coast Rivers Alliance v. U.S. Dep't of the Interior*, No. 16-cv-307 (DAD) (SKO), 2021 WL 1721698, at *2–*3 (Apr. 29, 2021). In light of the Sessions Memorandum, this Court may will wish to stay this matter pending review by the incoming Administration.

*Michigan State Univ. Bd. of Trustees*, No. 1:15-cv-1191, 2017 WL 11454764, at *1 (W.D. Mich. Oct. 30, 2017).

Heritage's Motion is obviously timely, it has been filed prior to the Court's initial scheduling conference in this matter and a mere eight days after this action was commenced.

As to "usefulness" courts routinely allow participation by *amici* when evaluating proposed consent decrees. *See, e.g.*, *United States v. U.S. Steel Corp.*, No. 2:18-cv-127 (JD), 2021 WL 869941, at *5–*6 (N.D. Ind. Mar. 3, 2021) (granting leave for interested national association to file *amicus* brief concerning proposed consent decree); *District of Columbia v. Potomac Elec. Power Co.*, 826 F.Supp.2d 227, 237 (D.D.C. 2011) (similar); *Penn. Env. Def. Found. v. Bellefonte Borough*, 718 F.Supp. 431, 434–35 (M.D. Penn. 1989) (considering *amicus* submission by United States and rejecting proposed consent decree). Relevant to that point, this Court has not hesitated to *sua sponte* order briefing on the propriety of a far less sweeping proposed consent decree. *See* Memorandum of Hearing, *Lexington Ins. Co. v. Amb. Group LLC*, No. 3:20-cv-330 (BJB) (W.D. Ky. Oct. 25, 2021) (ECF No. 135). And as the Court in *Pennsylvania Environmental Defense Foundation* explained, lack of adversity in a proceeding is a key driver in permitting *amicus* participation. "Were we to not consider the United States's comments, there would be no adversarial presentation to the Court as to the propriety or wisdom of approving the proposed consent decree. Our judicial system is designed to function best when a Court is presented with opposing viewpoints concerning an issue which is before it for decision." *Id.* at 435; *see also In re Search Warrant No. 5165*, 470 F.Supp.3d 715, 720 (E.D. Ky. 2020) (stating on application for search warrant to compel biometrics "To address the nascent question concerning the constitutionality of compelled biometrics, the Court appointed attorney Jarrod Beck as *amicus curiae*." "Both parties briefed the matter, and the Court heard oral arguments.") So too here.

4

Without Heritage's participation as *amici*, this Court will be deprived of the benefit of *any* argument whatsoever against entry of the Proposed Consent Decree.

The arguments Heritage previews below are important ones that should be fully heard prior to entry of the Proposed Consent Decree. Heritage is well positioned institutionally to present robust opposition to the Proposed Consent Decree. Moreover, in addition to policy expertise, Heritage has former high-ranking law enforcement officials on staff who have begun reviewing, and find fault with, the Proposed Consent Decree. Heritage also has already engaged with national experts to provide additional evidentiary support for Heritage's submissions.

## II.    ARGUMENTS HERITAGE INTENDS TO PRESENT.

Heritage seeks to present two principal arguments (presented in summary form below) and to present a robust evidentiary record to support those arguments.

First, and foremost, this Court was eminently correct when it both questioned whether the modern Proposed Consent Decree regime is compatible with courts' limited Article III powers and noted that precisely because proposed consent decrees are non-adversarial there had been little testing of these points. Regardless of the fact that the Sixth Circuit has *generally* held that "district courts retain jurisdiction to enter consent decrees" (*Lexington Ins.*, 581 F.Supp.3d at 868), *this* Proposed Consent Decree is so massive in scope and breadth that it raises open questions the Sixth Circuit has not directly considered. Direct resolution of the profound Article III question implicated by a virtual takeover of a local government entity by Proposed Consent Decree is long overdue and nigh required. *See Michigan*, 68 F.4th at 1023 n.2 ("But here, the parties don't challenge the legality of consent decrees, so we save this issue for another day."). So too other foundational legal issues raised by *this* Proposed Consent Decree.

