# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

**UNITED STATES OF AMERICA**                                                              **PLAINTIFF**

v.                                                                                         No. 3:24-cv-722-BJB

**LOUISVILLE JEFFERSON COUNTY**                                                            **DEFENDANT**
**METRO GOVERNMENT**

### OPINION & ORDER SETTING A HEARING RE: PROPOSED CONSENT DECREE

  **1. THIS LITIGATION.** The United States Department of Justice, following a two-year investigation, found "reasonable cause to believe" the Louisville Metro Police Department engages in a pattern or practice of violating federal law. 2023 DOJ Report (DN 1-1) at 9–10. Some of these findings involve apparently novel legal interpretations: the Justice Department concluded that the Americans with Disabilities Act, for example, requires the LMPD to adopt a behavioral-health intervention team to respond to some 911 calls in lieu of police. *Id.* at 66–68. Other findings, however, go to the most foundational and serious aspects of our nation's commitment to equal justice under law—like the Justice Department's accusation that LMPD officers racially discriminate by arresting black but not white citizens for the same actions. *Id.* at 38–54.

  After issuing its Report, the Justice Department negotiated with the Louisville Metro Government for nine months about what to do next. Then, on December 12, 2024, the Justice Department filed this case against the City. The civil suit formally accuses the Louisville Metro Police Department of engaging in a pattern or practice of seven specific violations of federal constitutional and statutory law:

  **a. Fourth Amendment**

    1. Using excessive force (including disproportionate strikes, dangerous neck restraints, police dogs, and tasers) against arrestees. Complaint (DN 1) ¶¶ 20–28.[1]

---

[1] The parties' filings do not appear to discuss in any detail the legal standard that determines whether the alleged actions (or a pattern or practice thereof) violate the Constitution or federal statutory law. As to this first alleged violation, as a general matter the use of force by law enforcement violates the Fourth Amendment when the force was objectively excessive based on "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S.

1

2. Conducting searches based on warrants that, though approved by a judge, lack probable cause. ¶¶ 29–33.[2]

3. Executing warrants without knocking and announcing. ¶¶ 34–36.[3]

4. Stopping people without reasonable suspicion and searching them without probable cause. ¶¶ 37–44.[4]

b. **First Amendment**

5. Violating the rights of lawful protestors to criticize or record police officers. ¶¶ 61–66.[5]

---

386, 396 (1989). That legal rule is well-settled and familiar, though others set forth in the footnotes below are less clear—even at a high level of generality. In the interest of clarity as the litigation progresses, this opinion identifies what appear to be the legal standards applicable to the Justice Department's claims. These citations, however, draw only on the Court's independent research during a compressed timeframe and without the benefit of briefing. The parties should not misinterpret them as a legal ruling rather than an invitation for the scrutiny and input that would ordinarily accompany an adversarial process. Counsel should prepare to address the legal and factual basis for the alleged violations so the Court may, as discussed below, assess their redressability by the parties' proposed remedies.

[2] "Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough." *Nathanson v. United States*, 290 U.S. 41, 47 (1933).

[3] Before executing a warrant, Fourth Amendment caselaw generally requires officers to knock and announce unless the officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

[4] The Fourth Amendment requires reasonable and articulable suspicion before an officer is authorized to stop and frisk someone, *see Terry v. Ohio*, 392 U.S. 1, 21 (1968), or probable cause before searching someone, *see id.* at 10.

[5] Under the First Amendment, content-based laws target speech based on its communicative content are presumptively unconstitutional unless the government proves that they are narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert*, 576 U.S. 155, 155 (2015). And while the "United States Supreme Court and the Sixth Circuit have yet to hold the public enjoys a First Amendment right to record police activities in public places," several courts of appeals have reached the opposite conclusion. *Freeman v. Spoljaric*, 667 F. Supp. 3d 636, 661–62 (S.D. Ohio 2023) (collecting cases).

### c. Americans with Disabilities Act

6. Discriminating against people with behavioral-health disabilities by not providing reasonable accommodations in "services" and "responses" when addressing 911 and other calls during a behavioral-health crises. ¶¶ 67–73.[6]

### d. Safe Streets Act of 1968 and Title VI of the 1964 Civil Rights Act

7. Racially discriminating against black people in law-enforcement activity. ¶¶ 45–60.[7]

The Louisville Metro Government (of which LMPD is a part) "does not concede the accuracy of the United States' findings or the claims in its Complaint." Joint Motion for Entry of Consent Decree (DN 4-2) at 5. And the City hasn't yet made clear whether it disputes the Justice Department's factual findings, its legal interpretations, or both. This point is crucial. Understanding the scope and nature of past legal violations is crucial to the remedies a judge may lawfully impose: "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).

