# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | |
| v. | | No. 3:24-cv-722-BJB |
| LOUISVILLE JEFFERSON COUNTY METRO GOVERNMENT, | | |
| Defendant. | | |

**AMICUS BRIEF ON BEHALF OF DR. MICHAEL HOGAN, DR. DANNA MAUCH, DR. ANTHONY ZIPPLE, CHIEF CHRIS BURBANK, MARTHA KNISLEY, CENTER FOR POLICING EQUITY, NATIONAL ALLIANCE FOR MENTAL ILLNESS, NAMI KENTUCKY, NAMI LOUISVILLE, MENTAL HEALTH AMERICA, MENTAL HEALTH AMERICA OF KENTUCKY, KENTUCKY MENTAL HEALTH COALITION, JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW, CENTER FOR PUBLIC REPRESENTATION, WELLSPRING, BRIDGEHAVEN, ST. JOHN CENTER, LOUISVILLE COALITION FOR THE HOMELESS, AND KENTUCKY PROTECTION AND ADVOCACY IN SUPPORT OF THE JOINT MOTION FOR ENTRY OF CONSENT DECREE**

BAKER & HOSTETLER, LLP

Jennifer L. Brumfield
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: (513) 878.4428
Email: jbrumfield@bakerlaw.com

Elizabeth B. McCallum
Lindsey N. Simmons (*pro hac vice pending*)
Orga Cadet
Daniel P. Wicklund
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 861.1500
Email: emccallum@bakerlaw.com
        lsimmons@bakerlaw.com

THE JUDGE DAVID L. BAZELON
CENTER FOR MENTAL HEALTH LAW

Megan E. Schuller
Ira Burnim
1090 Vermont Avenue, NW, Suite 220
Washington, D.C. 20005
Telephone: (202) 467.5730
Email: megans@bazelon.org
        irab@bazelon.org

CENTER FOR PUBLIC
REPRESENTATION

Steven J. Schwartz
Mona Igram
5 Ferry Street, #314
Easthampton, MA 01027
Telephone: (413) 586-6024
Email: sschwartz@cpr-ma.org

ocadet@bakerlaw.com                     migram@cpr-ma.org
dwicklund@bakerlaw.com


*Attorneys for Dr. Michael Hogan, Dr. Danna Mauch, Dr. Anthony Zipple, Chief Chris Burbank, Martha Knisley, Center for Policy Equity, National Alliance for Mental Illness (NAMI), NAMI Kentucky, NAMI Louisville, Mental Health America, Mental Health America of Kentucky, Kentucky Mental Health Coalition, Judge David L. Bazelon Center for Mental Health Law, Center for Public Representation, Wellspring, Bridgehaven, St. John Center, Louisville Coalition for the Homeless, Kentucky Protection and Advocacy*

## CONSENT OF THE PARTIES TO THE FILING
## FEDERAL RULE OF APPELLATE PROCEDURE 29(A)(2)

This brief is filed with the consent of Plaintiff United States of America. Defendant Louisville Jefferson County Metro Government has no objection to the filing of the brief.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for *amici curiae* certifies that no *amici* have a parent corporation and that no publicly held corporation owns 10% or more of any *amici*'s respective stock.

## STATEMENT PURSUANT TO FEDERAL RULE
## OF APPELLATE PROCEDURE 29(A)(4)(E)

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

Dated: January 10, 2025                    By: /s/ *Jennifer L. Brumfield*

Jennifer L. Brumfield
BAKER & HOSTETLER, LLP
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: (513) 878.4428
Email: jbrumfield@bakerlaw.com

iii

# TABLE OF CONTENTS

CONSENT OF THE PARTIES TO THE FILING FRAP 29(a)(2) ................................. iii

CORPORATE DISCLOSURE STATEMENT ............................................................. iii

STATEMENT PURSUANT TO FRAP 29(a)(4)(E) ..................................................... iii

INTEREST OF *AMICI CURIAE* .................................................................................1

SUMMARY OF ARGUMENT .....................................................................................1

ARGUMENT .................................................................................................................5

I. The DOJ'S Factual Findings Support Entry of the Consent Decree. ......................5

     A.     DOJ's Investigation Found Reasonable Cause To Believe Louisville Systematically Violated Federal Law. .....................................................5

     B.     Other Courts Have Relied Upon DOJ's Findings to Approve Similar Consent Decrees. .......................................................................................9

           i.     *The Sixth Circuit and Other Local District Courts Have Adopted DOJ's Louisville Metro Findings.* ...................................9

           ii.    *Other Federal Courts Considering Similar Municipal Consent Decrees Have Relied Upon DOJ's Findings in Approving Them as Fair, Adequate, and Reasonable.* ....................................11

II. Based on DOJ's Findings, Louisville Metro Violated Federal Law Requiring a Health Care Response to a Behavior Health Crisis, Further Supporting Entry of the Consent Decree. .............................................................................................12

     A.     The ADA Requires a Health Care Response to a Behavioral Health Crisis. .........13

III. This Court Should Approve the Consent Decree ..................................................20

     A.     Governing Precedent ...............................................................................21

     B.     The Decree Was Reached In An Arms-Length Process Mandated by Federal Law .............................................................................................22

     C.     The Decree Is Amply Supported by DOJ's Findings and ADA Law ....................24

     D.     The Decree Imposes the "Reasonable Modification" Remedy Contemplated by the ADA. ..................................................................................................25

     E.     The Decree Meets Sixth Circuit Standards. ...........................................................28

F.     The Decree Is A Reasonable and Necessary Implementation of Federal Law......28

G.     The Decree is Fair, Adequate, Reasonable, and In the Public Interest.................29

CONCLUSION...................................................................................................................30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ability Center, Toledo v. City of Sandusky*,
    385 F.3d 901 (6th Cir. 2004) ........................................................................26

*Allah v. Goord*,
    405 F.Supp.2d 265 (S.D.N.Y. 2005)............................................................19

*AT&T Broadband v. Tech Commons Inc.*,
    381 F.3d 1309 (11th Cir. 2004) ...................................................................22

*Benalcazar v. Genoa Twp., Ohio*,
    1 F.4th 421 (6th Cir. 2021) ..........................................................................21

*Bennett-Nelson v. Louisiana Board of Regents*,
    431 F.3d 448 (5th Cir. 2005) .......................................................................26

*Bircoll v. Miami-Dade County*,
    480 F.3d 1072 (11th Cir. 2007) ...................................................................16

*Bragdon v. Abbott*,
    524 U.S. 624 (1998)....................................................................................17

*Bread for the City v. District of Columbia*,
    No. 223-1945-AOR (D.D.C. Sept. 10, 2014) .........................................17, 18

*Brooklyn Center for Indep. Of Disabled v. Bloomberg*,
    980 F.Supp.2d 588 (S.D.N.Y. 2013)............................................................15

*Childress v. Fox Associates, LLC*,
    932 F.3d 1165 (8th Cir. 2019) ..................................................................3, 16

*Citizens for a Better Environment v. Gorsuch*,
    718 F.2d 1117 (D.C.Cir. 1983) ...................................................................24

*Communities Actively Living Independent & Free v. City of Los Angeles*,
    2011 WL 4595993 (C.D.Cal. Feb. 10, 2011)............................................15, 20

*Disability Rights Oregon, et al. v. Washington County, et al.*,
    2024 WL 4046017 (D.Or. Aug. 30, 2024)................................................17, 18

*Disabled in Action v. Board of Elections in New York*,
    752 F.3d 189 (2d Cir. 2014).........................................................................19

*Douglas v. Muzzin,*
  2022 U.S. App. Lexis 21529 (6th Cir. Aug. 3, 2022)...........................................26

*Duvall v. County of Kitsap,*
  260 F.3d 1124 (9th Cir. 2001) ...........................................................................26

*Est. of LeRoux v. Montgomery County, Maryland,*
  2023 WL 2571518 (D.Md. Mar. 20, 2023)..........................................................26

*Firefighters v. City of Cleveland,*
  498 U.S. 501 (1986)...........................................................................................24

*Frew ex rel. Frew v. Hawkins,*
  540 U.S. 431 (2004)...........................................................................................29

*Gohier v. Enright,*
  186 F.3d 1216 (10th Cir. 1999) .........................................................................16

*Gray v. Cummings,*
  917 F.3d 1 (1st Cir. 2019)...................................................................................16

*Greene v. City of New York,*
  2024 WL 1308434 (S.D.N.Y. Mar. 26, 2024) .....................................................17

*Guess v. City of Paducah,*
  687 F.Supp.3d 799 (W.D.Ky. 2023)....................................................................29

*Haberle v. Troxell,*
  885 F.3d 171 (3d Cir. 2018)................................................................................16

*Hainze v. Richards,*
  207 F.3d 795 (5th Cir. 2008) .............................................................................16

*Henrietta D. v. Bloomberg,*
  331 F.3d 261 (2d Cir. 2003)...............................................................................19

*Horne v. Flores,*
  557 U.S. 443 (2009)................................................................................4, 20, 21, 28

*King v. Hendricks County Commissioners,*
  954 F.3d 981 (7th Cir. 2020) .............................................................................16

