UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT,<br><br>Defendant | Case No. 3:24-CV-00722-BJB<br><br>*Electronically filed* |

**AMICUS CURIAE BRIEF OF THE ACLU OF KENTUCKY AND 14 OTHER LOUISVILLE COMMUNITY ORGANIZATIONS IN SUPPORT OF MOTION FOR CONSENT DECREE**

The ACLU of Kentucky and 14 Louisville community organizations,[1] by counsel, submit this *amicus curiae* brief in support of the Joint Motion for Entry of Consent Decree (DN 4) in the above-styled action.

### I. THE NEGOTIATED CONSENT DECREE IS NECESSARY TO CHANGE UNLAWFUL POLICE PRACTICES

As found by the Department of Justice in its Investigation of the Louisville Metro Police Department (LMPD) and Louisville Metro Government, LMPD has a systemic, long-term, and ongoing problem of unconstitutional policing and lack of transparency. DN 1-1, Investigation of LMPD and Louisville Metro Government (the "DOJ Report") at 1. Community organizations, including the *amici* represented here, have devoted years documenting many such abuses, including unlawful detentions and unlawful uses of force, as well as advocating for significant

---

[1] The full list of *amici curiae* is attached as an appendix.

changes to LMPD's policies, both within the political arena and through public educational efforts. Unfortunately, their efforts were largely unsuccessful. The problems extensively documented throughout the DOJ Report persisted.

Policing in Louisville has been particularly problematic for Louisville's Black community. As noted in the summary "For years, LMPD has practiced an aggressive style of policing that it deploys selectively, especially against Black people, but also against vulnerable people throughout the city." DOJ Report at 1. The DOJ Report documents how for years LMPD has known about – and done nothing to stop – a pattern of stopping and searching a disproportionate number of Black drivers in Louisville, as just one example of the discriminatory practices identified by the DOJ. DOJ Report at 39. The lack of transparency on this issue alone has been a focal point for several *amici* over the years. *See, e.g.,* Claire Galofaro, *ACLU Pressures LMPD To Release Traffic Report*, Louisville Courier-Journal, https://www.courier-journal.com/story/news/local/2014/10/21/aclu-pressures-lmpd-release-traffic-report/17689765/

This community's overall frustration with LMPD erupted as news of the killing of Breonna Taylor became public in late spring of 2020. For months that summer, community members gathered downtown to protest against LMPD's practices and for racial justice. DOJ Report at 61-62.) During those demonstrations, the DOJ found that in "using force against peaceful protesters without individualized and adequate justifications, LMPD repeatedly retaliated against speech, in violation of the First Amendment." *Id.* at 55. LMPD's violent response to demands for systemic change further undermined the already-strained relationship between it and the community it is supposed to serve.

More importantly, as documented by the Department of Justice, the lack of meaningful change has led to a problematic lack of trust in LMPD among *amici* and their members. DOJ

2

Report at 37 ("Not only do LMPD's street enforcement practices violate the Fourth Amendment, but they also undermine public safety by poisoning the relationship between the police and community members."). As Louisville Metro has recognized in agreeing to the negotiated consent decree, implementation of it is critical to repairing community trust in LMPD not only to rebuild community relationships with LMPD but also in the interest of public safety.

## II.   THE NEGOTIATED CONSENT DECREE PROVIDES SPECIFIC REMEDIES THAT WILL HELP THE DIRECTLY IMPACTED COMMUNITY.

As discussed further below, the proposed consent decree (DN 4-1, the "Consent Decree") has specific provisions that are critical for making systemic, lasting changes to LMPD for the betterment not only of LMPD itself, but also for the community. And while a*mici* recognize that a consent decree is a form of settlement agreement that necessarily means both sides have compromised, the negotiated terms (which do not include all the changes *amici* have sought, currently seek, or may in the future seek) materially advance the community's interests in improved public safety and police accountability. Therefore, nothing in this brief should be construed as agreeing that the Consent Decree represents the full scope of changes that the organizations would independently demand or are currently demanding. Rather, *amici* ask the Court to consider their perspective that the Consent Decree is a material positive change that is both necessary and appropriate to address long-standing and documented instances of unlawful policing in Louisville.

For example, the negotiated Consent Decree contains specific provisions that would, if approved, result in important changes with respect to, *inter alia*, transparency and accountability. This section provides additional concrete examples of how the Consent Decree will benefit the public, including the interests of *amici*.