Second, even under the Department's preferred legal standard, the Proposed Consent Decree is not the *fait accompli* the Department of Justice views it to be.  In the more common environmental consent decree milieu, the district court must determine that it is "'fair, adequate, and reasonable, as well as consistent with the public interest.'" *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010) (quoting *United States v. County of Muskegon*, 298 F.3d 569, 580–81 (6th Cir. 2002)).  Courts outside of the Sixth Circuit that have examined consent decrees joined pursuant to 34 U.S.C. § 1260 have adopted a substantively similar framework, with the additional caveats that a consent decree "is not illegal, a product of collusion, or against the public interest." *See United States v. Baltimore Police Dep't.*, 249 F.Supp.3d 816, 818 (D. Md. 2017).  Simply put, the Proposed Consent Decree's provisions are beyond the judicial ken and will likely be unworkable in practice in a city confronting a high relative rate of violent crime.  Many aspects of the Proposed Consent Decree cry out for factual adversarial testing.

### A.    The Proposed Consent Decree Presents Grave Legal Concerns.

**1.**    This Court has already explained why any consent decree presents first order questions under Article III.  *See Lexington Ins.*, 581 F.Supp.3d at 866.  As this Court wrote:

> [A] consent decree, unlike a dismissal, shifts the court's focus from past actions to future obligations. The basis for extending jurisdiction to that context is far less clear. By anticipating hypothetical future violations, consent decrees invite courts to exercise ongoing public supervision over a dispute that a private agreement has ended.  Why doesn't this violate the general rule that courts lack authority to act after a case becomes moot?

*Id.* at 867; *accord id.* at 868 (consent decrees are "not easy to reconcile with mootness precedent"). Of course, as this Court explained, the "custom of entering consent decrees is longstanding and familiar—repeatedly discussed, without apparent objection, by appellate courts." *Id.* at 867.  "But examples are not necessarily endorsements, and it's not easy to find caselaw reconciling consent-decree practice with case-or-controversy precedent." *Id.* at 867–68.  This area is thus a "'largely

6

unrecognized challenge to Article III's justiciability requirements,' which the 'Supreme Court has never squarely addressed.'" *Id.* at 868 (quoting Michael T. Morely, *Non-Contentious Jurisdiction and Consent Decrees*, 19 U. Pa. J. Const. L. Online 1, 12, 15 (2016)).

To be sure, the Court entered the consent decree in *Lexington Insurance* because the Sixth Circuit "held that district courts retain jurisdiction to enter consent decrees that . . . . 'spring from and serve to resolve a dispute within the court's subject-matter jurisdiction,' 'come within the general scope of the case made by the pleadings,' and 'further the objective of the law upon which the complaint was based.'" *Lexington Ins.*, 581 F.Supp.3d at 868. The Court found these factors met in *Lexington Insurance* which was a fairly anodyne matter and involved only a consent permanent injunction against infringement of trademarks. *Id.* at 868.

Why does the Court's reluctant acceptance of a consent decree in *Lexington Insurance* not govern here?

To start, subsequent to *Lexington Insurance*, the Sixth Circuit, per Judge Thapar stated that the Sixth Circuit's precedent *does not* foreclose considering the legality of consent decrees in an appropriate case:

> "Much has been written about the perniciousness of consent decrees." *Allen v. Louisiana*, 14 F.4th 366, 375 (5th Cir. 2021) (Oldham, J., concurring) (collecting authorities). Indeed, consent decrees "provide[ ] the legitimacy of a judicial decision without the reality of a judicial decision." Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. Chi. Legal F. 103, 132 (1987). They often limit the rights of third parties because once the court approves a consent decree, it's difficult to undo. *Id.* And they risk "improperly depriv[ing] future officials of their designated legislative and executive powers." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). But here, the parties don't challenge the legality of consent decrees, so we save this issue for another day.

*Michigan*, 68 F.4th at 1023 n.2.

Moving on, this is an appropriate case to consider the core legality of consent decrees because review of but a few provisions of the Proposed Consent Decree reveal that it encroaches