Rather than litigate whether the Police Department violated these laws, however, the parties have solicited public input, consulted with law-enforcement experts, negotiated a lengthy agreement, and presented it for the Court's approval. Joint Motion for Entry at 7–8. The parties assert that the agreement, memorialized

---

[6] The Americans with Disabilities Act prohibits state and local governments that receive federal funding from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12101–12213. "To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (citation omitted). The parties' filings don't make clear whether or when courts have previously found law-enforcement interactions with people suffering from behavioral-health issues to violate the ADA. This is an issue the parties should prepare to address at the hearing discussed below.

[7] The Justice Department clarified during the Court's initial status hearing (DN 18) that its racial-discrimination allegation rested on a disparate-impact rather than discriminatory-intent theory. *See generally Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) (recognizing disparate-impact claims in the employment context); *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) (recognizing disparate-impact claims in the context of the Fair Housing Act). Whether the disparate-impact theory properly applies to police conduct under the Safe Streets Act remains an open question, as neither the Supreme Court nor the Sixth Circuit has addressed it.

as a Consent Decree, would address the Justice Department's allegations, avoid protracted and costly litigation, and accelerate policy changes meant to ensure constitutionally compliant policing. The proposed Consent Decree (DN 4-1) spans 242 pages, contains several hundred training and policy requirements for the LMPD on topics such as de-escalation techniques,¶ 21, and trauma-informed community engagements, ¶ 403(d), calls for the appointment of an independent monitor to oversee reform, ¶ 608, pledges $1.475 million annually (¶ 619) subject to cap increases from the Court (¶ 623) to compensate the monitor, sets implementation deadlines, *e.g.*, ¶ 649, and envisions a 5-year timeline to completion, ¶ 652. According to the City, the Police Department has already begun many of the promised reforms.

    **2**. **PROPOSED CONSENT DECREE.** Although the underlying allegations may be extraordinary, the procedure outlined thus far is not. Governmental and nongovernmental parties privately resolve complicated and important disputes without public adjudication in millions of civil suits every year. Indeed, the law's longstanding preferences for liberty, efficiency, reconciliation, and finality all favor settlement over litigation. *See generally Gardner v. Grand Beach Co.*, 48 F.2d 491, 492 (6th Cir. 1931) ("The law favors the settlement of controversies out of court ….").

    What distinguishes settlements like this one is that it would begin, rather than end, the judicial role in this dispute. Consent decrees are private settlements, but only in part; they are also court orders, enforceable by contempt sanctions, which lend a judge's imprimatur and remedial discretion to the parties' contractual resolution.[8] Unlike a judgment following a trial or briefing, a consent decree is handed to—not handed down by—the judge. So although the parties here investigated and

---

[8] The jurisdictional foundation for judicial supervision over what would otherwise be an ordinary settlement agreement is far from ironclad. *See Lexington Ins. Group v. The Ambassador Group LLC*, 581 F. Supp. 3d 863, 866–69 (W.D. Ky. 2021) (raising concerns about the existence of a justiciable case or controversy under Article III of the federal Constitution when an agreed injunction appears to end any live dispute between litigants); *United States v. Michigan*, 68 F.4th 1021, 1023 n.2 (6th Cir. 2023) (noting "the perniciousness of consent decrees" insofar as they "limit the rights of third parties" and "risk improperly depriving future officials of their designated legislative and executive powers") (cleaned up and citations omitted). Given the apparent disagreement regarding the legal consequences of past actions under federal law, the risk of mootness and lack of adversity appear diminished (but not nonexistent) here. And the historical and doctrinal support for this peculiar brand of litigation is nontrivial. *See, e.g.*, Paul J. Mishkin, *Federal Courts As State Reformers*, 35 WASH. & LEE L. REV. 949, 959 n.42 (1978) (noting, among other concerns, the "special need for effective adversary process" in "institutional reform cases where the nature of the issues strains the capacities of the judicial process in the first place"); Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 YALE L.J. 1363, 1373–74 (1973) ("Concededly, the lack of an adversary presentation increases the risk that the Court's constitutional pronouncements will not be sufficiently considered."). The Court invites the parties to address the Court's jurisdiction during the upcoming hearing.