*Lane v. Tennessee,*
  315 F.3d 680 (6th Cir. 2003) .............................................................................13

*Lay v. Louisville Metro Government,*
    2024 WL 3378951 (W.D.Ky. July 9, 2024) ...............................................10

*Lexington Insurance Co. v. Ambassador Group LLC,*
    581 F.Supp.3d 863 (W.D.Ky. 2021) ..............................................21, 25

*Lovell v. Chandler,*
    303 F.3d 1039 (9th Cir. 2002) ......................................................19

*Mote v. City of Chelsea,*
    252 F.Supp.3d 642 (E.D.Mich. 2017) .............................................27

*Olmstead v. L.C.,*
    527 U.S. 521 (1999) ...............................................................4, 17

*Pelichet v. Gordon,*
    2019 WL 4619742 (E.D.Mich. Mar. 6, 2020) ...................................27

*Pennsylvania Department of Corrections v. Yeskey,*
    524 U.S. 206 (1998) ..................................................................15

*Pierre v. District of Columbia,*
    128 F.Supp.3d 250 (D.D.C. 2015) ................................................26

*Popovich v. Cuyahoga County Court of Common Pleas,*
    276 F.3d 808 (6th Cir. 2002) .......................................................13

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ..................................................................22

*Roberts v. City of Omaha,*
    723 F.3d 966 (8th Cir. 2012) .......................................................16

*Robertson v. Las Animas County Sheriff Dep't,*
    500 F.3d 1185 (10th Cir. 2007) ...................................................26

*Rodde v. Bonta,*
    357 F.3d 988 (9th Cir. 2004) .......................................................20

*Seremeth v. Board of Cnty Commissioners, Frederick County,*
    673 F.3d 333 (4th Cir. 2012) .......................................................16

*Sheehan v. City and County of San Francisco,*
    743 F.3d 1211 (9th Cir. 2014) .....................................................16

*Shotz v. Cates,*

256 F.3d 1077 (11th Cir. 2001) ..................................................................19

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)..................................................................................17

*S.R. v. Kenton Cnty. Sheriff Office*,
2015 WL 9462973 (E.D.Ky Dec. 28, 2015) ...........................................28

*Stucker v. Louisville Metro Government*,
2024 WL 2135407 (6th Cir, May 13, 2024) ............................................10

*Tennessee v. Lane*,
541 U.S. 509 (2004)..................................................................................13

*United States v. Akzo Coatings of America*,
949 F.2d 1409 (6th Cir. 1991) .................................................................21

*United States v. Baltimore Police Department*,
249 F.Supp.3d 816 (D.Md. 2017) ...........................................................11

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990)......................................................................21

*United States v. Lexington-Fayette Urban County Government*,
591 F.3d 484 (6th Cir. 2010) .........................................................20, 21, 29

*United States v. New Orleans*,
35 F.Supp.3d 788 (E.D.La. 2013)......................................................11, 12

*Van Velzor v. City of Burleson*,
43 F.Supp.3d 746 (N.D.Tex. 2014) .....................................................15, 19

*Vanguards of Cleveland v. City of Cleveland*,
753 F.2d 479 (6th Cir. 1985) ...................................................................24

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018) .................................................................28

*Waksul v. Washtenaw County Cmty. Mental Health*,
979 F.3d 426 (6th Cir. 2020) ...................................................................27

*Weaver v. Louisville County, Jefferson Government*,
2024 WL 2819556 (W.D. Ky. June 3, 2020)...........................................10

*Williams v. Vukovich*,
720 F.2d 909 (6th Cir. 1982) .....................................................4, 24, 25, 29

*Wygant v. Jackson Bd. of Education*,
   476 U.S. 267 (1986)......................................................................................................25

**Statutes**

29 U.S.C. § 794.................................................................................................2, 22, 27

34 U.S.C. § 12601................................................................................................................5

42 U.S.C. § 2000(d).......................................................................................................22, 27

42 U.S.C. § 12101(a)(4)........................................................................................................14

42 U.S.C. § 12101(a)(5)..................................................................................................3, 4, 13

42 U.S.C. § 12101(a)(7)....................................................................................................3, 16

42 U.S.C. § 12101(b)(1).................................................................................................13, 29

42 U.S.C. § 12101(2)...........................................................................................................14

42 U.S.C. § 12102................................................................................................................14

42 U.S.C. § 12102(4)(a)........................................................................................................14

42 U.S.C. § 12102(4)(c)........................................................................................................14

42 U.S.C. § 12131(1)...........................................................................................................24

42 U.S.C. § 12132 ...............................................................................................................2, 13

42 U.S.C. § 12133.........................................................................................................22, 27

42 U.S.C. § 12212...............................................................................................................22

**Regulations**

28 C.F.R. § 35.101..............................................................................................................14

28 C.F.R. § 35.102..............................................................................................................13

28 C.F.R. § 35.105(b)..........................................................................................................14

28 C.F.R. § 35.108(b)..........................................................................................................14

28 C.F.R. § 35.130 .......................................................................................................15

28 C.F.R. § 35.130(b)(1)...................................................................................3, 16, 19

28 C.F.R. § 35.130(b)(3).............................................................................................16

28 C.F.R. § 35.130(b)(7)..............................................................................3, 4, 17, 26

28 C.F.R. § 35.172 .....................................................................................................22

28 C.F.R. § 35.173 .....................................................................................................23

28 C.F.R. § 41.51(b)(1)(i)-(iii).....................................................................................16

45 C.F.R. § 92.102(c)..................................................................................................14

**Government Reports**

U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIVISION, INVESTIGATION OF THE CITY OF PHOENIX AND
    THE PHOENIX POLICE DEPARTMENT (2024) ...........................................................1

U.S. DEP'T OF JUST., CIVIL RIGHTS DIV., INVESTIGATION OF THE LOUISVILLE METRO POLICE
    DEPARTMENT AND LOUISVILLE METRO GOVERNMENT (2023) ................................5, 6, 7, 8

U.S. DEP'T OF JUST. AND HEALTH AND HUMAN SERVS., GUIDANCE FOR EMERGENCY RESPONSES
    TO PEOPLE WITH BEHAVIORAL HEALTH OR OTHER DISABILITIES (2023)....................8, 9, 17

**Other Authorities**

AYOBAMI LANIYONU AND PHILLIP ATIBA GOFF, *Measuring Disparities in Police Use of Force
    and Injury Among Persons with Serious Mental Illness*,
    BMC PSYCHIATRY, Oct. 12, 2021 ..........................................................................8

EMMA FRANKHAM, *Mental Illness Affects Police Fatal Shootings*, CONTEXTS, Spring 2018........8

JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW, WHEN THERE'S A CRISIS,
    CALL A PEER (2024).............................................................................................9

MENTAL ILLNESS POLICY ORG, *Survey: Police Needlessly Overburdened by Mentally Ill
    Abandoned by Mental Health System* (2011)..................................................27

SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION,
    *Crisis Services: Meeting Needs, Saving Lives* (2020) ..................................14

SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION,
    NATIONAL GUIDELINES FOR BEHAVIORAL HEALTH CRISIS CARE: BEST PRACTICE
    TOOLKIT (2020) ............................................................................................9

SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION,
    *What is Mental Health?* ............................................................................15

## INTEREST OF *AMICI CURIAE*

*Amici* are all national disability, mental health, or law enforcement experts, national disability family and professional organizations, and local entities that work every day with people with behavioral health disabilities in Louisville, Kentucky, and throughout the nation. They are deeply engaged in the intersection of the needs and rights of people with behavioral health disabilities, governmental services to support people with disabilities, and police interactions with people with disabilities in response to behavioral health emergencies in Louisville, Kentucky, and throughout the nation. They also include organizations with deep expertise on the Americans with Disabilities Act (ADA). *Amici* played a significant role in the ADA's passage by former President George H.W. Bush. *Amici* believe their decades-long experience and expertise can help inform the Court's consideration of this important case and its determination of the appropriateness and necessity for the behavioral health remedies set forth in Section VIII of the Consent Decree.

## SUMMARY OF ARGUMENT

As the Complaint alleges, a default policy of dispatching police officers to address behavioral health emergencies often ends up harming, rather than helping, people in crisis, resulting in them not getting access to needed treatment and even in unnecessary incarceration, hospitalization, violence, and death.[1] Depriving people with behavioral health disabilities of the same safe and effective emergency response provided to all other citizens is not only poor public

---

[1] *See* DEP'T OF JUSTICE, CIVIL RIGHTS DIVISION, INVESTIGATION OF THE CITY OF PHOENIX AND THE PHOENIX POLICE DEPARTMENT, 86-100 (2024) [hereinafter DOJ Phoenix Report] (detailing harms flowing from a default police response to 911 calls involving behavioral health emergencies, including among other things handcuffing and ultimately arresting a 15 year old in response to a call from her mother stating that the daughter was upset and would not get into her mother's car, despite her mother's statements that she had mental health issues).

policy, it is a violation of the federal civil rights law Congress enacted in the Americans with Disabilities Act ("ADA").  Based upon the discriminatory practices of the Louisville Jefferson County Metro Government's (hereinafter "Louisville Metro") emergency response system described in Section 7 of the United States' 2023 Letter of Findings Report (hereafter "Findings Letter"), the provisions of Section VIII of the proposed Consent Decree are necessary and properly tailored to redress the violations of the ADA, are consistent with accepted professional standards for responding to behavioral health emergencies, and have been successfully employed in other jurisdictions.  Therefore, the Court should approve those provisions, and the entire Consent Decree, as fair, adequate, reasonable, and in the public interest.