### A. Document Retention

First, Paragraph 93 requires LMPD to retain all body worn camera video for the length specified in the record retention schedule or the length of the decree, whichever is longer. Consent Decree at ¶93. Currently no time period for retention is specified in the schedule and, unlike many other types of documents and records, it is unclear how long LMPD is required to retain such videos. Louisville Metro Records Retention Schedule, Dec. 13, 2024, https://perma.cc/7VN4-FXLQ at 89. Body worn cameras have become an important piece of evidence in uncovering instances of police misconduct. *See, e.g.,* Josh Wood, *After firing pepper balls at TV crew, LMPD officer fired dangerous munitions at protesters*, Louisville Courier-Journal, https://www.courier-journal.com/story/news/crime/2024/11/12/dusten-dean-bodycam-officer-targeted-protestors-during-2020-demonstrations/76197275007/. Greater access for the media and public to these videos ensures the community has the ability to research and review accurate documentation about events as they unfolded, that the media has the ability to report to the public when LMPD acts in compliance with law, and for law enforcement to refute false accusations of unlawful conduct. Without access to the video, the public and courts are left in the dark.

### B. Significant Increased Reporting and Audits Will Provide Transparency

As another example, community organizations have been urging Louisville Metro to complete and share audits of LMPD, including its compliance with record retention policies and traffic stops. *See* Roberto Roldan, *City audit finds failures in Louisville police's oversight of public records, investigative files*, LPM News, https://www.lpm.org/news/2023-09-28/city-audit-finds-failures-in-louisville-polices-oversight-of-public-records-investigative-files. Such transparency has and would continue to allow these organizations to both hold LMPD accountable when the audits demonstrate improper practices, and conversely to highlight positive changes and dedicated

4

policing. The Consent Decree, if approved, would require LMPD to show the public its work, and the public can evaluate for itself whether LMPD is making meaningful improvements. Paragraphs 255 through 260 require comprehensive data collection for all traffic stops, as well as pedestrian stops and warrantless home searches. And in Paragraph 262, LMPD and Louisville Metro commit to publicly sharing the underlying data of those analyses. Such transparency does not exist today, and if the Consent Decree is not entered such information will continue to be shielded from public inspection.

Additionally, Paragraphs 466-470 lay out a comprehensive list of performance audits that LMPD will conduct "with the goal of identifying deficient performance and opportunities for improvement." No such performance audits are currently provided. Moreover, LMPD will post a report for each audit that "summarizes the audit's methodology, data sources, and conclusions." Consent Decree at ¶470. Again, this type of transparency promotes public confidence in law enforcement and thus enhances public safety, both for LMPD's officers and for the community. *See, e.g.*, Jason Sunshine & Tom R. Tyler, *The Role of Procedural Justice and Legitimacy,* 37 Law & Soc'y Rev. 513, 526 (2003) (finding that "[p]erceptions of police legitimacy and evaluations of police performance predicted citizen cooperation with the police") (cleaned up).

### C. Comprehensive Overhaul of the Citizen Complaint System

The DOJ found the citizen complaint system is broken, evidenced in part by the "extremely low" number of complaints for a department of LMPD's size. DOJ Report at 77. Civilians are afraid to file complaints, and those who do want to file complaints are deterred by the lack of information and clarity to the process. DOJ Report at 76-77. And community groups have been urging LMPD to provide additional independent oversight for years. DOJ Report at 8, 79. In light

of those failed efforts, the Consent Decree will give the community assurance that its complaints will be addressed in an appropriate manner.

Specifically, Paragraph 508 would require informing the community of how to make a complaint addressing the basic problem of a lack of information about the process itself. Paragraphs 508 - 530 would overhaul the entire process, including required training on how to handle complaints and weigh evidence, providing some assurance that these complaints will be investigated in a professional and thorough manner. Moreover, the new Consent Decree will further build trust by requiring communication with complainants. Consent Decree at ¶¶ 526-530.

Additionally, there will be oversight and assessments of the citizen complaint program – a much-needed level of transparency that LMPD has avoided. Paragraphs 531-534 require LMPD to initiate and administer a "testing program designed to assess Civilian Complaint intake." Consent Decree at ¶531. The testing program will be handled by a third-party, wholly independent from LMPD. That entity will then produce regular public reports that evaluate LMPD's complaint intake practices and make recommendations for improvement. *Id.* at ¶534.

Finally, there will be increased community awareness of the complaints themselves, which has been a significant frustration in the past. *See, e.g.,* Roberto Roldan, *Police accountability group suing LMPD over access to complaints against officers*, LPM News https://www.lpm.org/news/2022-10-06/police-accountability-group-suing-lmpd-over-access-to-complaints-against-officers. Paragraphs 591-593 also provide for significant transparency in the complaint process, including making complaint information publicly available, and generating publicly accessible reports and data on investigations and discipline.