upon Article III in an aggressive manner that no Court in the Sixth Circuit has ever directly considered or sanctioned.  The Sixth Circuit cases cited in *Lexington Insurance* pointedly did not consider the specific arguments Judge Thapar noted are "for another day."  Rather, they exercised *general* jurisdiction over consent decrees and did not pass on the specific points of law that make *this* Proposed Consent Decree so objectionable.  *See Benalcazar v. Genoa Township, Ohio*, 1 F.4th 421, 424–25 (6th Cir. 2021) (adjudicating dispute in minor zoning case over whether there was a cause of action sufficient to sustain subject matter jurisdiction); *United States v. Bd. of Cnty. Comm'rs. of Hamilton*, 937 F.3d 679, 688–89 (6th Cir. 2019) (adjudicating propriety of preliminary injunction to enforce existing consent decree in sewer Clean Water Act case); *Pedreira v. Sunrise Childres's Servs., Inc.*, 802 F.3d 865, 871–72 (6th Cir. 2015) (resolving dispute over whether order was consent decree, holding order was consent decree, and remanding for failure to allow intervention by affected party); *Vanguard of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017–18 (6th Cir. 1994) (adjudicating standard for modification of consent decree and the merits of modification regarding minority fire department hiring); *Lexington-Fayette*, 591 F.3d at 489 (adjudicating a dispute over appropriate application of prudential test for consent decree and reversing for failure to enter Clean Water Act consent decree on those grounds).  Although, to be sure, a Court must always satisfy itself of jurisdiction, the precedential value of opinions that did not pass on a questionable point of jurisdiction is limited and fact bound.  *See, e.g.*, *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided *as to constitute precedents*. (emphasis added))."  Here, consideration of but a few examples in the Proposed Consent Decree demonstrates its extraordinary breadth.  These fundamental questions should be fully brief, argued, and resolved.

**2.**    The Proposed Consent Decree raises other foundational legal issues.  As the Supreme Court has noted, "[i]f not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004).  This makes sense, as Professor Michael W. McConnell put it in the course of his withering criticism, consent decrees are inherently anti-democratic:  "If changes in policy have already been ruled out by binding and irrevocable agreements with private parties, then there is no point in holding them."  Michael W. McConnell, *Why Hold Elections— Using Consent Decrees to Insulate Policies from Political Change*, 1987 University of Chicago Legal Forum 295, 300 (1987).  That concern is present here in spades.  The Proposed Consent Decree would restrict the enforcement of valid laws and would bar otherwise lawful conduct without any explanation of why broad prophylaxis is required.  Afterall, that is part of the point of the Proposed Consent Decree—to bind the Trump 47 Administration and future elected Louisville administrations who may well vehemently and categorically disagree with the Proposed Consent Degree.  *Cf. e.g*., *United States v. City of Seattle*, 474 F.Supp.3d 1181 (W.D. Wash. 2020) (during height of Goerge Floyd riots granting TRO to prevent implementation of newly adopted City Ordinance banning use of crowd control devices as violative of consent decree).  Again, these issues should be fully briefed, argued, and resolved.

**3.**    A few examples suffice to demonstrate the gravity and extent of the legal concerns raised by the Proposed Consent Decree.

**Independent Monitor**.  The Monitor is "to serve as an agent of the Court."  Proposed Consent Decree at ¶ 608.  But the Court is denied power to appoint its own agent.  Rather it must rubber stamp the monitor selected by the parties in a "joint motion" or "select the Independent

Monitor from the candidates submitted by the Parties, after considering the Parties' views on all of the candidates submitted." *Id.* at ¶ 614. The Joint Motion does not explain how *the parties* can compel and control the exercise of judicial power in appointing an "agent of the court."[2] That almost certainly is an affront to Article III. And even more perniciously, the Court may only remove the monitor "for cause." *Id.* at ¶ 617. That affront to separation of powers is equally obvious. *See Snyer v. United States*, 626 F.Supp. 1374, 1401 (D.D.C. 1986) (3 Judge Court) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey."), *aff'd, sub. Nom. Bowsher v. Syner*, 478 U.S. 714.

Continuing on, the Monitor may "hire or retain" staff to work under them (presumably also agents of the Court, but the Proposed Consent Decree does not say) again by consent of the parties, unless there is disagreement at which case the Court may approve or reject the Monitor's request. Proposed Consent Decree ¶ 621. The Court also does not control or set the monitor's budget; it is limited to merely approving it. *Id.* at ¶ 620. The Court also may raise the Monitor's budget cap it if finds that "the increase is necessary for the Monitor to fulfill its duties under the Proposed Consent Decree and is not due to a failure in planning, budgeting, or performance by the Monitor." *Id.* at ¶ 623.

Nowhere does the Joint Motion explain how this arrangement complies with Article III's limitations on judicial power in a case in which the parties have no dispute.

**Performance Review Methodology.** The Proposed Consent Decree contains a complicated mechanism by which performance reviews are conducted to "asses[] . . . whether

---

[2] To be sure, in a case requiring a Special Master the Court may *choose* to adopt such a procedure. The point here is that the consent decree is presented as a package *fait acompli*; the Court is denied that antecedent choice.