negotiated these allegations for years before filing this lawsuit, the Court's own involvement in the case spans a mere two weeks. And this consent decree, like others, requires the Court's extensive and ongoing involvement (through an agent of the Court dubbed a "Monitor") in the settlement's implementation. Given the scope of those proposed reforms, that "oversight" extends to operational supervision of substantially all of a roughly thousand-officer police force charged with the safety and security of a million-person metro area. If everything goes to plan, the parties believe the decree could be lifted and the case closed in approximately five years. *See* Consent Decree §§ XV.D–E at pp. 220–28. Yet other consent decrees (and the attendant judicial supervision) have remained in place far longer. *See,* for instance, extreme examples such as *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 917 F. Supp. 2d 668, 670 n.1, 686 (N.D. Ohio 2013) (terminating consent decree after 39 years of judicial supervision), *Doe v. Briley*, No. 3:73-cv-6971, 2016 WL 6125437, at *1, 6 (M.D. Tenn. Oct. 20, 2016) (vacating consent decree after 43 years).

The parties seek quick judicial approval, citing other courts' favorable disposition toward consent decrees, courts' frequent utilization of the device since at least the mid-20th century, the assistance of an expert Monitor, and the bounds placed up front on the case's cost and duration. *See* Joint Motion at 6–9. Other interested outfits oppose swift approval of the consent decree in its current formulation, however, citing concerns about public safety, political insulation, judicial aggrandizement, and the collectively bargained rights of police officers. *See* River City F.O.P. Lodge 614, Inc.'s Motion to Intervene (DN 17); The Heritage Foundation's Motion to Participate as Amicus Curiae (DN 11).

Binding caselaw favors judicial approval of consent decrees, but only those that are "fair, adequate, reasonable, and consistent with the public interest." *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 489 (6th Cir. 2010) (citations omitted); *Horne v. Flores*, 557 U.S. 443, 450 (2009) (consent decrees must be "limited to reasonable and necessary implementations of federal law"). That scrutiny is necessary to ensure an appropriate connection between past violations and future remedies consistent with courts' historical equitable authority to enjoin parties and order prospective relief. Although "breadth and flexibility are inherent in equitable remedies," *Swann*, 402 U.S. at 15, federal "equitable powers" do not include "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund*, 527 U.S. 308, 332 (1999). And judicial findings are particularly important for an agreement that precedes rather than follows litigation (raising concerns about a collusive agreement[9]),

---

[9] *See, e.g.*, *Ragsdale v. Turnock*, 941 F.2d 501, 517 (7th Cir. 1991) (Flaum, J., concurring in part and dissenting in part); *Horne v. Flores*, 557 U.S. 443, 449 (2009) (citing *Nw. Env't Advocs. v. EPA*, 340 F.3d 853, 855 (9th Cir. 2003) (Kleinfeld, J., dissenting)).

5

imposes federal legal requirements on state policymakers (raising concerns about federalism and political accountability[10]), and extends beyond the normal terms of the elected or appointed officials entering into it (purporting to bind their successors and limit the ability of voters and accountable officials to change course in the future[11]).

As the parties here surely understand, their proposed remedies—even if not entirely unprecedented—shift the Court's traditional focus on historical adjudication to future supervision. And that move—however well-intentioned or pragmatic—undoubtedly displaces responsibilities of elected city officials and the political process in favor of the rulings of an unelected federal judge and a protracted legal process. To be clear, none of this means the consent decree is necessarily unlawful or improper; indeed, much and perhaps all of the envisioned reforms could and may already be happening as a result of the parties' own agreement. *See Mayor Greenberg Announces Historic Consent Decree*, LOUISVILLEKY.GOV, https://louisvilleky.gov/news/mayor-greenberg-announces-historic-consent-decree-0 (last visited Dec. 28, 2024) (quoting Police Chief: LMPD is "already well on [its] way to implementing many of the requirements in this consent decree"). But candor and caselaw alike demand acknowledging the significant and unusual nature of executive-branch actors' request for judicial oversight of core law-enforcement functions outside the ordinary political process. Absent a serious inquiry and careful determination regarding the fairness, adequacy, reasonableness, and public-interestedness of the proposed decree based on the underlying violations, this Court lacks any basis for intervening in the affairs of a municipal agency. That agency and its leaders are already accountable to the people through elected representatives and their delegated officers. Their actions are subject to the political process, professional discipline, civil damages, and even criminal prosecution.[12] Before the Court departs

---

[10] So-called institutional-reform injunctions, the Supreme Court has explained, "raise sensitive federalism concerns"—namely, intrusion of federal executive and judicial authority into quintessentially state and local functions. *Horne*, 557 U.S. 448; *see also id.* at 471 ("When it is unclear whether an onerous obligation is the work of the Federal or State Government, accountability is diminished."). The Constitution's horizontal and vertical separation of powers prevent state governments (and their constituent municipal units) from circumventing concerns of political accountability simply by consenting to the reallocation of authority from the state to federal levels or from elected official to judge. *See New York v. United States*, 505 U.S. 144, 156–57 (1992).