*Amici* agree with Plaintiff that Louisville Metro's practice of sending police to respond to 911 calls for behavioral health emergencies, while sending medical personnel to other medical emergencies, is discrimination against Louisville residents with behavioral health disabilities.[2] Both behavioral health emergencies and physical health emergencies are, in fact, *health* emergencies. Because a behavioral health emergency is, in the vast majority of cases, a marker for and evidence of a behavioral health disability, providing a police response rather than a health-centered response denies individuals with behavioral health disabilities equal opportunity to benefit from Louisville Metro's emergency response system.

Title II of the ADA prohibits Louisville Metro from excluding people with disabilities from participation in or denying them the benefits of public services, programs, or activities, or otherwise subjecting them to discrimination.[3]  This means that Louisville Metro must ensure that its services are as "effective in affording equal opportunity to obtain the same result" to people

---

[2] *See* Complaint ¶ 68.
[3] *See* 42 U.S.C. § 12132; 29 U.S.C. § 794.

with mental disabilities "as that provided to others."[4]  It also means that Louisville Metro must make reasonable modifications in policies, practices, or procedures when "necessary to avoid discrimination on the basis of disability," unless it "would fundamentally alter the nature of the service, program, or activity."[5]

Discrimination under the ADA takes many forms.  In passing the ADA, Congress recognized that "individuals with disabilities continually encounter various forms of discrimination, including "outright intentional exclusion," but also "failure to make modifications to existing facilities and practices."[6]  Here, the Department of Justice (DOJ) after a lengthy investigation found reasonable cause to believe that Louisville Metro's practice excludes people with behavioral health disabilities from an equal opportunity to benefit from Louisville Metro's emergency response system, by sending police instead of a health response to behavioral health emergencies when everyone else gets a health response to a health emergency.  DOJ further found that Louisville Metro failed to reasonably modify its emergency practices to avoid discriminating against people with behavioral health disabilities and ensure they have an equal opportunity to benefit.  Such conduct is disability discrimination prohibited by the ADA and the Court has a duty to enforce the statutes as Congress has written them.

But importantly, there is no requirement that the Court make a legal determination, based upon evidentiary findings, that Louisville Metro has violated federal law in order to approve the proposed Consent Decree filed jointly by the parties.  The Court is not being asked to determine

---

[4] 28 C.F.R. § 35.130(b)(1). *See also* 42 U.S.C. § 12101(a)(7) ("[T]he Nation's proper goal[] regarding individuals with disabilities [is] to assure equality of opportunity."); *Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1171 (8th Cir. 2019) ("A person with a disability receives meaningful access if she receives an 'equal opportunity to gain the same benefit' as a person without her disability.") (citation omitted).

[5] 28 C.F.R. § 35.130(b)(7).

[6] 42 U.S.C. § 12101(a)(5).

3

its own remedy or decide that the Decree sets forth the best or only remedies for the alleged federal law violations. Rather, the Court is being asked to decide whether to approve an agreed order that the parties themselves negotiated with adequate representation in order to redress alleged federal law violations. The Consent Decree: (a) was negotiated at arm's length, (b) provides sufficient relief (with due consideration to the fact that either party might lose at trial), and (c) where, as here, the defendants are state or local governments, is designed to prevent or remedy violations of federal law.[7] The United States' detailed Findings Letter and the Complaint provide a reasonable basis for believing the Consent Decree protects rights secured by federal law, without the cost, delay, and uncertainty of a protracted trial and potential appeals – all of which would clearly not serve the public interest. The portion of the Consent Decree focused on the response to behavioral health emergencies appropriately requires Louisville Metro to make reasonable modifications to its emergency response system in order to avoid discrimination on the basis of disability, as it is obligated to do under federal law.[8] Moreover, there is a significant public interest in cases being resolved by settlement.[9]

---

[7] *See Horne v. Flores*, 557 U.S. 443, 450 (2009) (consent decrees must be "limited to reasonable and necessary implementations of federal law").

[8] 28 C.F.R. § 35.130(b)(7). *See also* 42 U.S.C. § 12101(a)(5) (citing failure to reasonably modify practices as a form of disability discrimination); *Olmstead v. L.C.*, 527 U.S. 521, 604 (1999) (explaining the reasonable modification requirement of Title II of the ADA).

[9] *See, e.g., Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1982) ("Voluntary compliance will frequently contribute to the ultimate achievement of the public objectives. Consent decrees minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies adjudicated guilt") (emphasis added).

4

## ARGUMENT

## I. THE DOJ'S FACTUAL FINDINGS SUPPORT ENTRY OF THE CONSENT DECREE.

A. <u>DOJ's Investigation Found Reasonable Cause To Believe Louisville Systematically Violated Federal Law</u>.

On April 26, 2021, the U.S. Department of Justice (DOJ) commenced its investigation into whether Louisville Metro and its Louisville Metro Police Department (LMPD) engage in systemic conduct that deprives people of their rights under the Constitution and federal law, pursuant to its authority under the Violent Crime Control and Law Enforcement Act of 1994,[10] and the ADA.[11]

On March 8, 2023, after a lengthy investigation, DOJ issued a Findings Letter, determining it had reasonable cause to believe that Louisville Metro and LMPD engage in a pattern or practice of constitutional and federal law violations. DOJ's Finding Letter concluded that Louisville Metro and LMPD discriminate against people with behavioral health disabilities when responding to crisis calls through their emergency response system, in violation of the ADA.[12]

During the three-year investigation, and with Louisville Metro's and LMPD's cooperation and considerable assistance, DOJ analyzed documents from 911 calls, 911 audio recordings, body-worn camera footage of police encounters with people with behavioral health disabilities, and LMPD's policies and training practices related to people with behavioral health disabilities.  In doing so, DOJ worked with experts in the area of behavioral health services, crisis response, and dispatching.[13]  "This findings report is based on Louisville Metro's and

---

[10] 34 U.S.C. § 12601 (formerly 42 U.S.C. §§ 14141-14142).
[11] U.S. Dep't of Just., Civil Rights Div., Investigation of the Louisville Metro Police Department and Louisville Metro Government 9 (2023) [hereinafter Findings Letter].
[12] *Id*. at 1.
[13] *Id*. at 60.

LMPD's own data, many thousands of documents, and thousands of hours of body-worn camera footage.  Importantly, DOJ's findings are also based on conversations with hundreds of LMPD officers, Louisville Metro employees, and community members."[14]

DOJ's Findings Letter documented that Louisville Metro has an ineffective, unnecessary and harmful emergency response system for addressing crisis calls from people with behavioral health disabilities.[15]  Specifically, DOJ found reasonable cause to believe the following: MetroSafe is Louisville Metro's 911 communications center and the agency that dispatches emergency responders to both medical and behavioral health emergencies.[16]  For health emergencies other than those involving behavioral health crises, including all medical emergencies, MetroSafe dispatchers send trained medical EMS responders.[17]  In contrast, MetroSafe regularly dispatches police, and only police, to behavioral health emergencies.[18] Even though MetroSafe call takers spend significant amounts of time responding to behavioral health emergency calls,[19] DOJ found that they receive no specific training for handling such calls.[20]  MetroSafe's policies and procedures do not direct call-takers to inquire about mental health issues, and therefore fail to obtain information necessary to adequately respond to behavioral health emergency calls.[21]  Failure to implement procedures to adequately classify

---

[14] *Id*. at 2.
[15] *Id*. at 60.
[16] *Id*. at 65.
[17] *Id*.
[18] *Id*. at 59.
[19] *Id*. at 65 (indicating that "MetroSafe staff spend more than a quarter of their time on behavioral health calls.").
[20] *Id*.
[21] *Id*. at 66.

behavioral health calls impact both the type of response and the officer's approach upon arrival, often resulting in ineffective responses, interventions that escalate the crisis, and harm.[22]

As a result of MetroSafe's dispatch policies and practices, "LMPD officers are the primary and generally the sole responders to situations involving behavioral health issues in Louisville, even in instances where safety does not require a law enforcement presence."[23] Louisville Metro's practice of sending police officers unnecessarily to thousands of behavioral health emergency calls which could be "safely and more effectively resolved through a response by behavioral health professionals,"[24] is "ineffective and harmful."[25]  LMPD officers are routinely dispatched as responders to behavioral health crisis calls even where there is no public safety issue.[26]  Officers indicated that "they frequently respond to calls for which they do not have the tools to resolve, and that do not require an arrest or transportation."[27]  DOJ found that officers often "fail to engage in well-known tactics to successfully de-escalate people in crisis."[28] Additionally, in review of LMPD body camera footage, DOJ determined that "LMPD officers frequently escalate situations rather than de-escalate them."[29]  DOJ thus concluded that Louisville Metro and LMPD "have subjected many individuals to an unnecessary or overly aggressive LMPD response during a behavioral health episode, violating the ADA."[30]