### D. Independent Monitor Oversight and Reporting

One of the most significant aspects of the negotiated Consent Decree is the role of an independent third-party Monitor. *Amici* maintain that the DOJ's findings, coupled with their own shared observations, confirm that LMPD is unable or unwilling to implement needed reforms absent entry of the negotiated Consent Decree. Thus, the Consent Decree, if approved, will require an outside, independent assessment for all of the negotiated changes. While the community remains optimistic that the Monitor's assessment will be inclusive of community voices including *amici*, any independent oversight is nevertheless welcome.

The Consent Decree not only requires this oversight but provides significant transparency which will allow the public to assess LMPD's performance as well. The obligatory semi-annual reports from the Monitor will provide a comprehensive review of LMPD's efforts to meet the requirements in the Consent Decree. Paragraph 653 requires the Monitor to provide a publicly available written report identifying the progress made and overall assessment of LMPD's compliance with the Consent Decree. In addition, the Monitor is required to meet with community stakeholders to hear their concerns and provide information about the Monitor's reports. Consent Decree at ¶657.

### III. THE PROPOSED CONSENT DECREE IS IN THE PUBLIC INTEREST.

*Amici* have been working on various efforts through public education and political advocacy to reform LMPD's unlawful policing practices for years. The level of frustration with the current policies and practices is significant, as indicated by the DOJ's Report: "Louisville residents have long demanded police accountability, including external civilian oversight. Community groups have tracked police complaints and submitted findings to elected officials, arguing that 'the police can't police themselves.'" DOJ Report at 79. The Consent Decree will at

least provide some comfort to the community that some of the needed reforms will take place, and that an independent third party will be providing necessary oversight.

In looking at whether a consent decree is consistent with the public interest, courts should consider whether it furthers the goals of addressing the alleged violations. *See United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010). Additionally, courts should look to see whether the broader public support its provisions. *Su v. Allen*, No. 3:17-CV-784-BJB, 2023 WL 6323310, at *2 (W.D. Ky. Sept. 28, 2023) ("trial judges must consider whether a consent decree furthers not only the sometimes narrow interests of the parties, but also the broader interests of the public"). In doing so, the Court should consider the interests of those who have been directly impacted by the alleged violations and have been trying to fix those violations for years. That broader public interest supports the Consent Decree, while recognizing it is the product of a compromise that does not necessarily achieve all of the goals of any of the *amici*.

As discussed above, the Consent Decree contains important transparency provisions that will lead to greater accountability. And community groups will benefit from this because it will likely lead to decreased unconstitutional policing in ways that other consent decrees have been successful. *See, e.g.,* https://www.justice.gov/opa/pr/justice-department-and-city-albuquerque-new-mexico-seek-partial-termination-consent-decree (press release announcing termination of the majority of the Albuquerque, NM policing consent decree and summarizing success); https://www.nypdmonitor.org/wp-content/uploads/2024/04/2024.04.11-927-1-Twentieth-Report.pdf (Monitor's report showing significant reductions in racial disparities in stop-and-frisk in NYC); https://static1.squarespace.com/static/59db8644e45a7c08738ca2f1/t/66fc4a0b0763eb5189270ac9/1727810060097/749+-+First+Amendment+Assessment.pdf (Monitor's report showing the

Baltimore police to be in total compliance with the First Amendment requirements of a consent decree).

Moreover, consent decrees can in fact lead to both better policing and lower crime rates, which is consistent with furthering the broad public interest. For example, in August 2013, the district court entered a permanent injunction requiring extensive changes to NYPD policies, practices, and procedures, and appointing an independent monitor to facilitate implementation of reforms. *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013). Crime—including violent crime and firearm related homicides—went down in the wake of that injunction and stayed down for at least five years. *See* New York State Crime Report, Sept. 2015, https://www.criminaljustice.ny.gov/crimnet/ojsa/indexcrimes/nys-crime-report-2014.pdf (showing decrease in crime in NYC from 2013 to 2014); New York State Crime Report, September 2019, https://www.criminaljustice.ny.gov/crimnet/ojsa/Crime-in-NYS-2018.pdf (showing that crime continued to decrease in NYC from 2014 through 2018).

## CONCLUSION

For the foregoing reasons, the Court should enter the Parties' Joint Motion for Consent Decree.

Respectfully submitted,

/s Corey M. Shapiro
Corey M. Shapiro
William E. Sharp
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org
*Counsel for Amici*

APPENDIX OF *AMICI CURIAE*

***ACLU of Kentucky***

***The 490 Project***

***DOVE Delegates***

***Fairness Campaign***

***Families United***

***Forward Justice Action Network***

***Interfaith Coalition for Immigrant Justice***

***Kentucky Alliance Against Racist and Political Repression***

***Kentucky Equal Justice Center***

***Kentucky Open Government Coalition***

***Louisville Urban League***

***Louisville Showing Up for Racial Justice (LSURJ)***

***The Salaam Network***

***Sister Thea Bowman Society, Louisville Chapter***

***VOCAL-KY***