Louisville Metro and LMPD have achieved the Key Objectives in a section of the Decree by demonstrating that personnel act in accord with the requirements of a section of this Decree."  The Proposed Consent Decree Provides:

> If the Parties are unable to reach agreement on a Performance Review methodology within one year of the Effective Date and believe that further negotiations are unlikely to result in an agreement, the Monitor will assume responsibility for creating a methodology for the areas of disagreement.  The Monitor will present the draft methodology for review and comment by the Parties.  If the Parties and the Monitor cannot agree upon the methodology within a timeframe identified in the Implementation Plan, the Parties may ask the Court to resolve the matter.

Proposed Consent Decree at ¶ 635.  No standard or procedures for how the Court should "resolve" such disputes is provided.  The intricate detail required for a Performance Review Methodology is illustrated by the recent Agreed Notice (ECF No. 5).  The Joint Motion does not address how adjudicating such a discretionary policy document is within the limited role Article III sets for federal courts.

**Relief Likely Not Attainable in Litigation**.  The Proposed Consent Decree repeatedly would have this Court use its coercive power (and supervisory? power) to restrain and oversee *legal* conduct.  Such relief almost certainly would not be attainable in litigation and thus creates potential issues under Article III and the scope of this Court's remedial power.  For example, the Complaint asserts that Louisville has used conducted Electrical Weapons ("CEWs") *in a manner that violates the Constitution*.  *See* Compl. at ¶ 25 ("LMPD uses tasers against people who are not a threat, including using tasers against people who have submitted to an officer or are already restrained."); ECF No. 1-1 at 16 ("These taser uses are painful and dangerous, and they violate the law.").  If a pattern and practice were proven at trial, Plaintiffs would only be entitled to have that unlawful conduct restrained and remedied; that is all the Complaint seeks.  *See* Compl. at ¶ 106 (f) ("Order Defendant, its officers, agents, and employees to adopt and implement policies, training,

accountability systems, and practices to remedy the constitutional and statutory violations described in this Complaint, and to prevent Defendant, its officers, agents, and employees from depriving persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.").  But the Proposed Consent Decree sweeps far more broadly:

> policy will require that officers Discharge CEWs only where grounds for Arrest or detention are present, and: (1) such force is necessary to protect the officer or another person from imminent physical injury; and (2) when less intrusive means have been or will likely be ineffective or increase the likelihood of greater harm to the officer, the Subject, or another party.

Proposed Consent Decree ¶ 42.  (Less there be doubt the Proposed Consent Decree reiterates officers may "[n]ot Discharge a CEW solely on the basis that a person flees from an officer."  *Id.* at ¶ 45(h)).  Just one problem—that prohibition sweeps in a good deal of *lawful* conduct.  As Judge Thapar explained earlier this year, "we've held that it's reasonable for officers to tase fleeing suspects."  *Brown v. Giles*, 95 F.4th 436, 439 (6th Cir. 2024).  Again, the Joint Motion does not contain the required explanation as to how this Court has power on this limited and one-sided record to grant broad prophylactic relief well in excess of the legal violations plead in the Complaint.  *See, e.g.*, *United States v. Pioneer Nat. Resources Co.*, 452 F.Supp.3d 1005, 1014–15 (D. Colo. 2020).

**Non-Enforcement of Criminal Provisions.**  The Proposed Consent Decree places severe limitations on how (undisputably unlawful) offenses are enforced.  *See* Consent Decree at ¶ 240 (listing offenses).  When only those offenses are present, "[t]he officer [may]only issue[] a citation if they determine that a warning or referral to Deflection or the Outreach Team would be inappropriate or insufficient to address the matter" (*id.* at ¶ 241(c)); "[t]he officer [may] only make[] an Arrest if they determine that a citation and/or referral to Deflection or the Outreach Team would be inappropriate or insufficient to address the matter" (*id.* at ¶ 241(d)) and "[i]f a

citation is issued or an Arrest is made, the officer documents their reasons for concluding that less intrusive action would be inappropriate or insufficient." *Id.* at ¶ 241(e).