[11] *See, e.g.*, Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies From Political Change*, 1987 U. CHI. LEGAL F. 295, 298–301 (arguing that consent decrees "can enable officials to transgress limits on their authority or sidestep political checks and balances").

[12] The Court understands the parties' position that it need not make factual findings regarding the conduct underlying the consent decree prior to approving it. Joint Motion at 5

from those settled legal arrangements, the law and public interest alike demand careful scrutiny of the parties' proposals.

3. **HEARING.** The Justice Department contends that judicial oversight and approval are necessary to ensure these proposals are accompanied by transparency and accountability. Joint Motion for Entry at 6. That may well be true regarding the implementation of future reforms. But with respect to the alleged legal violations that purportedly justify those reforms, the Court (and perhaps the public) remain in the dark. To ensure that any consent order conforms to the law of the Sixth Circuit, that any remedies flow from the alleged violations, and that the Court and public understand the legal basis for the Court's proposed involvement, the Court orders the parties to attend a hearing on the joint motion for entry of a consent decree.

To measure these proposed remedies against the legal standards governing the underlying alleged violations, the Court orders the parties to prepare to address, among other considerations the parties deem relevant:

- the extent to which the City disputes the factual allegations contained in the 2023 DOJ Report;
- the consequences (whether administrative, civil, or criminal) already faced by the officers described (but not named) in the 2023 DOJ Report;
- whether the City concedes any of the seven pattern-or-practice violations alleged in the Complaint;
- caselaw from the Sixth Circuit or elsewhere supporting the legal or remedial theories advanced by the Justice Department (for example, whether any Court has imposed ADA liability on a police department for lack of a behavioral-health response unit the consent decree contemplates);
- the extent to which the proposed remedies are compelled by federal law or merely conducive to police practices less likely (in the parties' views) to violate federal law;
- whether and how the consent decree or underlying settlement could be modified by a future Mayor, Metro Council, or Attorney General whose views on police practices or their legal implications might differ.

The Court encourages the parties to present limited documentary evidence or witness testimony to help the Court understand their positions on these questions.

4. **TIMING.** Notwithstanding the deliberate nature of the investigations and negotiations thus far, these incredibly serious accusations and proposed

---

(citing *Cotton v. Hinton*, 559 F.2d 1236, 1330 (5th Cir. 1977)). In the Court's view, however, understanding the extent of any agreement on the underlying facts and the LMPD's patterns and practices appears at least relevant to the Court's essential determination that the consent decree is fair, adequate, reasonable, and in the public interest.

7

interventions demand a prompt response from the Justice Department, City, and Court. Mindful of that urgency, the Court **denies** the parties' request to extend the deadline—until January 20, 2025—to answer the Complaint's allegations. *See* DN 14. Understanding what (if any) facts and legal positions are agreed may go a long way toward establishing the basis (or lack thereof) for this consent decree. The Answer remains due on **January 6, 2025**.

**5. AMICI.** The Heritage Foundation has asked to file an amicus brief and set a briefing schedule. *See* DN 11. Balancing the need for a speedy and orderly litigation schedule against the undoubted public interest in this case, the Court **grants the motion in part**. The Heritage Foundation may file its amicus brief, but the Court declines to set a further briefing schedule, apart from this: any other potential amici may file a statement of interest and proposed brief no later than January 10.

**6. INTERVENTION.** Yesterday River City F.O.P. Lodge 614, Inc. moved to intervene. DN 17. The Court orders the Justice Department and City, to the extent they haven't already done so, to confer with the FOP regarding the impact (if any) of its proposed intervention on the steps and schedule outlined above. Then, no later than **January 6, 2025,** the Justice Department and City must file a response to the motion indicating whether and why (or why not) they oppose intervention. If necessary, the FOP may file a short reply brief no later than **January 10, 2025.**