DOJ also found that Louisville Metro's emergency response system subjects people with behavioral health disabilities to harm and unnecessary arrest.  In nearly one-quarter of the use of

---

[22] *Id.*
[23] *Id.* at 59.
[24] *Id.*
[25] *Id.* at 60.
[26] *Id.* at 59.
[27] *Id.* at 61.
[28] *Id.* at 60.
[29] *Id.* at 64.
[30] *Id.* at 60.

force reports DOJ reviewed, the involved individuals exhibited signs of a behavioral health crisis or serious mental illness. Many of these incidents included at least one unreasonable use of force.[31]  DOJ found further that "unnecessary and inappropriate LMPD involvement can also lead to avoidable arrests and incarceration."[32]

Harms resulting from the dispatch of police responders to people with behavioral health disabilities in Louisville are consistent with harms seen nationally.  National research studies indicate that individuals with disabilities may account for 30% to 50% of the incidents of police use of force.[33]  One study found that of the over 7,500 people shot and killed by law enforcement officers in the United States since 2015, one in five were people with mental illness.[34] Individuals with disabilities may account for 30% to 50% of the incidents of police use of force.[35]  Roughly 40% of police encounters that result in the death of a person with mental illness begin with a 911 call from concerned friends or family seeking help.[36]  Even when a 911 call does not end in a shooting, dispatching police officers to respond to 911 calls involving people with mental health disabilities risks serious harm with the individual being unnecessarily arrested and incarcerated.[37]

---

[31] *Id.*

[32] *Id.* at 63.

[33] U.S. DEP'T OF JUST. AND HEALTH AND HUMAN SERVS., GUIDANCE FOR EMERGENCY RESPONSES TO PEOPLE WITH BEHAVIORAL HEALTH OR OTHER DISABILITIES 2 (2023) [hereinafter DOJ and HHS Guidance].

[34] *Id.* (between 20 and 25% of all fatal police encounters involve a person with a serious mental illness); Ayobami Laniyonu and Phillip Atiba Goff, *Measuring disparities in police use of force and injury among persons with serious mental illness*, BMC PSYCHIATRY, Oct. 12, 2021, at 1, 6 (explaining a person suffering from a serious mental illness is about twelve times more likely to experience use of force and about eleven times more likely to experience injury from police encounters than persons without serious mental illness).

[35] DOJ and HHS Guidance, *supra* note 33, at 3-4.

[36] Emma Frankham, *Mental Illness Affects Police Fatal Shootings*, CONTEXTS, Spring 2018, 70, at 71.

[37] Compl. ¶ 71.

National and local experts agree that a police response is not an effective way to address most behavioral health emergencies and too often harms people in crisis, unlike emergency responses to physical health emergencies.  Federal agencies, including the Substance Abuse and Mental Health Services Administration (SAMHSA), have recognized that dispatching police to mental health crisis calls can result in unnecessary and unreasonable use of force, including lethal force.[38]  Law enforcement and behavioral health professionals recommend, instead, a response from trained mental health personnel, just as trained health personnel are provided to all citizens calling 911 for other health emergencies.[39]  The U.S. Department of Health and Human Services (HHS), in collaboration with DOJ, has detailed national efforts to divert people with behavioral health disabilities from unnecessary arrest and incarceration, including the use of alternatives to police response to emergencies.[40]  These efforts, and the successful municipal crisis response programs, are necessary to comply with the ADA and ensure equal treatment for people with behavioral health disabilities.

B.  <u>Other Courts Have Relied Upon DOJ's Findings to Approve Similar Consent Decrees</u>.

 i.  *The Sixth Circuit and Other Local District Courts Have Adopted DOJ's Louisville Metro Findings.*

The Sixth Circuit Court of Appeals as well as several district courts in Kentucky have cited with approval DOJ's Findings Letters, and accepted their factual findings as evidence in support of claims of civil rights violations committed by LMPD officers and Louisville Metro.

---

[38] SAMHSA, NATIONAL GUIDELINES FOR BEHAVIORAL HEALTH CRISIS CARE: BEST PRACTICE TOOLKIT 68 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf ("Estimates suggest that 25-50% of fatal encounters with law enforcement involve a person experiencing mental illness.").

[39] *See* JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW, WHEN THERE'S A CRISIS, CALL A PEER 8-10 (2024), https://www.bazelon.org/wp-content/uploads/2024/01/Bazelon-When-Theres-a-Crisis-Call-A-Peer-full-01-03-24.pdf.

[40] *See* DOJ and HHS Guidance, *supra* note 33, at 10-14 (2023).

For example, in *Stucker v. Louisville Metro Government*, the Sixth Circuit took judicial notice of the 2023 DOJ Findings Letter offered by the plaintiffs, finding that "its sources 'cannot reasonably be questioned.'"[41]  In vacating the lower court's dismissal of the Plaintiff's Monell claim, the court specifically remanded the case "to consider the evidence, including the 2023 DOJ report."[42]

Two local district courts similarly held that the 2023 DOJ Findings Letter was admissible and relevant.  In *Weaver v. Louisville County Jefferson Government*, the court held that the plaintiff's claim that the defendants acted consistently with illegal policies and practices was supported by the DOJ Findings Letter.[43]  And in *Lang v. Louisville Metro Government*, the district court concluded that the 2023 DOJ Findings Letter was relevant and admissible, noting that it was a matter of public record, and Lang's use of the report to show that Louisville had engaged in unlawful conduct – and that LMPD was on notice of their unconstitutional behavior – satisfied the evidentiary threshold required.[44]

The acceptance of the DOJ Findings Letter by local courts at both the motion to dismiss and summary judgment stage demonstrates the relevance, reliability, and widespread acceptance of the report and underlying evidence contained within it.  Consistent with the holdings of the Court of Appeals and other sister district courts, this Court can and should rely upon the DOJ Findings Letter as persuasive evidence of systemic violations of federal law.

---

[41] *Stucker v. Louisville Metro Gov't*, 2024 WL 2135407, at *12 (6th Cir. May 13, 2024).
[42] *Id.* at *13.
[43] *Weaver v. Louisville Cnty. Jefferson Gov't*, 2024 WL 2819556, at *4 (W.D. Ky. June 3, 2024).
[44] *Lang v. Louisville Metro Gov't*, 2024 WL 3378951, at *5 (W.D. Ky. July 9, 2024).

*ii. Other Federal Courts Considering Similar Municipal Consent Decrees Have Relied Upon DOJ's Findings in Approving Them as Fair, Adequate, and Reasonable.*

DOJ findings letters, submitted after thorough investigations of claims of constitutional and federal violations of law, form a reasonable basis for courts to approve a settlement as fair, reasonable, and in the public interest. DOJ's pre-filing investigation provides information similar to what might have been obtained in post-filing discovery. The extensive and comprehensive investigation provided sufficient information for the parties, through a lengthy and intensive negotiation process, to develop an agreed-upon remedy to the federal law violations. In circumstances very similar to the instant case, the district court in *United States v. Baltimore Police Department* relied heavily on DOJ's findings to support its approval of a settlement agreement between DOJ and municipal defendants involving comprehensive reforms to the City's police practices.[45] In that case, the agreement was signed by the parties based upon the investigation findings developed in lieu of any formal discovery, and included detailed remedial actions that would be taken by the City, albeit without any admission of wrongdoing or liability on the part of the governmental defendants. It was approved by the court based, in significant part, on the evidence of federal law violations set forth in the DOJ's findings letter in that case.[46] Similarly, in *United States v. New Orleans*, the DOJ investigation into constitutional and federal violations of the Parish of New Orleans and the New Orleans Police Department

---

[45] *United States v. Balt. Police Dep't*, 249 F.Supp.3d 816, 818 (D. Md. 2017).

[46] *Id.* ("No evidence has been presented to the Court, and no discovery has occurred as part of the instant litigation. Nor have Defendants admitted wrongdoing or liability. However, the strength of Plaintiff's case can be inferred from Defendants' evident cooperation in Plaintiff's investigation of Baltimore police practices and their ready embrace of a negotiated resolution of this case based upon that investigation, a resolution that is highly intrusive on the day-to-day operations of the BPD and that requires Defendants' commitment to spend millions of dollars.").

concluded with a complaint and settlement agreement filed on the same day, more than one year after findings were issued by DOJ.[47]

In both cases, district courts relied on DOJ findings letters and reports, in lieu of formal discovery or admissions, to support its approval of the parties' agreement as fair, reasonable, and in the public interest, noting the need for reform and the appropriateness of the consent decree remedies.  As the district court concluded in *United States v. New Orleans*: "Settlement is to be encouraged.  Because of the consensual nature of [a consent decree], voluntary compliance is rendered more likely… Indeed, "the value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance."[48]

## II. BASED ON DOJ'S FINDINGS, LOUISVILLE METRO VIOLATED FEDERAL LAW REQUIRING A HEALTH CARE RESPONSE TO A BEHAVIORAL HEALTH CRISIS, FURTHER SUPPORTING ENTRY OF THE CONSENT DECREE.