**B.      Even On Cursory Review, the Proposed Consent Decree is Neither In the Public Interest, Nor Is It "Fair, Adequate, and Reasonable."**

As concerns the question of "public interest", the Joint Motion's analysis is again largely cursory.  It alleges violations of the "Constitution or laws of the United States."  *See* Joint Mot. at 4.  But nowhere does it explain *how* the Proposed Consent Decree fixes *those* violations.  Instead, it touts the parties' work in negotiating a settlement (*id.* at 4–6)  and highlights a hodgepodge of ideals putatively served by the Proposed Consent Decree that read more like a legislative committee report than a judicial order.  *See, e.g.*, *id.* at 6 ("The proposed Decree sets out reform efforts to be undertaken by Louisville Metro and LMPD for the express purpose of promoting effective community engagement and oversight, effective policy guidance, improved training, closer supervision, and improved technology and resources.").  Indeed, the Joint Motion even highlights that "the United States' investigation and the Parties' subsequent negotiations already have set in motion a process of reform within Louisville Metro and LMPD", but does not explore the obvious corresponding question of why, given that progress, a consent decree is necessary as opposed to a memorandum of understanding or a declaratory injunction.  *Id.* at 6.  So too questions of whether the decree is "fair, adequate, and reasonable."  *Id.* at 7.  Far from exploring direct empirical proof of this proposition (ordinarily required for what is in form a massive structural injunction), the Joint Motion proceeds by inference.  In its telling, the mere fact of the negotiation (and some outreach) establishes the point.  *See id.* at 7–8.  Somehow so does the appointment of a Monitor.  *Id.* at 8; *but see supra* pp. 9–10.

Examination of only a handful of the Proposed Consent Decrees' provisions establish that the Joint Motion's inferential propositions are empirically questionable at best.  This Court would

13

benefit from the evidentiary adversary testing a national think tank can provide in exercising its considerable discretion.  *See, e.g.*, *Lexington-Fayette*, 591 F.3d at 491.

**Staffing Constraints.**  The Proposed Consent Decree is premised from its first paragraph that Louisville and the Department of Justice  "share a commitment to lawful and effective public safety."  Proposed Consent Decree at ¶ 1.  The Parties' Joint Motion presumes the Proposed Consent Decree will achieve this aim with possible "financial costs", but that these costs are justified because "these reforms serve the public interest by allowing the Parties to expeditiously work to implement and continue improvements that will foster constitutional, lawful, and effective public safety and emergency response services for Louisville."  Joint Mot. at 6.  But the Joint Motion offers no factual basis to support this speculation and omits the on-going recruitment crisis Louisville faces.

In August 2024, then-interim Police Chief Paul Humphrey acknowledged Louisville is "short 250 plus officers."[3]   In that August graduating class only nine individuals graduated, while the police academy has the capacity for forty-eight.  The Proposed Consent Decree will likely worsen the police shortage both by introducing competition for the pool of potential applicants with the mandated "Deflection" program and by placing ever greater demands on an already understaffed department through increased monitoring requirements, data management and internal auditing, and diversion of patrol officers into new roles.

Regarding competition for qualified candidates, the LMPD competes with the "Deflection" unit.  The Proposed Consent Decree specifies that the "Deflection" program's "Mobile Crisis Response Team" shall not be employees of LMPD.  Proposed Consent Decree at ¶ 311(g)  June

---

[3] David Mattingly, *LMPD recruiting numbers hit new low* (Aug. 30, 2024), WAVE News, https://www.wave3.com/2024/08/30/lmpd-recruiting-numbers-hit-new-low/

2024 reporting indicates that Deflection currently has forty-six full-time staff[4], or, to put a fine point on it, nearly an entire police academy class.[5]  The Proposed Consent Decree requires "sufficient, well-trained staff and resources for the Behavioral Health Coordination and Oversight Council, MetroSafe, the Deflection program, and Advanced Behavioral Health Response Officers [] to comply with this Decree."  Proposed Consent Decree at ¶ 473(d).

In addition to fully staffing the above-cited programs, Louisville Metro and LMPD "must provide for adequate staffing and resources to satisfy all requirements of this Proposed Consent Decree, including:

a. A sufficient number of supervisors to provide close and effective supervision;
b. Sufficient, well-trained staff and resources to conduct timely and thorough investigations of uses of force and allegations of misconduct;
c. Sufficient, well-trained staff and resources to conduct timely and thorough investigations of reports of Sexual Assault, Sexual Misconduct, and Domestic Violence, consistent with Section IX, above; . . .
e. Sufficient, well-trained staff and resources to conduct trainings of LMPD personnel necessary to comply with this Decree; and
f. Sufficient, well-trained staff and resources to conduct timely and thorough data analysis, audits, policy development, and Proposed Consent Decree implementation tasks, as required by this Decree.

Proposed Consent Decree at ¶ 473.

That final component, staff and resources necessary to comply with the Proposed Consent Decree's requirements, has proven more burdensome than expected in other jurisdictions that have entered into consent decrees.  Among other things, the compliance burden led the City of New Orleans to seek termination of its consent decree in 2022.  New Orleans argued that the court-approved Monitor shifted the task of designing, conducting, and analyzing audits onto the city.