The ADA requires that a health care response, rather than a police response, be made to behavioral health crisis calls, just as it is for all other crisis calls, in order to comply with the ADA's equal opportunity provision.  This is not a novel proposition of law, but rather is rooted in the language of the ADA and its regulations and in a growing body of law addressing the precise circumstances here.  Accordingly, the Consent Decree's provisions requiring Louisville Metro to provide a behavioral health response as part of its 911 program is necessary to comply with the ADA and is appropriately tailored to cure the ADA violations found by DOJ.

---

[47] *See generally* Compl., *United States v. New Orleans*, 35 F.Supp.3d 788 (E.D. La. 2013) (No. 2:12-cv-01924-SM-DPC); Consent Decree Regarding the New Orleans Police Dep't, *New Orleans*, 35 F.Supp.3d 788 (No. 2:12-cv-01924-SM-DPC), ECF No. 2-1.
[48] *New Orleans*, 35 F.Supp.3d at 792 (citations omitted).

A.  <u>The ADA Requires a Health Care Response to a Behavioral Health Crisis</u>.

The appropriateness of sending a health response to people experiencing a physical health emergency is obvious.  An individual experiencing a physical health emergency, like a heart attack or a diabetic crisis, would not expect the police to respond to a call to help them.  Further, that person would not expect to be treated as a threat – handcuffed and placed in the back of a police car – without even having received medical attention.  A person with a behavioral health disability experiencing a behavioral health crisis should similarly receive a health response and should be able to expect behavioral health crisis responders to be dispatched to provide needed health care services.  To do otherwise is straightforward discrimination against people with behavioral health disabilities – just as it would be discriminatory if a hospital emergency room referred only people experiencing chest pain to its security guards, while providing a health response to all others.

In enacting the ADA, Congress "provide[d] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," including "failure to make modifications to existing … practices, … and relegation to lesser services."[49]  Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[50]  The reference to "services, programs, or activities,"[51] is an all-inclusive phrase that covers everything that a public entity does.[52] As the Supreme Court has recognized, "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs," including in "the administration of a wide range

---

[49] 42 U.S.C. §§ 12101 (a)(5), (b)(1).
[50] 42 U.S.C. § 12132.
[51] *Id*.
[52] 28 C.F.R. pt. 35, app. B, subp. A § 35.102, at 690 (2023).

of public services, programs, and activities."[53]  Accordingly, as the Sixth Circuit has made clear, "Title II was enacted 'to guarantee meaningful enforcement' of the constitutional rights of the disabled."[54]

People who experience a behavioral health crisis almost universally are people with disabilities to whom the ADA applies.[55]  "Disability" is broadly defined[56] as: (i) a physical or mental impairment that substantially limits one or more major life activities,[57] including the operation of a major bodily function[58]; (ii) a record of such an impairment; or (iii) being regarded as having such an impairment.[59]  The implementing regulation explains that "mental impairment" expressly includes "any mental or psychological disorder such as … emotional or mental illness."[60]  Important here, a person with an episodic impairment (like an impairment that might lead to a 911 call from a concerned family member, friend, or bystander) is still protected by the ADA if the impairment would substantially limit a major life activity when active.[61]

---

[53] *Tennessee v. Lane*, 541 U.S. 509, 524-25 (2004) (citations omitted).

[54] *Lane v. Tennessee*, 315 F.3d 680, 682 (6th Cir. 2003) (citing to *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 815-16 (6th Cir. 2002).

[55] SAMHSA, *Crisis Services: Meeting Needs, Saving Lives* 41 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf ("[M]ental illness is the most prevalent disability in the United States.").

[56] In 2008, Congress amended the ADA's definition of disability to overrule court decisions that "narrowed the broad scope of the protections intended to be afforded."  42 U.S.C. § 12101(a)(4).  The statute thus expressly instructs that "disability" is to be broadly construed "to the maximum extent permitted by the terms" of the ADA.  42 U.S.C. § 12102(4)(A) (directing that under the ADA "disability" should be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter"); 28 C.F.R. § 35.101 (same).

[57] Major life activities also include "caring for oneself, …sleeping, … learning, …concentrating, thinking, communicating, and working." 42 U.S.C. § 12101(2). An individual is protected by the ADA if any *one* of these activities, or another major life activity, is substantially limited by the person's mental condition or its symptoms. 42 U.S.C. § 12101(4)(C).

[58] Major life activities also include the operation of "neurological [and] brain" functions. 42 U.S.C. § 12102(2)(B).

[59] 42 U.S.C. § 12102.

[60] 28 C.F.R. § 35.108(b); *see also* 28 C.F.R. § 36.105(b); 45 C.F.R. § 92.102(c).

[61] 42 U.S.C. § 12102(4)(D).

Under the ADA's expansive definition of disability, and in *amici*'s experience working with

people with behavioral health disabilities every day, most people experiencing a behavioral

health emergency have a disability within the meaning of the ADA.[62]

Congress's mandate under Title II is broad and applies to "any State or local

government" and "any department, agency, special purpose district, or other instrumentality of a

State or States or local government."[63]  By its plain terms, Title II applies to all governmental

entities, and the statutory text contains no "exception that could cast the coverage of" emergency

services or law enforcement entities "into doubt."[64]  As the appendix issued with the regulation

explains, "[t]he general regulatory obligation to modify policies, practices, or procedures

---

[62] Behavioral health emergencies reflect that an individual is experiencing an impairment to their ability to focus, concentrate, communicate, and engage in major life activities.  *See What is Mental Health?* SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, https://www.samhsa.gov/mental-health.  In *amici*'s experience, this is often associated with and can lead to depression, withdrawal, anxiety, grief, fright, shame, humiliation, or anger. *See Nervous Breakdown*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/22780-nervous-breakdown (Individuals "having a mental health crisis . . . may feel like [they're] losing control."  This can result in symptoms "such as fear, anxiety, worry, nervousness and depression."  Individuals can feel "stuck, overwhelmed, or incapacitated, which makes [the individual] unable to cope and function with life.").  Which in turn present as behavioral health emergencies and prompt crisis calls—by friends, bystanders, or the individual themselves—to 911.

[63] 42 U.S.C. § 12131(1); *see also Penn. Dep't. of Corr. v. Yeskey*, 524 U.S. 206, 209-12 (1998) (discussing the breadth of Title II's coverage).

[64] *Penn. Dep't of Corr.*, 524 U.S. at 209 (1998). *Cf. Cmties. Actively Living Indep. & Free v. City of Los Angeles*, 2011 WL 4595993, at *13 (C.D. Cal. Feb. 10, 2011) (concluding that "the City provides a governmental program—its emergency preparedness program" and that "[n]either the City nor the individual departments [such as the fire department, police department, and Department of Parks and Recreation] have assessed whether they have the capacity to respond to the needs of individuals with disabilities during an emergency or disaster"); *Van Velzor v. City of Burleson*, 43 F. Supp. 3d  746, 759 (N.D. Tex. 2014) (explaining that, "[t]aken as true, [the plaintiff]'s allegations show that he was denied the benefit of the police department's enforcement of parking and traffic laws" when the police department enforced all laws except disability-related violations); *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642 (S.D.N.Y 2013) (examining "a public entity's emergency preparedness and planning for compliance with the ADA and the Rehabilitation Act") (citation omitted).

requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities."[65]  Thus, "activities" under Title II include everything a government and its agencies do, including its emergency response services, interactions with or detention of members of the public, and making arrests. Indeed, circuit courts have consistently held that Title II applies to law enforcement conduct.[66]

As directed by Congress, DOJ issued regulations in 1991 that implement Title II's broad non-discrimination mandate, including a requirement that public entities, like Louisville Metro, provide an "opportunity to participate in or benefit from" public services, programs, and activities that is "equal to that afforded others" and is "as effective in affording equal opportunity to obtain the same result" or "to gain the same benefit."[67]  People with disabilities may not be provided different benefits or services, "unless" the difference "is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others."[68]  Louisville Metro also may not administer its programs in a manner that "[has] the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the

---

[65] 28 C.F.R. pt. 35, app. B, subp. B, § 35.130, at 699 (2023).

[66] *See Gray v. Cummings*, 917 F.3d 1, 16-17 (1st Cir. 2019); *Haberle v. Troxell*, 885 F.3d 171, 180 (3d Cir. 2018); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012); *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2008); *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 988-89 (7th Cir. 2020); *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013); *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds, cert. dismissed in part by* 575 U.S. 600 (2015); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007).

[67] 28 C.F.R. § 35.130(b)(1)(i)-(iii) (ADA); *accord* 28 C.F.R. § 41.51(b)(1)(i)-(iii) (Rehabilitation Act); 42 U.S.C. § 12101(a)(7) ("[T]he Nation's proper goal[] regarding individuals with disabilities [is] to assure equality of opportunity."). *Cf. Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1171 (8th Cir. 2019) ("A person with a disability receives meaningful access if she receives an 'equal opportunity to gain the same benefit' as a person without her disability.") (citation omitted).