---

[4]  Reyna Katko, *Louisville's 911 Crisis Call Diversion Program now available 24 hours a day* (Jun. 27, 2024), WDRB News, https://www.wdrb.com/news/louisvilles-911-crisis-call-diversion-program-now-available-24-hours-a-day/article_63ff4c30-347d-11ef-9d1f-4b3ffa637e70.html
[5]

*See* Memorandum in Support of Motion to Terminate Consent Decree by City of New Orleans, at 33–36, *United States v. The City of New Orleans*, 2:12-cv-1924 (SM) (DPC) (E.D. La. Aug. 18, 2022) (ECF No. 629-1). That the Proposed Consent Decree here places the burden of conducting on audits on Louisville Metro and LMPD from the onset is cold comfort. *See* Proposed Consent Decree at ¶ 602. The Monitor is under no obligation to accept Louisville Metro's audits during compliance assessments. *See e.g.*, *id.* at ¶ 631 ("the Monitor will consider the conclusions of Louisville Metro and LMPD's own audits and may rely on such conclusions if the Monitor validates their accuracy and reliability using accepted and trustworthy means and methods"); id. at ¶ 640 ("Louisville Metro and LMPD will report self-assessment results to the Monitor and the United States, and the Monitor will evaluate their accuracy and reliability. Such self-assessments will not serve as a basis for determining compliance with this Decree unless their accuracy and reliability have been validated by the Monitor using accepted and trustworthy means and methods."). Thus, on this (anemic) record additional, likely substantial resource drains can be expected to impact an already unsourced police department. Because the Joint Motion ignores all of this it necessarily does not answer the resulting key factual question—will under resourcing hinder actual law enforcement?

**Collective Bargaining.** LMPD and the River City FOP Lodge 614's current contract runs from July 1, 2023 through June 30, 2027. The Proposed Consent Decree places new procedures for misconduct investigations that facially appear to conflict with the collective bargaining agreement. *Compare* Proposed Consent Decree at ¶ 495 ("LMPD policy will prohibit Members from reviewing any non-public evidence related to an incident for which the Member has been notified they are under investigation, or a witness to, alleged Misconduct, except in the following circumstances: a. Reports authored by the Member; b. In Preparation for a criminal prosecution in which the incident is the subject; c. In preparation for a civil litigation proceeding; or d. Upon approval of LMPD.") *with* Collective Bargaining Agreement Article 17, Section 4, G ("Metro

16

Government shall provide the Member any written or recorded statements in the possession of the department in connection with any disciplinary action taken against the Member except for attorney work product.") (Cornett Decl. Ex. 3).   Moreover, the Proposed Consent Decree recognizes possible future collective bargaining provisions may conflict with the provisions of the Decree and permits the Department, Louisville, or the Monitor to "seek the Court's intervention or modification to the Proposed Consent Decree to ensure that [Louisville] can comply with the Decree and the law."  Proposed Consent Decree at ¶ 683.

It appears the Proposed Consent Decree impinges on existing the collective bargaining agreement.  Louisville "cannot use the device of a nonconsensual consent decree to avoid its obligations, which the other party negotiated and bargained to obtain."  *United States v. City of Hialeah*, 140 F.3d 968, 983 (11th Cir. 1998).[6]

**CONCLUSION**

Heritage's Motion should be granted.


Dated:  December 20, 2024                    Respectfully submitted,


                                               /s/ R. Kent Westberry
                                             R. KENT WESTBERRY
                                             75883
                                             LANDRUM & SHOUSE LLP
                                             220 W. Main St., Suite 1900
                                             Louisville, KY  40202-1395
                                             (502) 589-7616
                                             kwestberry@landrumshouse.com

                                             BRIDGET M. BUSH
                                             91734
                                             LANDRUM & SHOUSE LLP

---

[6] while the union in *Hialeah* intervened, the principle is the same and their may well be intervention in this case; the clock has only been running for 8 days.

220 W. Main St., Suite 1900
Louisville, KY  40202-1395
(502) 589-7616
bbush@landrumshouse.com

SAMUEL EVERETT DEWEY
(D.C. Bar No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:   (703) 261-4194
Email:  samueledewey@sedchambers.com
(*pro hac vice* pending)

ERIC NEAL CORNETT
(D.C. Bar No. 1660201)
Law Office of Eric Neal Cornett
Telephone:  (606) 275-0978
Email:  neal@cornettlegal.com
(application for admission pending)

*Counsel for Plaintiffs*