[68] 28 C.F.R. § 35.130(b)(1)(iv) (ADA); *accord* § 41.51(b)(1)(iv) (Rehabilitation Act).

public entity's program with respect to individuals with disabilities."[69]  Additionally, it is well

established under the law that the government has an affirmative obligation to make "reasonable

modifications in policies, practices, or procedures" when "necessary to avoid discrimination on

the basis of disability," unless the modification "would fundamentally alter the nature of the

service, program, or activity."[70]

DOJ and HHS have explained that a public entity's emergency response system must

ensure "that people with behavioral health disabilities receive a health response in circumstances

where others would receive a health response—for example, if call centers would dispatch an

ambulance or a medic rather than law enforcement to respond to a person experiencing a heart

attack or a diabetic crisis, equal opportunity would entail dispatching a health response in similar

circumstances involving a person with a behavioral health disability."[71]  The views of these

agencies, charged with implementing the ADA and the Rehabilitation Act, "'constitute a body of

experience and informed judgment to which courts and litigants may properly resort for

guidance.'"[72]

Recently, two federal courts in Oregon and Washington, D.C. agreed, finding that the use

of police as default first responders to behavioral health emergencies, when physical health

emergencies receive health responses, states a claim of discrimination under the ADA and

---

[69] *Id.* §§ 35.130(b)(3) (ADA). *Accord id.* § 45.51(b)(3) (Rehabilitation Act).
[70] *Id.* § 35.130(b)(7); *see also Olmstead v. L.C.*, 527 U.S. at 604 (explaining the reasonable modification requirement of Title II of the ADA and defendant's burden of proof for a fundamental alteration defense).
[71] DOJ and HHS Guidance*, supra* note 33, at 3-4.
[72] *Olmstead*, 527 U.S. at 598 (citing *Bragdon v. Abbott*, 524 U. S. 624, 642 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944)).

Rehabilitation Act.[73]  In denying a motion to dismiss in *Bread for the City v. District of Columbia*, the district court found that the lawsuits' allegation that D.C. denies people with behavioral health disabilities equal access to the benefit of timely and effective emergency assistance, if true, is precisely the type of unequal treatment based on disability that the ADA and Rehabilitation Act forbid.[74]  The court held that the plaintiff "has amply alleged the ways in which the emergency-response system fails to provide timely and effective emergency assistance for behavioral health emergencies," in alleging that, "rather than trained professionals, the service usually dispatches police officers who often escalate the situation and expose the individuals in crisis to unnecessary force or legal consequences, such as involuntary confinement."[75]  The court concluded: "Those allegations support a reasonable inference that people with behavioral health disabilities do not have meaningful access to the benefits of the district's emergency-response system."[76]

Further, in *Disability Rights Oregon v. Washington County*, the federal magistrate judge recommended that the County's motion to dismiss be denied, explaining: "Defendants have chosen to provide a service to all residents of Washington County that, in practice, is allegedly

---

[73] Findings and Recommendation, *Disability Rights Oregon et al. v. Washington County et. al*, No. 3:24-cv-00235-SB, 2024 WL 4046017 (D. Or. Aug. 30, 2024) (hereinafter, "*Disability Rights*"); Transcript of Status Conference Before the Honorable Ana C. Reyes, *Bread for the City v. District of Columbia*, No. 23-1945-ACR (D.D.C. Sept. 10, 2014), https://assets.aclu.org/live/uploads/2023/07/Bread-MTD-decision.pdf.  *But see Greene v. City of New York*, 2024 WL 1308434, at *15 (S.D.N.Y. Mar. 26, 2024) (granting motion to dismiss ADA claims based on different facts and New York law, with leave to amend).  Notably, plaintiffs filed an amended complaint in *Greene* with similar claims to those alleged in D.C., Oregon, and here. Defendants filed a new motion to dismiss that is pending, but court has permitted the parties to proceed with discovery.

[74] *Id.*

[75] *Id.*

[76] Transcript of Status Conference Before the Honorable Ana C. Reyes, *Bread for the City v. District of Columbia*, No. 23-1945-ACR (D.D.C. Sept. 10, 2014), https://assets.aclu.org/live/uploads/2023/07/Bread-MTD-decision.pdf.

denied to mentally disabled residents.  Plaintiffs do not seek a new service but instead seek meaningful access to Defendants' existing service."[77]  After extensive analysis, the report concluded: "Even if people with behavioral health disabilities can access some of the benefits of Defendants' dispatch, such as consistent access to firefighters in the case of a fire or even access to EMTs and paramedics in the case of a physical health emergency," the plaintiffs "adequately alleged that they do not have equal opportunity to gain the benefits of consistent access to emergency medical service for all health emergencies" and that "they were denied meaningful access to a benefit solely by reason of disability."[78]

Far from being a novel application of the ADA, these decisions are firmly rooted in the statutory language and in caselaw.  The touchstone for establishing disability discrimination under the ADA and Rehabilitation Act  is to show that a person has been denied equal access to state-provided services on the basis of a disability.[79] While a plaintiff must plead that they have been denied equal access, they need not "prove that they have been disenfranchised or otherwise 'completely prevented from enjoying a service, program, or activity.'"[80]  For example, disability

---

[77] *Disability Rights* at 27.

[78] *Id*. at 25.

[79] *See e.g. Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) ("Title II of the ADA and § 504 of the [Rehabilitation Act] both prohibit discrimination on the basis of disability.").

[80] *Disabled in Action v. Bd. of Elections in N.Y.*, 752 F.3d 189, 198 (2d Cir. 2014) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001)); *see also Allah v. Goord*, 405 F. Supp. 2d 265, 280 (S.D.N.Y. 2005) ("Although plaintiff is not wholly precluded from participating in this service, if he is at risk of incurring serious injuries each time he attempts to take advantage of outside medical attention, surely he is being denied the *benefits* of this service."); *Van Velzor*, 43 F. Supp. 3d at 759 ("It is true that even given [the plaintiff's allegations that the police did not enforce disability-related laws, the plaintiff] would still have access to some of the benefits of the City's enforcement of parking and traffic laws, such as the regulation of speed limits and the enforcement of stop-sign and traffic-light laws. However, [the plaintiff]'s allegations show that the benefit he received from the City was 'not equal to that afforded others.'" (citing 28 C.F.R. § 35.130(b)(1)(ii))).

discrimination occurs when plaintiffs "face conditions that are more onerous for them [than non-disabled individuals] because of their particular disabilities."[81]

Relevant here, "state action that disproportionately burdens the disabled because of their unique needs remains actionable under the ADA," including when this inequality would result in people with disabilities "receiv[ing] inadequate or harmful medical treatment."[82] Where, as here, a public entity's action "would deny certain disabled individuals meaningful access to government-provided services because of their unique needs, while others retain access to the same class of services," actionable discrimination has occurred.[83]

As DOJ's findings make clear, the ADA requires a healthcare response to a mental health crisis where, as here, the jurisdiction dispatches a healthcare response to physical health crises. DOJ's findings that Louisville Metro structured its emergency response system so that police, rather than mental health workers, respond to people experiencing mental health crises, while people with physical health crises receive a medical response, show a violation of the ADA and the Rehabilitation Act.

### III. THIS COURT SHOULD APPROVE THE CONSENT DECREE.

As this Court explained in its December 28 order, "[b]inding caselaw favors judicial approval of consent decrees, but only those that are "fair, adequate, reasonable, and consistent with the public interest."[84] This Decree – and in particular section VIII regarding emergency responses to behavioral health emergencies – satisfies those requirements, as well as the

---

[81] *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003).

[82] *Rodde v. Bonta*, 357 F.3d 988, 995 n.10, 998 (9th Cir. 2004).

[83] *Rodde*, 357 F.3d at 998; *see also Communities Actively Living Indep.*, 2011 WL at *13–15 (holding that "the City disproportionately burdens [people with disabilities] through its facially neutral practice of administering its [emergency planning] program in a manner that fails to address [their] needs").

[84] Order at 5 (citing *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 489 (6th Cir. 2010) (citations omitted) and *Horne v. Flores*, 557 U.S. at 450).

"prudential requirements long established under Sixth Circuit law" mandating approval of consent decrees that the Court described in *Lexington Insurance Group v. Ambassador Group LLC*.[85] Amici respectfully suggest, therefore, that it be approved.

A. Governing Precedent.

This Court in *Lexington Insurance Group* described the binding rules governing Consent Decrees and their approval. "Public policy … generally supports a presumption in favor of voluntary settlement of litigation'' through ''a consent decree.''[86] That presumption is "particularly strong" when the proposed decree "has been negotiated by the Department of Justice on behalf of a federal administrative agency … which enjoys substantial expertise" in the field at issue.[87]

Giving due regard to this presumption, proposed consent decrees should be approved when they meet three requirements:  the proposed Consent Decree must (1) "spring[] from and serve[] to resolve a dispute within the court's subject-matter jurisdiction," (2) "come within the general scope of the case made by the pleadings," and (3) "further the objective of the law upon which the complaint was based."[88]  Similarly, the Supreme Court's decision in *Horne v. Flores* provides consent decrees must be "reasonable and necessary implementations of federal law."[89]

When a proposed decree meets those requirements, the Court's ability to enter it as an injunction is "broad," reviewed only for abuse of discretion, and must be exercised "consistent

---

[85] *Lexington Insurance Company v. Ambassador Group LLC*, 581 F.Supp. 3d 863 (W.D. Ky. 2021).

[86] *Id.* at 866 (citing *Lexington-Fayette Urban County Gov't*, 591 F.3d at 490-91).

[87] *Lexington-Fayette Urban County Gov't*, 591 F.3d at 490-91 (quoting *United States v. Akzo Coatings*, 949 F.2d 1409, 1436 (citing *United States v. Cannons Eng'g Corp*., 899 F.2d 79, 84 (1st Cir. 1990)).

[88] *Lexington Insurance Company*, 581 F.Supp at 868, (citing *Benalcazar v. Genoa Twp., Ohio*, 1 F.4th 421, 425 (6th Cir. 2021)).

[89] *Horne v. Flores*, 557 U.S. 443, 450 (2009).

with public policy's general 'presumption in favor of voluntary settlement of litigation.'"[90]
Because this case is brought to vindicate the public interest, "[the district court's] equitable powers assume an even broader and more flexible character."[91]  Finally, decrees should be approved when they are "fair, adequate, reasonable, and consistent with the public interest."[92]

B.  The Decree Was Reached In An Arms-Length Process Mandated by Federal Law

The ADA, like the Sixth Circuit, encourages settlements: "[T]he use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, fact-finding, minitrials, and arbitration, is encouraged to resolve disputes arising under this chapter."[93]  Indeed, the ADA *requires* DOJ to attempt to resolve findings of violations without litigation.  When the DOJ finds reasonable cause to believe a state or local actor has discriminated against people with disabilities, as DOJ did here, DOJ must include in its findings a "description of a remedy for each violation found (including compensatory damages where appropriate)."[94]  It must, further, "[i]nitiate negotiations with the public entity to secure compliance by voluntary means," and if it is able to do so, the agreement securing voluntary

---

[90] *Lexington-Fayette Urban County Gov't*, 591 F.3d at 870.
[91] *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004) (brackets in original) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).
[92] *Id.*
[93] *See* 42 U.S.C. § 12212 (providing where appropriate, the "use of alternative means of dispute resolution…is encouraged to resolve disputes arising under this subchapter"); *see also* 42 U.S.C. § 12133 (providing for remedies, procedures, and rights set forth in in the Rehabilitation Act, which, in turn, provides for remedies, procedures, and rights set forth in the Civil Rights Act, 29 U.S.C. § 794a(a)(2) (citing 42 U.S.C. § 2000d et seq.)). By incorporating the remedies, procedures, and rights of the Civil Rights Act, the ADA requires " no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d–1.
[94] 28 C.F.R. § 35.172.

compliance must "specify the corrective or remedial action to be taken," "provide assurance that discrimination will not recur," and provide for enforcement.[95]

That is precisely what the parties to this action have done.  DOJ conducted a thorough investigation and issued detailed findings.  DOJ and Louisville Metro then engaged in good-faith, arms-length settlement negotiations.  The parties have proposed a Consent Decree that specifies the corrective and remedial actions to be taken to comply with federal law; that relate directly to the policies and practices identified in the DOJ investigation and Findings Letter which contribute to identified systemic violations and deficiencies; that provides assurance that discrimination will not recur, including through court oversight and independent monitoring; and that provides for enforcement through the court.  Louisville Metro has not only moved this Court to grant the Consent Decree, but has also already taken actions to begin implementing measures outlined within the Consent Decree.[96]  The police chief has also signed the Consent Decree to indicate LMPD's agreement to implement it.[97]  Louisville Metro and the LMPD should not be penalized for their efforts to reach a voluntary agreement and forced to engage in protracted litigation over these issues.  Rather, the Court has a duty under these circumstances, and it is in the public interest, to approve the Consent Decree and permit the parties to move forward with

---

[95] 28 C.F.R. § 35.173.

[96] *See* Defendant Answer to Complaint, filed Jan. 6, 2025, at 1 ("Even prior to the DOJ beginning its investigation, Louisville Metro and LMPD began implementing measures to better serve the citizens of Louisville.").

[97] Consent Decree, *United States v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:24-cv-00722, at 242 (W.D. Ky. Dec. 12, 2024), ECF No. 4-1.

implementation of the remedies they have mutually crafted and agreed to as necessary to comply with federal law.

C.   The Decree Is Amply Supported by DOJ's Findings and ADA Law.

As described in detail in Section I above, the Decree is based on DOJ's detailed findings, entered after a three-year-long, wide-ranging, and well-supported investigation and already relied upon by other courts, that Louisville Metro violated the ADA by routinely dispatching police officers to respond to health crises that involve behavioral health.  And as Section II demonstrates, such findings demonstrate a violation of the ADA, specifically by denying people with behavioral health disabilities the opportunity to participate and benefit equally from Louisville Metro's emergency response system.

The fact that Louisville Metro does not concede that the findings are correct or that a violation of law occurred (*see* Joint Mot.; *see generally* Answer) is not dispositive.[98]  It is not required, for a court to enter a Consent Decree like the one at issue, for the court to make express findings that a violation has been proven.[99]  As the Supreme Court made clear: "It is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates obligations embodied in a consent decree."[100]  The very nature of a "consent" decree is that it is entered before litigation, in order to avoid litigation, in order to achieve the

---

[98] Louisville Metro's position on the facts and law further demonstrates that the proposed Decree is not collusive.  *See Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1982) (consent decree which is illegal or the product of collusion should not be approved).

[99] *Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 484 (6th Cir. 1985), aff'd sub nom. *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986) ("When presented with a proposed consent decree, the district court must ascertain only that the settlement is fair, adequate and reasonable."); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983) ([T]the long-standing rule is that a district court has power to enter a consent decree without first determining that a statutory violation has occurred").

[100] *Firefighters v. City of Cleveland*, 478 U.S. 501, 517 (1986).

"voluntary" compliance encouraged by the Sixth Circuit and "minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies adjudicated guilt."[101]  As this Court recognized, "the parties typically compromise despite an ongoing disagreement regarding whether and to what extent their past conduct was lawful."[102]

Indeed, requiring defendants to admit factual claims or concede liability as a prerequisite to a consent decree would actually discourage settlements, contrary to both Sixth Circuit law holding that settlements are to be encouraged and to ADA law encouraging settlements and requiring attempts to reach them.[103]  Few defendants would willingly enter a consent decree if the price is conceding liability with all the attendant consequences of that concession.

D.  The Decree Imposes the "Reasonable Modification" Remedy Contemplated by the ADA.

Title II of the ADA "does more than prohibit public entities from intentionally discriminating against disabled individuals.  It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide."[104]  As the Sixth Circuit held, "Title II mandates not only that public entities refrain from intentionally discriminating against disabled individuals,

---

[101] *Williams*, 720 F.2d at 923.

[102] *Lexington Ins. Group*, 581 F. Supp. 3d at 867.

[103] *Williams*, 720 F.2d at 923; *see also Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 290 (1986) (O'Connor, J., concurring) ("The imposition of a requirement that public [entities] make findings that they have engaged in illegal discrimination before they engage in [voluntary compliance] would severely undermine the public [entities'] incentive to meet voluntarily their civil rights obligations.").

but that they also make certain accommodations to the disabled in the course of providing public services . . ."[105]

As described above, the United States has found reasonable cause to believe pervasive pattern and practice violations of the ADA in Louisville Metro's emergency response system. The proper remedy under the ADA is to reasonably modify those discriminatory practices,[106] including by dispatching behavioral health professionals where appropriate, to ensure that people with disabilities have equal opportunity under Louisville Metro's response system.[107]  That is exactly what the provisions of the Consent Decree would do.  It requires (i) convening a Behavioral Health Coordination and Oversight Council, (ii) providing a behavioral health emergency response to individuals experiencing a behavioral health crisis, (iii) establishing a dispatch operation with crisis triage workers, and providing training to the LMPD on how to

---

[105] *Ability Center, Toledo v. City of Sandusky,* 385 F.3d 901, 908 (6th Cir. 2004).

[106] 28 C.F.R. § 35.130(b)(7). *See also Douglas v. Muzzin*, 2022 U.S. App. LEXIS 21529, at *22 (6th Cir. Aug. 3, 2022) (unpublished) (discussing requirement to reasonably modify a state prison's footwear policy); *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 269 (D.D.C. 2015) (rejecting argument that a request was necessary to provide reasonable modifications to incarcerated person with "known communications-related difficulties"); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007); *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005) (public entities have "an affirmative obligation to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant."); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to his need for accommodation or where the need for accommodation is obvious . . . the public entity is on notice that an accommodation is required . . . ") (internal brackets omitted).

[107] *See., e.g.*, *Est. of LeRoux v. Montgomery County, Maryland*, No. 8:22-cv-00856-AAQ, 2023 WL 2571518, at *11 (D. Md. Mar. 20, 2023) (denying the defendant's motion to dismiss the plaintiffs' ADA claim where the plaintiffs, surviving family members of a man killed by police officers while suffering a mental health crisis, had "alleged that there were a number of reasonable accommodations that could have been implemented . . . such as dispatching the Mobile Crisis Team [or] the Crisis Intervention Team").

respond to individuals with behavioral health needs, thus protecting the rights of people with disabilities from past patterns and practices of discrimination.[108]

Importantly, moreover, ADA enforcement further contemplates injunctions directing remedial measures such as the reasonable modifications contained in the Consent Decree to remedy discrimination.[109]  The Sixth Circuit and courts therein have permitted claims seeking such remedial and broad injunctive relief to proceed.[110]  And, again importantly, the

---

[108] Consent Decree ¶¶ 296, 307-08, 319-20, 331. It is also worth noting that the Decree's requirement for a dedicated behavioral health response would relieve, rather than increase, burdens on already overburdened police officers. Although the reforms to the emergency response system may require some actions of police officers such as additional training, they will be primarily designed, implemented, and funded by Louisville Metro's behavioral health system, not the police department.  Indeed, the police will be relieved of the burden of responding when only a mental health response is required.  A national survey reflects the sentiment of most police officers that they are overburdened by mental health crisis calls.  *Survey: Police needlessly overburdened by mentally ill abandoned by mental health system*, MENTAL ILLNESS POLICY ORG (2011),
https://mentalillnesspolicy.org/crimjust/homelandsecuritymentalillness.html. Approximately 84% of police stated there has been an increase in the number of calls responding to mental health incidents over their career, 80% reported the number of time spent on these calls has increased or substantially increased, and 56% stated the increase is due to inability to connect individuals with mental health treatment.  *Id.*

[109] *See* 42 U.S.C. § 12133 (providing for remedies, procedures, and rights set forth in in the Rehabilitation Act, which, in turn, provides for remedies procedures, and rights set forth in the Civil Rights Act, 29 U.S.C. § 794a(a)(2) (citing 42 U.S.C. § 2000d et seq.).

[110] *See Waksul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 463-64 (6th Cir. 2020) (reversing the district court's dismissal of a claim that a "reasonable modification" of a Medicaid system that allegedly discriminated against people with mental disabilities by keeping them institutionalized could require a budget overhaul was a fundamental alteration); *Pelichet v. Gordon*, 2019 WL 4619742 at *26-*27 (E.D. Mich. Mar. 6, 2020) (refusing to dismiss claim that the design of a State program providing treatment for behavioral health disabilities required reasonable modification to avoid unnecessary institutionalization of such persons and allowing request to enjoin defendants from "administering behavioral health services in a setting that unnecessarily isolates and segregates individuals with disabilities from the community and requiring Defendants to administer behavioral health services in the most integrated setting appropriate" to proceed).  *See also Mote v. City of Chelsea*, 252 F. Supp. 3d 642 (E.D. Mich. 2017) (affirming a district court's approval of a consent decree in the context of an ADA discrimination case).

modifications proposed in the Consent Decree are similar to those found reasonable in other cases involving police encounters with individuals experiencing behavioral health episodes.[111]

E.  The Decree Meets Sixth Circuit Standards.

This Decree meets the standards from the Sixth Circuit that this Court described in *Lexington Insurance*.  It "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction" because it involves a federal claim under the ADA.  It "come[s] within the general scope of the case made by the pleadings," because the Complaint alleges, and the Consent Decree resolves, a claim that Louisville Metro violated the ADA by providing health-care emergency responses to people with physical health crises but law enforcement emergency responses to people with behavior heath crises.  And it "further[s] the objective of the law upon which the complaint was based" by addressing exactly the kind of discrimination against people with disabilities that the ADA was enacted to prevent and by providing exactly the type of reasonable modification remedy required by the ADA.

F.  The Decree Is A Reasonable and Necessary Implementation of Federal Law.

For all the same reasons, the Decree is consistent with *Horne v. Flores*' requirement that it be "limited to reasonable and necessary implementations of federal law."[112]  Under *Horne*, the inquiry is whether the consent decree is "directed to protecting federal interests" and whether a "relationship between the proposed injunction and the 'law upon which the complaint was

---

[111] In *Vos v. City of Newport Beach*, the Ninth Circuit reversed a district court's summary judgment ruling dismissing plaintiffs' ADA claim, holding that officers attempting to apprehend a mentally ill man running around a convenience store with scissors in his hand, "had the time and the opportunity to assess the situation and potentially employ . . . accommodations . . . including de-escalation . . . or specialized help."  892 F.3d 1024, 1037 (9th Cir. 2018); *see also S.R. v. Kenton Cnty. Sheriff's Ofc.*, No. 2:15–cv–143, 2015 WL 9462973 1, *8 (E.D. Ky. Dec. 28, 2015) (holding that plaintiffs plausibly alleged defendant "failed to modify its practices with respect to disabled students" by declining to take "less severe measures such as crisis intervention, de-escalation, etc. to address their behavioral problems").

[112] *Horne*, 557 U.S. at 450.

based," is properly established.[113]  The ADA provides the required protected federal interest, as it provides a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and ensures "that the Federal Government plays a central role in enforcing the standards in [the ADA] on behalf of individuals with disabilities."[114]  The Decree fulfills these purposes.  As discussed throughout, it is firmly rooted in DOJ findings that Louisville Metro's conduct violated federal law, and it addresses such violations with the reasonable modification remedy that the ADA requires.  And to the extent that circumstances change and the Consent Decree becomes untenable, the provisions of Fed. R. Civ. P. 60(b)(5) are available for relief, as *Horne* explains.[115]

G.  The Decree is Fair, Adequate, Reasonable, and In the Public Interest.

Where, as here, the settlement agreement, incorporated into a consent decree, is grounded in a detailed investigation that documents systemic federal law violations; includes remedial provisions that are necessary to comply with the law; requires actions that reflect professional consensus on appropriate police and governmental practices for responding to people with disabilities; was developed through lengthy and arduous arms-length negotiations as required by the governing law; and is agreed-to by public officials, that consent decree is presumptively fair, and is definitely reasonable and adequate under federal jurisprudential principles.[116]

On the issue of public interest, and in addition to the public interest supporting settlements described above, there can be no doubt that that the public interest is best served

---

[113] *Guess v. City of Paducah*, 687 F.Supp.3d 799, 803 (W.D.Ky. 2023) (Beaton, J.) (citing *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)).
[114] 42 U.S.C. § 12101(b)(1) and (b)(3).
[115] *Williams*, 720 F.2d at 917 (consent decree may be modified based on changed circumstances).
[116] *See Lexington-Fayette Urban County Government*, 591 F.3d at 489 (discussion of factors favoring approval of consent decree).

when people with behavioral health disabilities are not subject to discriminatory practices and all people have equal access to participate fully in our republic. Ensuring that people with behavioral health disabilities receive a health-based response rather than a police response during a behavioral health emergency serves the public interest by meeting individuals' needs without constraining police resources. Nothing could be more in the public interest than a City improving the lives of its citizens.

## CONCLUSION

Based on the above we urge the Court to grant the Parties' Joint Motion to Approve the Consent Decree.


Dated: January 10, 2025                              Respectfully submitted,

                                                    BAKER & HOSTETLER LLP

                                                    By: /s/ *Jennifer L. Brumfield*

                                                    Jennifer L. Brumfield
                                                    312 Walnut Street
                                                    Suite 3200
                                                    Cincinnati, OH 45202-4074
                                                    Telephone: (513). 878.4428
                                                    Email: jbrumfield@bakerlaw.com

                                                    Elizabeth B. McCallum
                                                    Lindsey N. Simmons (*pro hac vice pending*)
                                                    Orga Cadet
                                                    Daniel P. Wicklund
                                                    Washington Square, Suite 1100
                                                    1050 Connecticut Avenue, NW
                                                    Washington, D.C. 20036
                                                    Telephone: (202) 861.1500
                                                    Facsimile: (202) 861.1783
                                                    Email: emcallum@bakerlaw.com
                                                         lsimmons@bakerlaw.com
                                                         ocadet@bakerlaw.com
                                                         dwicklund@bakerlaw.com

THE JUDGE DAVID L. BAZELON
CENTER FOR MENTAL HEALTH LAW

Megan E. Schuller
Ira Burnim
1090 Vermont Avenue NW, Suite 220
Washington, DC 20005
Telephone: (202) 467.5730
Email: megans@bazelon.org
        irab@bazelon.org


CENTER FOR PUBLIC REPRESENTATION

Steven J. Schwartz
Mona Igram
5 Ferry Street, #314
Easthampton, MA 01027
Telephone: (413) 586-6024
Email: sschwartz@cpr-ma.org
        migram@cpr-ma.org

*Attorneys for Dr. Michael Hogan, Dr. Danna
Mauch, Dr. Anthony Zipple, Chief Chris Burbank,
Martha Knisley, Center for Policy Equity, National
Alliance for Mental Illness (NAMI), NAMI
Kentucky, NAMI Louisville, Mental Health
America, Mental Health America of Kentucky,
Kentucky Mental Health Coalition, Judge David L.
Bazelon Center for Mental Health Law, Center for
Public Representation, Wellspring, Bridgehaven, St.
John Center, Louisville Coalition for the Homeless,
Kentucky Protection and Advocacy*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of January 2025, I filed a copy of the foregoing,

which will electronically serve all counsel of record who have entered an appearance in the case.


By: /s/ *Jennifer L. Brumfield*

Jennifer L. Brumfield
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH 45202-4074
Telephone: (513). 878.4428
Email: jbrumfield@bakerlaw.com