## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | Case No. 3:24-cv-722 (BJB) |
| LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, | |
| *Defendant.* | |

**HERITAGE FOUNDATION'S, HERITAGE FOUNDATION OVERSIGHT PROJECT EXECUTIVE DIRECTOR MIKE HOWELL, & THE LAW ENFORCEMENT LEGAL DEFENSE FUND'S BRIEF AS *AMICI CURIE***

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .......................................................................................................... 1

I.   THIS MATTER SHOULD BE STAYED PENDING REVIEW BY THE NEW
     ADMINISTRATION. ............................................................................................. 3

II.  THE PROPOSED CONSENT DECREE WOULD VIOLATE ARTICLE III. ................. 5

     A.  This Court Lacks Article III Jurisdiction to Enter the Proposed Consent Decree. ....... 5

     B.  "Drive By" Jurisdictional Acceptance of Consent Decrees is Not Binding. .............. 10

     C.  The Proposed Consent Decree Would Violate Separation of Powers. ...................... 12

III. THIS COURT RETAINS EQUITABLE DISCRETION TO REJECT THE CONSENT
     DECREE. ............................................................................................................. 14

IV.  THE DISPARATE-IMPACT THEORY DOES NOT APPLY TO POLICE CONDUCT
     UNDER THE SAFE STREETS ACT ................................................................... 15

V.   THE PROPOSED CONSENT DECREE GOES WELL BEYOND THE VIOLATIONS
     OF FEDERAL LAW PLEAD IN THE COMPLAINT. ................................................. 17

VI.  THE PROPOSED CONSENT DECREE WOULD IMPERMISSIBLY MODIFY VALID
     LAWS OF THE COMMONWEALTH OF KENTUCKY. ............................................. 21

VII. THE PROPOSED CONSENT DECREE IS NEITHER IN THE PUBLIC  INTEREST,
     NOR IS IT "FAIR, ADEQUATE, AND REASONABLE." ........................................... 24

     A.  The Proposed Consent Decrees Remedies Sweep Far Beyond Remedying Illegal
         Conduct and Imposes Broad Prophylaxis. .................................................. 25

     B.  The Proposed Consent Decree Does not Reasonably Addressing Financial and
         Staffing Concerns.................................................................................. 31

     C.  The Proposed Consent Decree Fails to Account for the Substantial Voluntary
         Reforms Louisville Has Made. ................................................................. 33

     D.  Past Experience Indicates the Proposed Consent Decree May Fail to Achieve Its
         Goals. .................................................................................................. 36

i

CONCLUSION..................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate,* 469 U.S. 287 (1985) ........................................................ 16

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .................................................... 16

*Arizonians for Off. English v. Arizona*, 520 U.S. 43 (1997) ........................... 7

*Benalcazar v. Genoa Township, Ohio*, 1 F.4th 421 (6th Cir. 2021) ............... 11, 18, 21

*Brown v. Giles*, 95 F.4th 436 (6th Cir. 2024) ................................................. 30

*California v. San Pablo & Tulare R. Co.*, 149 U. S. 308 (1893) ..................... 8

*Carter v. Hickory Healthcare Inc.*, 905 F.3d 963 (6th Cir. 2018) ................. 11

*CFPB v. Fifth Third Bank*, No. 1:21-cv-262, 2024 WL 2451080 (S.D. Ohio July 18, 2024)...... 11

*Clinton v. Jones*, 520 U.S. 681 (1997) ............................................................. 3

*Commonwealth v. Chapman*, No. 2023-CA-1221-MR, 2024 WL 4795919 (Ky App. Nov. 15, 2024) ............................................................................................. 28

*Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508 (7th Cir. 2021)...................... 15

*Frew ex rel Frew v. Hawkins*, 540 U.S. 432 (2004) ..................................... 10, 18, 21, 26

*Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167 (2000) .............. 8

*Guess v. City of Paducah*, 687 F. Supp. 3d 799 (W.D. Ky. 2023) ................ 14

*Hecht Co. v. Bowies*, 321 U.S. 321 (1944) ..................................................... 14

*Horne v. Flores*, 557 U.S. 443 (2009) ....................................................... 5, 26, 31

*Landis v. North Am. Co.*, 299 U.S. 24 (1936).................................................. 3

*Lewis v. Casey*, 518 U.S. 343 (1996) .............................................................. 7

*Lexington Ins. Co. v. Amb. Group LLC*, No. 3:20-cv-330 (BJB), 2024 WL 399806 (W.D. Ky. Feb. 2, 2024) ............................................................................................. 11, 18

*Local No. 93, Intern. Ass'n of Firefighters v. City of Clevland*, 478 U.S. 501 (1986) ..... 18, 21, 26

*Lord v. Veazie*, 49 U.S. (8 How.) 251 (1850) ............................................................ 7, 8

*Louisville/Jefferson Cnty. Metro. Gov't v. Moore*, No. 2022-SC-0112-DG, 2024 WL 3930410 (Ky. Aug. 22, 2024) ................................................................................ 23

*Maryland v. United States*, 460 U.S. 1001 (1983) .......................................................... 9

*Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47 (1971) .................................. 7

*North Coast Rivers Alliance v. U.S. Dep't of the Interior*, No. 16-cv-307 (DAD) (SKO), 2021 WL 1721698 (Apr. 29, 2021) ............................................................. 4

Order, *United States v. Louisville Jefferson Cty. Metro Gov.*, No. 3:24-cv-722 (BJB) (W.D. Ky. Dec. 28, 2028) (ECF No. 18) ....................................... 1, 5, 9, 12, 19, 21, 25, 26, 35

*Pedreira v. Sunrise Childres's Servs., Inc.*, 802 F.3d 865 (6th Cir. 2015) ................... 11

*Peretz v. United States*, 501 U.S. 923 (1991) ............................................................. 14

*Perkins v. City of Chicago Heights*, 47 F.3d 212 (7th Cir. 1995) ................................. 21

*PG Pub. Co. v. Aichele*, 705 F.3d 91 (3d Cir. 2013) ................................................... 21

*Pope v. United States*, 323 U.S. 1 (1944) ..................................................................... 6

*Powell v. McCormack*, 395 U.S. 486 (1969) ................................................................ 7

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) .............................................. 14

*Ricci v. DeStefano*, 557 U.S. 557 (2009) .................................................................... 16

*Ross v. Sales*, No. 3:23-cv-283 (BJB), 2024 WL 1285214 (W.D. Ky. May 26, 2024) ............... 12

*Rufo v. Inmates of Suffolk Cnty Jail*, 502 U.S. 367 (1992) ........................................... 5

*Snyer v. United States*, 626 F.Supp. 1374 (D.D.C. 1986) (3 Judge Court) .................... 13

*St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264 (8th Cir. 2011) .................................... 21

*Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83 (1998) ........................................ 11

*Taylor v. Owens*, 990 F.3d 494 (6th Cir. 2021) ......................................................... 11

*United State v. Marales*, 10 Fed. App'x 268 (6th Cir. 2001) ...................................... 28

*United States v. Bd. of Cnty. Comm'rs. of Hamilton*, 937 F.3d 679 (6th Cir. 2019) ................... 11

iv

*United States v. Balt. Police Dep't*, 249 F.Supp.3d 816 (D.D.C. 2017)................................. 5, 24

*United States v. Campbell*, 549 F.3d 364 (6th Cir. 2008)............................................. 30

*United States v. City of Seattle*, 474 F.Supp.3d 1181 (W.D. Wash. 2020)................................... 5

*United States v. Dukes*, 779 F. App'x 332 (6th Cir. 2019)........................................... 22

*United States v. Durham*, No. 3:21-cv-12 (BJB), 2022 WL 1785294 (W.D. Ky. June 1, 2022) . 29

*United States v. Johnson*, 319 U.S. 302 (1943) ...................................................... 7, , 36

*United States v. Leon*, 468 U.S. 897 (1984)........................................................ 27

*United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484 (6th Cir. 2010)......... 2, 11, 24

*United States v. McCraney*, 674 F.3d 614 (6th Cir. 2012) ........................................... 22

*United States v. McMullen*, 103 F. 1225 (6th Cir. 2024)............................................. 30

*United States v. Michigan*, 68 F.4th 1021 (6th Cir. 2023)........................................... 10

*United States v. Pioneer Nat. Resources Co.*, 452 F.Supp.3d 1005 (D. Colo. 2020)................... 26

*United States v. Raddatz*, 447 U.S. 667 (1980) ..................................................... 13

*United States v. Texas*, 559 U.S. 670 (2023) ....................................................... 12

*United States v. Tucker*, 313 F.3d 1259 (10th Cir. 2002) ........................................... 28

*United States v. Windsor*, 570 U.S. 744 (2013) ...................................................... 7

*Vanguard of Cleveland v. City of Cleveland*, 23 F.3d 1013 (1994) ................................... 11

*Vermont v. New York*, 417 U.S. 270 (1974).......................................................... 9

*Whiteman-Walker Clinic, Inc. v. HHS*, No. 20-cv-1630 (JEB), 2021 WL 2033072 (D.D.C. Sept. 03, 2021) ......................................................................................... 4

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................... 14

**Statutes**

34 U.S.C. § 10228(c)(1)............................................................................. 16, 17

42 U.S.C. § 2000d.................................................................................... 16

v

Const. Amend. XI .................................................................................................... 21

KRS § 218A.500(8). .............................................................................................. 22

KRS § 431.005(1)(d) ............................................................................................. 22

KRS §§ 511.060–511.070 ...................................................................................... 21

KRS § 519.020 ....................................................................................................... 21

KRS § 525.055–525.060 ........................................................................................ 22

KRS § 525.140 ....................................................................................................... 21

KRS § 67C.301–67C.327 ...................................................................................... 23

KRS § 67C.326(7)(b) ............................................................................................. 23

**Other Authorities**
*Memorandum from Attorney General Merrick Garland* (Apr. 16, 2021) ...................... 4

*Memorandum from the Attorney General to Heads of Civil Litigating Components* (Nov. 7, 2018) ...................................................................................................................... 2

Memorandum in Support of Motion to Terminate Consent Decree by City of New Orleans, *United States v. The City of New Orleans*, 2:12-cv-1924 (SM) (DPC) (E.D. La) (Aug. 18, 2022) (ECF No. 629-1) ............................................................................................ 33

Michael T. Morley, *Consent of the Governed or Consent of the Government?  The Problems with Consent Decrees in Government-Defendant Cases*, 16 U. Pa. J. Const. L. 637 (2014) ............. 8

Michael W. McConnell, *Why Hold Elections—Using Consent Decrees to Insulate Policies from Political Change*, 1987 University of Chicago Legal Forum 295 (1987) ........................... 4, 26

**Rules**
Fed. R. Civ. Proc. 60(b)(5) ................................................................................... 5

Fed. R. Crim. Proc. 41(e)(2)(A)(ii) ..................................................................... 28

**INTRODUCTION**

This is a case where the United States and local authorities have partnered to seek the Court's approval of the federal takeover of the Louisville Metro Police Department ("LMPD") from the people of Louisville. The Department of Justice and the Jefferson County Metro Government ("Louisville") are in complete agreement. They are not adversaries. This course of conduct is lawless on multiple levels, is bad governance, and therefore must be rejected.

This is a case where there are no claims for the Court to decide, no legal disputes to resolve, and no factual questions to answer. Indeed, the Department's Complaint was filed contemporaneously with the Joint Motion for Entry of Proposed Consent Decree. *See* ECF No. 1; ECF No. 4-1 ("Proposed Consent Decree"). Despite this complete lack of adversity, the Department and Louisville seek to enlist the power of this Court in nationalizing the core local functions of policing via the Proposed Consent Decree. But this Court lacks Article III jurisdiction to do so. Substantively, the Proposed Consent Decree astonishes. To start, it relies on a disparate impact theory under the Safe Streets Act that is foreclosed by binding precedent. It would provide relief completely unmoored from any legal claims in the case. It would invalidate substantial applications of valid laws of *Kentucky*. It would impose any number of policing standards which almost certainly would not be available as relief in a contested case, and which would proscribe *legal* conduct as a broad prophylaxis. It seeks to replace the elected and appointed City leadership with this Court and a Monitor that exists in a state of perpetual suspension as an agent of the Court that is somehow not subject to the Court's supervision and control. *See* Order at 5, *United States v. Louisville Jefferson Cty. Metro Gov.*, No. 3:24-cv-722 (BJB) (W.D. Ky. Dec. 28, 2028) (ECF No. 18) ("Order"). All of these points have severe and fatal legal infirmities. Add to these legal questions the core factual question of whether it is even possible to run a functioning police

1

department in a high-crime urban environment with 786 paragraphs of legalese, plus the anticipated numerous pages of supplemental agreements (*see, e.g.*, ECF No. 5), and regular back and forth with the Monitor and this Court. *See, e.g.*, ECF No. 4-2 at 3 ("Joint Motion" or "Joint Mot.") (arguing "'Proposed Consent Decree must be "fair, adequate, and reasonable as well as consistent with the public interest'" (citing *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010)). It is not.

And why must *this* Proposed Consent Decree be entered *now* when President Donald J. Trump is days away from re-taking Office and has dramatically different views on legal policy than the Biden Administration? After all, President Trump's prior Department of Justice vastly restricted the use of consent decrees and the Proposed Consent Decree here flunks those standards. *See Memorandum from the Attorney General to Heads of Civil Litigating Components* (Nov. 7, 2018) ("Sessions Memorandum") (Exhibit 1 to the Declaration of Eric Neal Cornett (Dec. 20, 2024) ("Cornett Decl.") (ECF No. 13-1)). There is no reason to think President Trump will change his approach. During a December 17, 2024, Community Listening Session, the Department said the quiet part out loud. This Proposed Consent Decree must be rushed through now because the experts in the Department are somehow entitled to co-opt the judicial power of this Court in an end run around the more than 77 million voters who cast their ballots for President Trump:

> "[A]n interesting thing about Proposed Consent Decrees is that when we submit them to the court and the court enters them as an order, it really becomes the court's order. And we are parties before the court, who are there to defend and implement that order? And so it does sort of take it out of the hands, a little bit of, the sort of back and forth. And part of the reason we use Proposed Consent Decrees is that we anticipate that the changes that are going to be necessary may take some time. And so it's a way to make sure that there is consistency and the approach towards that change across different administrations and in the city and the federal government, and that we can just keep on, moving these things forward.

ECF No. 13-2 at 8–9.

This Court should stay this matter pending review by the Second Trump Administration or in the alternative should deny the Joint Motion and reject the Proposed Consent Decree.[1]

## I.    THIS MATTER SHOULD BE STAYED PENDING REVIEW BY THE NEW ADMINISTRATION.

This Court unquestionably has the inherent authority to stay proceedings in this matter pending review by the new Administration. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 24, 254–55 (1936). Thus, "[t]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997).

---

[1] The Heritage Foundation and Mike Howell are joined in this Brief by The Law Enforcement Legal Defense Fund ("LELDF"). As a preeminent and independent voice for law enforcement, LELDF seeks to promote effective and constitutional policing through rigorous research and reasoned advocacy. To advance that mission, the LELDF has conducted extensive research on the federal consent decree process, how such settlements function, and their effectiveness and resulting impact on public safety and policing in various jurisdictions. LEDLF has filed briefs as amicus curiae on these issues in the past. Brief of *Amicus Curiae* Citizens Committee for the Right to Keep and Bear Arms *et al.* in Support of Respondents, *Garland v. VanDerStok*, (23-852); Brief of *Amici Curiae* Law Enforcement Groups and State and Local Firearms Rights Groups in Support of Petitioners, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (No. 20-843); Brief *Amici Curiae* of International Law Enforcement Educators and Trainers Association *et al.* to File the Attached Brief as *Amicus Curiae* in Support of Plaintiff-Appellees for Affirmance in *Barnett* and Reversal in *Herrara*, *Herrara v. Raoul,* (7th Cir. Jun. 26, 2023) (No. 23-1825) (ECF No. 96); Brief of *Amicus Curiae* Law Enforcement Groups and Firearms Rights Groups New York State Sheriffs' Association *et al.* in Support of Appellees and Affirmance, *Antonyuk v. Negrelli*, (2nd Cir. Feb. 8, 2023) (No. 22-2908) (ECF No. 306). Due to the LELDF's firsthand experience and knowledge of decree negotiations and settlement outcomes and having closely studied the proposed consent decree between Louisville and the Justice Department, the LELDF has a deep understanding and interest in the outcome and impact of Louisville consent decree settlement on the law enforcement profession, public safety, and future policy decisions.

Courts have used this broad authority to enter stays in order to allow a new Administration to reconsider a prior Administration's position, particularly where there is reason to believe their views diverge. *See, e.g.*, *Whiteman-Walker Clinic, Inc. v. HHS*, No. 20-cv-1630 (JEB), 2021 WL 4033072, at *1–*2 (D.D.C. Sept. 03, 2021); *North Coast Rivers Alliance v. U.S. Dep't of the Interior*, No. 16-cv-307 (DAD) (SKO), 2021 WL 1721698, at *2–*3 (Apr. 29, 2021).

This makes good sense. Why spend a considerable amount of time and effort answering highly technical and complex legal questions when the entire matter may be resolved out of court by the Administration taking power in just 10 days? While a known unknown, there is no reason to think that the Second Trump Administration will take an approach to consent decrees more permissive than that taken by the First Trump Administration. Mostly likely, the Second Trump Administration will follow a similar approach to the Sessions Memorandum and *Amici* do not understand anyone to dispute that the Proposed Consent Decree is incompatible with the Sessions Memorandum.[2]

Further justifying a stay is the inherently anti-democratic nature of massive institutional consent decrees: "If changes in policy have already been ruled out by binding and irrevocable agreements with private parties, then there is no point in holding" elections. Michael W. McConnell, *Why Hold Elections—Using Consent Decrees to Insulate Policies from Political Change*, 1987 University of Chicago Legal Forum 295, 300 (1987); *see also Horne v. Flores*, 557

---

[2] To be sure, the Department currently operates under Attorney General Merrick Garland's memorandum of April 16, 2021 which repealed the Sessions Memorandum. *See Memorandum from Attorney General Merrick Garland* (Apr. 16, 2021), https://int.nyt.com/data/documenttools/justice-dept/21d2019efd4541a7/full.pdf. But this simply reinforces the point; the Biden Administration and the First Trump Administration have *drastically* different approaches to consent decrees. Logically, that carries over to the Second Trump Administration. Additionally, Plaintiffs respectfully submit that this Court may wish to put the question of timing to the Department at the January 13 hearing.

U.S. 443, 448–50 (2009) (detailing Court's deep concern with the anti-democratic nature of consent decrees that seek to entrench policy and bind successors in office).[3]  That concern is present here in spades.  This Court has already noted that the Proposed Consent Decree "extends beyond the normal terms of the elected or appointed officials entering into it (purporting to bind their successors and limit the ability of voters and accountable officials to change course in the future)."  Order at 6.  That is perhaps *the* key feature of the Proposed Consent Decree—to bind the second Trump Administration and future elected Louisville administrations who may well vehemently and categorically disagree with the Proposed Consent Decree.  *Cf. e.g.*, *United States v. City of Seattle*, 474 F.Supp.3d 1181 (W.D. Wash. 2020) (during height of George Floyd riots granting TRO to prevent implementation of newly adopted City Ordinance banning use of crowd control devices as violative of consent decree).  Again, the Department has not been shy about saying the quiet part out loud.  Why risk entering an anti-democratic order when a delay of a few weeks would ensure that the electorally chosen Second Trump Administration—and not a lame duck—is able to make policy for the next four years?[4]

## II.    THE PROPOSED CONSENT DECREE WOULD VIOLATE ARTICLE III.

### A.    This Court Lacks Article III Jurisdiction to Enter the Proposed Consent Decree.

---

[3]  In answer to the Court's inquiry (Order at 7), outside of modification by consent and court approval (Proposed Consent Decree at ¶ 679), any modification must come under Fed. R. Civ. Proc. 60(b)(5).  While that review embodies a "flexible approach" (*Rufo v. Inmates of Suffolk Cnty Jail*, 502 U.S. 367, 381 (1992)), it nonetheless requires a showing by the moving party that "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"  *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384).

[4]  *United States v. Baltimore Police Department* is not to the contrary.  There, the Court denied a request by the *new* Administration for *additional* time to consider in effect a re-negotiation after that new Administration had *itself* re-affirmed the motion to enter the consent decree.  *See United States v. Balt. Police Dep't*, 249 F.Supp.3d 816, 819 (D.D.C. 2017).  To the extent the court in that case went further and opined that the Department cannot pull out of the settlement that is both *dicta* and demonstrably wrong.  Until the Proposed Consent Order is entered any party can withdraw from it.

This Court has already explained why any consent decree requiring on-going judicial supervision presents first order questions under Article III.  *See Lexington Ins. Co. v Gov. Ambassador Grp., LLC*, 581 F.Supp.3d 863, 866 (W.D. Ky. 2021).  As this Court wrote:

> [A] consent decree, unlike a dismissal, shifts the court's focus from past actions to future obligations.  The basis for extending jurisdiction to that context is far less clear.  By anticipating hypothetical future violations, consent decrees invite courts to exercise ongoing public supervision over a dispute that a private agreement has ended.  Why doesn't this violate the general rule that courts lack authority to act after a case becomes moot?

*Id.* at 867; *accord id.* at 868 (consent decrees are "not easy to reconcile with mootness precedent").

Of course, as this Court explained, the "custom of entering consent decrees is longstanding and familiar—repeatedly discussed, without apparent objection, by appellate courts."  *Id.* at 867.  "But examples are not necessarily endorsements, and it's not easy to find caselaw reconciling consent-decree practice with case-or-controversy precedent."  *Id.* at 867–68.  Thus, this is a "'largely unrecognized challenge to Article III's justiciability requirements,' which the 'Supreme Court has never squarely addressed.'"  *Id.* at 868 (quoting Michael T. Morely, *Non-Contentious Jurisdiction and Consent Decrees*, 19 U. Pa. J. Const. L. Online 1, 12, 15 (2016)).

On this record, the Court's concerns are well-founded; a sweeping institutional decree simply does not comport with Article III due to mootness and lack of adversity.

To start the "institutional" consent decree simply was not the sort of case ever thought to be within the judicial cognizance in in either the English Courts in Westminster or in the colonies.  It is alien and a recent invention.  While the Chancellor could often make a "consent decree," such decrees were either confined to entering judgement on "unchallenged facts" established by stipulation (*see, e.g.*, *Pope v. United States*, 323 U.S. 1, 12 (1944)) or represented negative or declaratory relief that *ended* judicial involvement in the nature of a confession of judgement (the exact procedural posture of early opinions is not easy to decipher).

6

Moving on, the Proposed Consent Decree runs headlong into traditional Article III constraints. The Supreme Court has explained when "both litigants desire precisely the same result . . . There is, therefore, no case or controversy within the meaning of Art. III of the Constitution." *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 48 (1971); *accord Lord v. Veazie*, 49 U.S. (8 How.) 251, 255 (1850) (must be a "real dispute between the parties concerning some matter of right"). And controversy cannot be contrived, "there must be an actual controversy and adverse interests." *Lord*, 49 U.S. at 255; *United States v. Johnson*, 319 U.S. 302, 71 (1943) (must be "a genuine adversity").[5] As to traditional conceptions of mootness, "if the parties lack a legally cognizable interest in the outcome" the case is moot. *Powell v. McCormack*, 395 U.S. 486, 496 (1969).[6] These requirements must be present *throughout* the case, not just at some point and time. *See Arizonians for Off. English v. Arizona*, 520 U.S. 43, 67 (1997).

Here, to be sure, on the pleadings the parties have a theoretical live case or controversy. *See* Ans. at ¶¶ 109–112; Prayer. But the Proposed Consent Decree seeks to put an end to that controversy. "[B]oth litigants [have] desire[d] precisely the same result—the relief in the Proposed Consent Decree—*from the moment this case was filed*." *See Moore*, 402 U.S. at 48; *see also*

---

[5] These concerns are greatly magnified here because of the peculiarity that a consent decree can in certain circumstances exceed relief available at trial. Thus, other safeguards against a court transgressing Article III constraints simply are not present. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The actual-injury requirement would hardly serve the purpose we have described above—of preventing courts from undertaking tasks assigned to the political branches— if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration. The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

[6] *United States v. Windsor* is not inconsistent with this reasoning. The parties *had* adverse interests because the Government would not pay the tax refund despite agreeing on the legal position. *United States v. Windsor*, 570 U.S. 744, 757–58 (2013). Here, there appears to be *complete* agreement in action and no divergent interest. Moreover, *Windsor* is best read confined to its narrow facts in light of its *obvious* results driven rationale. *Id.* at 785–86 (Scalia, J., dissenting).

Michael T. Morley, *Consent of the Governed or Consent of the Government?  The Problems with Consent Decrees in Government-Defendant Cases*, 16 U. Pa. J. Const. L. 637, 658 (2014) (labeling filing of a proposed consent decree with a complaint "extreme case" of lack of adversity and mootness).  There is no actual controversy precisely because the Parties want exactly the same thing and have no divergent interests—indeed they have always wanted the same thing since the case came to this Court.  Thus, this case is moot because "the parties have settled" and thus the Court may not "retain jurisdiction" as "the parties plainly lack a continuing interest."  *Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167, 192 (2000).  "No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard."  *California v. San Pablo & Tulare R. Co.*, 149 U. S. 308, 314 (1893).  Indeed, the parties are so much in alignment that at the same time the Complaint and Proposed Consent Decree was filed the parties also filed a *Joint* Motion seeking entry of the Proposed Consent Decree.  They have even sought to limit the participation of *Amici* (whose primary purpose is to ensure there is *some* adversariness to this proceeding) to ensure speed in granting the Joint Motion.  *Compare* ECF No. 21 at 2–3 *with* ECF No. 11-2 at 4–5 (Amici's primary interest arises from a lack of adversity).  Not only is there "no real conflict of interest" between Department and Louisville they "have the same interest" and that is the very definition of lack of adversity.  *Lord*, 49 U.S. at 255.

But that is not all.  Here the Proposed Consent Decree "begin[s], rather than end[s], the judicial role in this dispute" and "requires the Court's extensive and ongoing involvement (through an agent of the Court dubbed a "Monitor") in the settlement's implementation . . . extends to operational supervision of substantially all of a roughly thousand-officer police force charged with

the safety and security of a million-person metro area." Order at 5.[7]  Put differently, at the very

moment the Proposed Consent Decree is entered the action is *unquestionably* moot and yet the

Court's obligations—unrelated to an ancillary proceeding to enforce that judgement—begin.  That

further exacerbates the mootness and lack of adversity.  How can the Court *possibly* have Article

power to perform its near constant tasks under the Proposed Consent Decree when judgment has

been entered and the parties' positions and interests are identical?  *See Vermont v. New York*, 417

U.S. 270, 277 (1974) (rejecting proposed "river master" appointment that would in effect settle

the "judicial" dispute and then at the outset place the Court in an "arbitral" possession outside of

"judicial power"); *cf. Maryland v. United States*, 460 U.S. 1001, 1004 (1983) (Rehnquist, J.,

dissenting from summary affirmance) (arguing exercise of remedial powers after the parties settled

a case, and thus prevented the normal course of findings essential to formulation of a remedy, may

be outside of "judicial power established by Article III of the Constitution.").

---

[7]  To take an example, the Proposed Consent Decree contains a complicated mechanism by which performance reviews are conducted to "asses[s] . . . whether Louisville Metro and LMPD have achieved the Key Objectives in a section of the Decree by demonstrating that personnel act in accord with the requirements of a section of this Decree."  The Proposed Consent Decree provides:

> If the Parties are unable to reach agreement on a Performance Review methodology within one year of the Effective Date and believe that further negotiations are unlikely to result in an agreement, the Monitor will assume responsibility for creating a methodology for the areas of disagreement.  The Monitor will present the draft methodology for review and comment by the Parties.  If the Parties and the Monitor cannot agree upon the methodology within a timeframe identified in the Implementation Plan, the Parties may ask the court to resolve the matter.

Proposed Consent Decree at ¶ 635.  No standard or procedures for how the Court should "resolve" such disputes is provided.  The intricate detail required for a Performance Review Methodology is illustrated by the recent Agreed Notice (ECF No. 5).  The Joint Motion does not address how adjudicating such a discretionary policy document is within the limited role Article III sets for federal courts.

**B.    "Drive By" Jurisdictional Acceptance of Consent Decrees is Not Binding.**

**1.**    To be sure, the Court entered the consent decree in *Lexington Insurance* because the Sixth Circuit "held that district courts retain jurisdiction to enter consent decrees that . . . . 'spring from and serve to resolve a dispute within the court's subject-matter jurisdiction,' 'come within the general scope of the case made by the pleadings,' and 'further the objective of the law upon which the complaint was based.'" *Lexington Ins.*, 581 F.Supp.3d at 868 (citations ommited).  The *Lexington Insurance* Court found these factors met in an anodyne matter which only involved a consent permanent trademark injunction (which has its own peculiar and narrow historical pedigree).

Why does the Court's reluctant acceptance of a consent decree in *Lexington Insurance* not govern here?

**2.**    To start, after *Lexington Insurance*, Judge Thapar of the Sixth Circuit, stated that the Sixth Circuit's precedent *does not* foreclose considering the legality of consent decrees in an appropriate case:

> "Much has been written about the perniciousness of consent decrees." *Allen v. Louisiana*, 14 F.4th 366, 375 (5th Cir. 2021) (Oldham, J., concurring) (collecting authorities).  Indeed, consent decrees "provide[ ] the legitimacy of a judicial decision without the reality of a judicial decision." Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. Chi. Legal F. 103, 132 (1987).  They often limit the rights of third parties because once the court approves a consent decree, it's difficult to undo.  *Id.*  And they risk "improperly depriv[ing] future officials of their designated legislative and executive powers." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).  But here, the parties don't challenge the legality of consent decrees, so we save this issue for another day.

*United States v. Michigan*, 68 F.4th 1021, 1023 n.2 (6th Cir. 2023).

**3.**    Moving on to appellate authority approving consent decrees, the Sixth Circuit cases cited in *Lexington Insurance* pointedly did not consider the specific arguments this Court raised

concerning mootness and lack of adversity.  Rather, they exercised *general* jurisdiction over consent decrees and did not pass on the specific points of law that make *this* Proposed Consent Decree so objectionable.  *See Benalcazar v. Genoa Township, Ohio*, 1 F.4th 421, 424–25 (6th Cir. 2021) (adjudicating dispute in minor zoning case over whether there was a cause of action sufficient to sustain subject matter jurisdiction);[8] *United States v. Bd. of Cnty. Comm'rs. of Hamilton*, 937 F.3d 679, 688–89 (6th Cir. 2019) (adjudicating propriety of preliminary injunction to enforce existing consent decree in sewer Clean Water Act case); *Pedreira v. Sunrise Childres's Servs., Inc.*, 802 F.3d 865, 871–72 (6th Cir. 2015) (resolving dispute over whether order was consent decree, holding order was consent decree, and remanding for failure to allow intervention by affected party); *Vanguard of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017–18 (6th Cir. 1994) (adjudicating standard for modification of consent decree and the merits of modification regarding minority fire department hiring); *Lexington-Fayette*, 591 F.3d at 489 (adjudicating a dispute over appropriate application of prudential test for consent decree and reversing for failure to enter Clean Water Act consent decree on those grounds).

Because these authorities did not address the threshold Article III question at all they are "drive-by jurisdictional rulings" that "have no precedential effect."  *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 91 (1998); *accord Taylor v. Owens*, 990 F.3d 494, 497 (6th Cir. 2021); *Carter v. Hickory Healthcare Inc.*, 905 F.3d 963, 968 (6th Cir. 2018);  *Ross v. Sales*, No. 3:23-cv-

---

[8] *Benalcazar* speaks in terms of "jurisdiction."  *See, e.g.*, *CFPB v. Fifth Third Bank*, No. 1:21-cv-262, 2024 WL 2451080, at * 1 (S.D. Ohio July 18, 2024); *Lexington Ins. Co. v. Amb. Group LLC*, No. 3:20-cv-330 (BJB), 2024 WL 399806, at *1 (W.D. Ky. Feb. 2, 2024).  But that :jurisdiction" is subject matter jurisdiction.  The entire dispute in *Benalcazar* was whether there was subject matter jurisdiction.  *See Benalcazar*, 1 F.4th at 424 ("So long as the *Benalcazars'* due process and equal protection claims are not 'frivolous' but 'arguable,' the district court had subject-matter jurisdiction over them.  With that jurisdiction, the district court had authority to approve a settlement.").

283 (BJB), 2024 WL 1285214, at *3 n.3 (W.D. Ky. May 26, 2024).  Of course, this rule can mean that a good deal of law can be thrown out when the Article III question is actually properly addressed (as it should be).  *See, e.g.*, *United States v. Texas*, 559 U.S. 670, 725 (2023) (Alito, J, dissenting) (writing in dissent from dismissal on standing grounds, "If the new rule adopted by the Court in this case is sound, these decisions and others like them were all just wasted ink.  I understand that what we have called "'drive-by jurisdictional rulings'" are not precedents . . . but the Court should not use a practice of selective silence to accept or reject prominently presented standing arguments on inconsistent grounds.").  That is part of why the (recent) "history" in this area means so little.  *Cf. Lexington Ins.*, 581 F.Supp.3d at 867–68.

Accordingly, none of the Sixth Circuit cases discussed above are binding on Article III jurisdiction and this is an appropriate case to consider the core legality of "institutional" consent decrees like the Proposed Consent Decree here.

### C.    The Proposed Consent Decree Would Violate Separation of Powers.

The Proposed Consent Decree effectively parcels out judicial power to a Monitor not subject to adequate control by this Court.  That violates the separation of powers under Article III because only the Judiciary may exercise "judicial" power.

The Monitor is "to serve as an agent of the Court."  Proposed Consent Decree at ¶ 608; *accord* Order at 5 ("this consent decree, like others, requires the Court's extensive and ongoing involvement (through an agent of the Court dubbed a 'Monitor'") in the settlement's implementation").[9]  But the Court is denied power to appoint its own agent.  Rather it must rubber

---

[9] As an agent of the Court, the Monitor would be afforded significant protections.  *See* Proposed Consent Decree at ¶ 661 (exempt from litigation and testifying in any case outside of this matter); *id.* (exempt from discovery process in other judicial or administrative proceedings); *id.* at ¶ 664 (exempt from federal and state open records laws); *id.* (not liable for any claim, lawsuit,

stamp the Monitor selected by the parties either in a "joint motion" or "select the Independent Monitor from the candidates submitted by the Parties, after considering the Parties' views on all of the candidates submitted." *Id.* at ¶ 614.  The Joint Motion does not explain how *the parties* can compel and control the exercise of judicial power in appointing an "agent of the court."[10]  That certainly is an affront to Article III.  And even more perniciously, the Court may only remove "for cause" the Monitor it did not select. *Id.* at ¶ 617.  Continuing on, the Monitor may "hire or retain" staff to work under them (presumably also agents of the Court, but the Proposed Consent Decree does not say) again by consent of the parties, unless there is disagreement at which case the Court may approve or reject the Monitor's request.  Proposed Consent Decree ¶ 621.  The Court also does not control or set the Monitor's budget; it is limited to merely approving it. *Id.* at ¶ 620.  The Court may also raise the Monitor's budget cap it if finds that "the increase is necessary for the Monitor to fulfill its duties under the Proposed Consent Decree and is not due to a failure in planning, budgeting, or performance by the Monitor." *Id.* at ¶ 623.

Moreover, there is no ability of the Court to withdraw the reference and rescind this delegation of power.  Absent removal for cause the Court is "stuck" with the Monitor performing the proscribed duties, and thus it cannot be said "the entire process takes place under the district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667, 681 (1980); *see also Snyer v. United States*, 626 F.Supp. 1374, 1401 (D.D.C. 1986) (3 Judge Court) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey."), *aff'd, sub. Nom.*

---

or demand brought by non-parties to the Consent Decree related to Monitor's performance of duties).

[10]  In a case requiring a Special Master the Court may *choose* to adopt such a procedure.  The point here is that the consent decree is presented as a package *fait acompli*; the Court is denied that antecedent choice.

*Bowsher v. Syner*, 478 U.S. 714. *cf. Peretz v. United States*, 501 U.S. 923, 938 (1991) ("'Moreover, the magistrate himself is subject to the Art. III judge's control. Magistrates are appointed by district judges, § 631(a), and subject to removal by them, § 631(h). In addition, district judges retain plenary authority over when, what, and how many pretrial matters are assigned to magistrates'" (quoting *United States v. Raddiz*, 447 U.S. 667, 685 (1980) (Blackmun, J., concurring)). Collectively, that is an afront to separation of powers.

Nowhere does the Joint Motion explain how this arrangement complies with Article III's limitations on judicial power in a case in which the parties have no dispute and aligned interests..

## III.    THIS COURT RETAINS EQUITABLE DISCRETION TO REJECT THE CONSENT DECREE.

Courts retain equitable discretion to *dismiss* cases where jurisdiction is found to be inappropriate in "exceptional circumstances where denying a federal forum would clearly serve an important countervailing interest." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). This Court has done so before. *See Guess v. City of Paducah*, 687 F. Supp. 3d 799, 804 (W.D. Ky. 2023) (citing *Slyman v. City of Willoughby*, 134 F.3d 372 (Table), No. 96-4028, 1998 WL 24990 at *2 n.1 (6th Cir. 1998)).

That broad discretion applies in spades to simply rejecting a particular form of equitable relief (here the Proposed Consent Decree), but otherwise exercising jurisdiction over the case and entering another form of relief (*e.g.*, a prohibitory injunction after trial). After all, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also Hecht Co. v. Bowies*, 321 U.S. 321, 327–30 (1944) (Court retains discretion to decline to grant injunction after finding repeated violations of law); *Guess*, 687 F. Supp. 3d 799 at 804 ("Prudence is all the more justified if the relief requested is equitable in nature: congressional conferral of jurisdiction "does

not eliminate" or "call into questio[n] the federal courts' discretion in determining whether to grant certain types of relief—a discretion that was part of the common-law background against which the statutes conferring jurisdiction were enacted." (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989)).

While in some ways, this may be seen as a form of abstention, there is a countervailing interest here that highlights how "the animating force of the Court's abstention cases is that they all implicate (in one way or another and to different degrees) underlying principles of equity, comity, and federalism foundational to our federal constitutional structure." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 525–26 (7th Cir. 2021) (quotation omitted).

That countervailing interest here includes the incoming Administration's inability to address the consent decrees less than ten days before it takes office, the lack of adversarial posture in this case, the Article III deficiencies related to jurisdiction, and the separation of powers violations, all of which are explained above. These all implicate underlying principles of equity, comity, and federalism, which should weigh on this Court's reasoning about whether the Court should exercise its equitable discretion to decline to enter the decree. Simply put, this Court can and should use its inherent and broad discretion to deem *this* Proposed Consent Decree, at *this* time, a bridge too far.

## IV.    THE DISPARATE-IMPACT THEORY DOES NOT APPLY TO POLICE CONDUCT UNDER THE SAFE STREETS ACT.

The Court should reject the parties' proposed expansion of the disparate-impact theory to police conduct under the Safe Streets Act. The text of the statutes forecloses such an application in this context. While the narrow application of the disparate-impact theory to police conduct under the Safe Streets Act remains an "open question" (ECF No. 18 at 3 n.7), the Sixth Circuit has found a claim for disparate-impact discrimination was *not* cognizable under an antidiscrimination

15

statute containing the same operative language.  *See Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235 (6th Cir. 2019).  The Sixth Circuit's reasoning in *Doe* is eminently correct, and this Court should follow it here and reject the Parties' proposed expansion of disparate impact liability.

Disparate-impact discrimination occurs when an entity acts for a nondiscriminatory reason, but their actions have a "disproportionally adverse effect" on a protected group.  *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  The antidiscrimination provisions of the Safe Streets Act bars discrimination "*on the ground of* race, color, religion, national origin, or sex."  34 U.S.C. § 10228(c)(1) (emphasis added).  In *Doe*, the Sixth Circuit found the plaintiff could not bring a disparate-impact discrimination suit under Section 1557 of the Affordable Care Act, which provided "an individual shall not, *on the ground* prohibited under" a series of four statutes be denied health care from an entity that receives federal funds.  *Doe*, 926 F.3d at 238 (citing 42 U.S.C. § 18116(a) (emphasis added)).  The court reasoned "the word 'ground' refers to the forbidden source of discrimination . . . ." *Id*.

Similarly, the Supreme Court has repeatedly noted that § 601 of Title VI prohibits only intentional discrimination.[11]  *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (denying a private right of action to enforce disparate-impact regulations promulgated under Title VI); *Alexander v. Choate,* 469 U.S. 287, 293 (1985) ("Title VI itself directly reach[es] only instances of intentional discrimination."); *Doe*, 926 F.3d at 240 ("Title VI, for example doesn't prohibit disparate-impact discrimination.").  In instances where the Supreme Court has found that a statute

---

[11]  Section 601 of Title VI is codified in 42 U.S.C. § 2000d and reads "no person in the United States shall, *on the ground of* race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal assistance . . ." (emphasis added).

provides a disparate impact claim "it has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable' which refers to the consequences of an action rather than the actor's intent. . . . That language is missing from [the operative statute in that case] just as it is missing from Title VI." *Doe*, 926 F.3d at 242 (citing *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project Inc.*, 576 U.S. 519, 532–34 (2015) (allowing disparate-impact discrimination claims under the Fair Housing Act); *Smith v. City of Jackson, Miss*, 544 U.S. 228, 235–36 (2005) (same for 1967 Age Act); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–31 (1971) (same for Title VII)).

Here, the Safe Streets Act proscribes that the "forbidden source" of the discrimination is race, color, religion, national origin, or sex. *Doe*, 926 F.3d at 238; s*ee also* 34 U.S.C. § 10228(c)(1). To find discrimination under the Safe Streets Act, one of those five grounds in the statute must be the *reason* for the discrimination. The discrimination must be intentional. Accordingly, disparate-impact discrimination—which by its very nature is unintentional—is inapplicable in this setting.

## V.    THE PROPOSED CONSENT DECREE GOES WELL BEYOND THE VIOLATIONS OF FEDERAL LAW PLEAD IN THE COMPLAINT.

The Proposed Consent Decree includes provisions that have nothing to do with even an *alleged* violation of federal law, and are included purely for policy reasons. This cannot be done. Whether as a matter of subject matter jurisdiction or limitation on equitable power, a "consent decree must 'com[e] within the general scope of the case made by the pleadings,' and must further the objectives of the law upon which the complaint was based." *Local No. 93, Intern. Ass'n of*

17

*Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986); *accord Benalcazar*, 1 F.4th at 425.[12] Necessarily then, "[c]onsent decrees entered in federal court must be directed to protecting federal interests." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 432, 437 (2004). Accordingly, at a basic level there must be a link between the federal claims plead and the relief provided. *See, e.g.*, *Lexington Insur. Co.*, 2024 WL 399806, at * 1 (Lanham Act claims for fraudulent use of trademark supported consent injunction restraining use of trademark). The entire Chapter of the Proposed Consent Decree concerning sexual assault and domestic violence flunks this test.[13]

The Complaint does not allege any violation based on sex or gender bias nor does it seek such relief. This is not surprising, as the Department's Report of Investigation (ECF No. 1-1) ("ROI") did not find "find reasonable cause, at this time, to believe that LMPD's practices result in gender bias in violation of federal law." ROI at 69. Despite this fact, the ROI went on to document its "serious concerns about how LMPD responds to and investigates reports of sexual assault and domestic violence, including reports of sexual misconduct and domestic violence by LMPD officers." *Id.* Over and over these concerns were divorced from any legal issue and turned on policy disagreements or failure to follow LMPD policy. *Id.* at 69–72. For example, after noting that "[a]gency leaders face difficult choices about resource allocations, to be sure," the ROI boldly proclaims that LMPD has "hampered the ability of sex crimes and domestic violence detectives to work their cases properly." *Id.* at 72. The evidence for this categorical and inflammatory statement is that LMPD consolidated certain units in 2021 due to "staffing shortages," reduced designated

---

[12]    Necessarily the provisions discussed herein are representative; a full catalogue of the prophylaxis and at times broad prophylaxis on prophylaxis in the Proposed Consent Decree would be a substantial undertaking.

[13]    Of course, a settlement agreement can include any terms the parties think relevant; a consent decree cannot precisely because it is an order of the court exercising judicial power under Article III.

sex crime and domestic violence detectives, and that these reductions have led to claims by the Domestic Violence Squad that services have been impacted and that "[i]n 2022, domestic violence *homicides* in Louisville reached their highest point in four years." *Id.* (emphasis added). This discussion only pays lip service to LMPD's need to balance ever scare resources or other causative factors for *homicides*. *See also, e.g.*, *id.* at 71 (alleging failures in investigative techniques in "sexual assault and domestic violence cases"). In a similar vein, the ROI hammers home allegations of violations of LMPD policy. *See, e.g.*, *id.* at 71 ("Despite *LMPD policy*, we found numerous domestic violence incidents where officers did not complete lethality screens when required." (emphasis added)).

Of course, these are extremely serious matters, but policy disputes and decisions on investigative techniques are vested in the politically accountable Government of the Commonwealth of Kentucky and the City of Louisville; they have nothing to do with violations of the Constitution or federal law. *Cf.* Order at 6 ("That agency and its leaders are already accountable to the people through elected representatives and their delegated officers."). Atrociously bad policing is simply not a violation of the Constitution or federal law and has long been remedied through the political process.

Nonetheless, the Proposed Consent Decree contains an entire section concerning "Sexual misconduct, sexual assault, and domestic violence." Proposed Consent Decree at 109. Most notably, this provision includes "Key Objectives" and thus relates directly to whether Louisville has achieved overall compliance with the Proposed Consent Decree—all without any legal violation. *Id.* at ¶ 396; *cf.* ¶ 676 ("[a]t all times" Louisville must be in "substantial compliance"); ¶¶ 699, 702 (termination only on "substantial compliance" in whole).

On the substance, the Proposed Consent Decree goes well beyond ensuring compliance with federal law and expressly imposes finely reticulated best policy practices.

For example, the Proposed Consent Decree prescribes a number of detailed investigative policies and procedures that would apply to general sexual assault and domestic violence investigations and the supervision of those investigations. *See id.* at ¶¶ 352–363, 368–380, 381. These policies micromanage the process. *See, e.g.*, *id.* at ¶ 358 ("LMPD policy will require its personnel assigned to investigate Sexual Assault to regularly contact victims about the investigation, including significant updates in the investigation until final resolution of the case."). They also require Louisville to devote considerable resources. *See, e.g.*, *id.* at ¶ 359 ("LMPD policy will require its personnel to offer all victims of Sexual Assault access to medical care, social service referrals, and information from a trained sexual assault victim advocate."). They also require Louisville to reconvene "Louisville's Sexual Assault Response Team (SART) to regularly review LMPD's Sexual Assault response, including investigations and applicable policies and procedures, and to provide recommendations that improve services to victims of Sexual Assault." *Id.* at ¶ 364. In so doing Louisville is required to "request participation from community and governmental stakeholders, such as representatives from Sexual Assault crisis service organizations, medical providers, and prosecutors" (*id.*) and LMPD must work with the SART to develop a number of protocols. *Id.* at 356–66. Separate provisions would govern reports against LMPD Members. *See id.* at 382–89.

The Proposed Consent Decree would also mandate a variety of training (*id.* at ¶ 390–92) and Louisville would be required to "consult with the community and governmental stakeholders, such as representatives from Sexual Assault and Domestic Violence crisis service organizations,

medical providers, and prosecutors in developing and implementing these trainings." *Id.* at 393. Detailed data collection analysis would also be required. *See id.* at 394–95.

These provisions are not simply a prophylactic remedy to a violation of federal law; they are *by the Government's own admission* totally unmoored from any violation of federal law. That is flatly impermissible. *See, e.g.*, *Frew*, 540 U.S. at 437; *Local No. 93*, 478 U.S. at 525; *Benalcazar*, 1 F.4th at 425. To be sure, the Government may well be right that their policy prescription is the appropriate solution to a grave problem. But again, that is not the Government's call to make; the Constitution rests that judgment in the Commonwealth and Louisville. *See* Const. Amend. XI; Order at 6 n.10 ("The Constitution's horizontal and vertical separation of powers prevent state governments (and their constituent municipal units) from circumventing concerns of political accountability simply by consenting to the reallocation of authority from the state to federal levels or from elected official to judge.").

## VI. THE PROPOSED CONSENT DECREE WOULD IMPERMISSIBLY MODIFY VALID LAWS OF THE COMMONWEALTH OF KENTUCKY.

A governing principle of consent decrees is that parties cannot circumvent or invalidate a valid state law by entering into a consent decree. *See e.g.*, *PG Pub. Co. v. Aichele*, 705 F.3d 91, 116 (3d Cir. 2013); *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 270 (8th Cir. 2011); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995). The Proposed Consent Decree seeks to do just that.

***Power to Arrest for Misdemeanor.*** The Proposed Consent Decree requires Louisville to develop new protocols for how officers handle citations and arrests for certain offenses, including obstructing governmental operations,[14] criminal trespass,[15] obstructing a highway,[16] disorderly

---

[14] *See* KRS § 519.020.
[15] *See* KRS §§ 511.060–511.070.
[16] *See* KRS § 525.140.

conduct,[17] and possession of drug paraphernalia,[18] when those offenses are not combined with other offenses.  *See* Proposed Consent Decree at ¶ 240.  These are not *Louisville* offenses—they are offenses under the laws of the *Commonwealth*.  Under the terms of the Proposed Consent Decree, for those offenses LMPD policy will require:

> a. The officer first reasonably determines whether any enforcement action is appropriate;
> b. If an enforcement action is appropriate, the officer determines whether a warning or referral to Deflection or the Outreach Team would be appropriate;
> c. The officer only issues a citation if they determine that a warning or referral to Deflection or the Outreach Team would be inappropriate or insufficient to address the matter;
> d. The officer only makes an Arrest if they determine that a citation and/or referral to Deflection or the Outreach Team would be inappropriate or insufficient to address the matter; and
> e. If a citation is issued or an Arrest is made, the officer documents their reasons for concluding that less intrusive action would be inappropriate or insufficient.

Proposed Consent Decree at ¶ 241.  In the event an officer exercises his discretion to make an arrest for the listed offenses, he or she must "notify a supervisor as soon as practicable after making an [a]rrest."  *Id.* at ¶ 242.

But *Kentucky* (not Louisville) law provides express authority to arrest (versus citation or other disposition), under KRS §431.005(1)(d), which provides "[a] peace officer may make an arrest . . . without a warrant when a misdemeanor, as defined in KRS §431.060, has been committed in his or her presence[.]"  The Kentucky misdemeanor arrest standard has been recently upheld.  *See e.g.*, *United States v. Dukes*, 779 F. App'x 332, 335 (6th Cir. 2019).  There is no constitutional violation in arrests for even minor offenses.  *United States v. McCraney*, 674 F.3d 614, 618 (6th Cir. 2012) ("There is no dispute that Ricker had probable cause to stop and arrest Ammons for *failing to dim the high-beam headlights* in the face of oncoming traffic.") (emphasis

---

[17] *See* KRS §§ 525.055–525.060.
[18] *See* KRS § 218A.500(8).

added)).  The Proposed Consent Decree would effectively invalidate this clear authorization.  In Louisville an officer "may [*not*] arrest" unless the Proposed Consent Decrees' procedure is complied with, regardless of what the legislature of the Commonwealth has to say about it. An officer responding to criminal trespass in the first degree (trespass in a dwelling a Class A Misdemeanor) can no longer exercise the authorization to arrest granted by Kentucky law.  That is not permissible.

**Conflict with Kentucky Police Officers' Bill of Rights.**  The Proposed Consent Decree's circumvention of state law goes beyond criminal procedure and impacts both the protections negotiated by FOP in its collective bargaining agreement with LMPD and the statutory protections afforded LMPD police officers by the Kentucky Legislature.   The Kentucky Legislature established an administrative procedure for disciplinary actions of police officers in a Consolidated Local Government.  *See* KRS §§ 67C.301–67C.327.  When read together this statutory scheme establishes "'minimum' 'administrative due process rights' provided to police officers in proceedings in front of the Merit Board."  *Louisville/Jefferson Cnty. Metro. Gov't v. Moore*, No. 2022-SC-0112-DG, 2024 WL 3930410, at *5 (Ky. Aug. 22, 2024).  The Proposed Consent Decrees Provisions would invalidate rights under this *Kentucky* statutory scheme.  To take but one of several examples, among those rights is the right to "copies of sworn statements or affidavits to be considered by the board and any exculpatory statements or affidavits . . . furnished to the police officer no less than twelve (12) days prior to the time of any hearing[.]"  KRS § 67C.326(7)(b). The Proposed Consent Decree however provides that:

> LMPD policy will prohibit Members from reviewing any non-public evidence related to an incident for which the Member has been notified they are under investigation . . . to[] alleged Misconduct, except in the following circumstances:
>   a.  Reports authored by the Member;
>   b.  In preparation for a criminal prosecution in which the incident is the subject;
>   c.  In preparation for a civil litigation proceedings; or

23

        d.  Upon approval of LMPD

Proposed Consent Decree at ¶ 495.  This provision is plainly contrary to statute and negatively

impacts the administrative due process rights of the LMPD rank and file.

## VII.  THE PROPOSED CONSENT DECREE IS NEITHER IN THE PUBLIC INTEREST, NOR IS IT "FAIR, ADEQUATE, AND REASONABLE."

There is no dispute that in the more common environmental consent decree milieu, the

district court must determine that it is "'fair, adequate, and reasonable, as well as consistent with

the public interest.'"  *Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d at 490 (quoting *United States*

*v. County of Muskegon*, 298 F.3d 569, 580–81 (6th Cir. 2002)); *accord* Joint Motion at 3.  Courts

outside of the Sixth Circuit that have examined consent decrees joined pursuant to 34 U.S.C. §

1260 have adopted a substantively similar framework, with the additional caveats that a consent

decree "is not illegal, a product of collusion, or against the public interest."  *Balt. Police Dep't.*,

249 F.Supp.3d at 818.

As concerns the question of "public interest", the Joint Motion's analysis is again largely

cursory.  It alleges violations of the "Constitution or laws of the United States."  *See* Joint Mot. at

4.  But nowhere does it explain *how* the Proposed Consent Decree fixes *those* violations.  Instead,

it touts the parties' work in negotiating a settlement (*id.* at 4–6) and highlights a hodgepodge of

ideals putatively served by the Proposed Consent Decree that read more like a legislative

committee report than a judicial order.  *See, e.g.*, *id.* at 6 ("The proposed Decree sets out reform

efforts to be undertaken by Louisville Metro and LMPD for the express purpose of promoting

effective community engagement and oversight, effective policy guidance, improved training,

closer supervision, and improved technology and resources.").  Indeed, the Joint Motion even

highlights that "the United States' investigation and the Parties' subsequent negotiations already

have set in motion a process of reform within Louisville Metro and LMPD," but does not explore

24

the obvious corresponding question of why, given that progress, a consent decree is necessary as opposed to a memorandum of agreement or a declaratory injunction. *Id.* at 6. So too questions of whether the decree is "fair, adequate, and reasonable." *Id.* at 7. Far from exploring direct empirical proof of this proposition (ordinarily required for what is in form a massive structural injunction), the Joint Motion proceeds by inference. In its telling, the mere fact of the negotiation (and some outreach) establishes the point. *See id.* at 7–8. Somehow so does the appointment of a Monitor. *Id.* at 8; *but see supra* pp. 9–10.

Examination of only a handful of the Proposed Consent Decrees' provisions establish that the Joint Motion's inferential propositions are empirically questionable at best, at worst, they are deeply flawed.

### A. The Proposed Consent Decrees Remedies Sweep Far Beyond Remedying Illegal Conduct and Imposes Broad Prophylaxis.

This Court requested briefing on "the extent to which the proposed remedies are compelled by federal law or merely conducive to police practices less likely (in the parties' views) to violate federal law. Order at 7. The answer is that the Proposed Consent Decree repeatedly would have this Court use its coercive power to restrain and oversee *legal* conduct. The Government does not hide this fact; indeed the ROI expressly admits it articulating a theory by which the Government has full rein to take over the LMPD because "[t]he systemic legal violations we found result *in part* from Louisville Metro's and LMPD's deficient supervision and accountability systems." ROI at 73 (emphasis added). This theory is expressly grounded in mere casual linkage; proximate cause is not alleged. *See id.*; *see also id.* ("In some sections of this report, we identify policy shortcomings that have contributed to legal violations by LMPD officers, while in other sections, we describe failures to follow policy that have resulted in violations. More broadly, LMPD does not adequately train, support, or supervise officers, and these failures are a contributing cause of

all of the problems we describe."). While this overbreadth may well be permissible in some abstract sense, (*see Local No. 93*, 478 U.S. at 526 (relief may exceed that available at trial)) it unquestionably goes to whether the decree is fair, appropriate, or in the public interest. That is for good reason: "If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers." *Frew*, 540 U.S. at 441; *see also Horne*, 557 U.S. at 448–49 (detailing and reinforcing this concern). That would of course in turn deprive the relevant populace of democratic accountability. *See, e.g.*, Michael W. McConnell, *Why Hold Elections—Using Consent Decrees to Insulate Policies from Political Change*, 1987 University of Chicago Legal Forum 295, 300 (1987); *accord Horne*, 557 U.S. at 448 (citing McConnell with approval). That concern is present here in spades. The Proposed Consent Decree would restrict the enforcement of valid laws and would bar otherwise lawful conduct without any explanation of why broad prophylaxis is required. Again, the Joint Motion does not contain the required explanation as to how it is appropriate for this Court, on a limited and one-sided record, to grant broad prophylactic relief well in excess of the legal violations plead in the Complaint. *See, e.g.*, *United States v. Pioneer Nat. Resources Co.*, 452 F.Supp.3d 1005, 1014–15 (D. Colo. 2020) (requiring explanation for relief) . It is as not as a few examples demonstrate.[19]

  ***Residential Search Warrant Probable Cause.*** As this Court has already observed, the Complaint contains a curious allegation: Louisville violated federal law by "[c]onducting searches based on warrants that, though approved by a judge, lack probable cause." Order at 2 (emphasis added); *accord* Compl. at ¶ 29 ("LMPD engages in a pattern or practice of conducting searches of

---

[19] Necessarily the provisions discussed herein are representative; a full catalogue of the prophylaxis and at times broad prophylaxis on prophylaxis in the Proposed Consent Decree would be a massive undertaking.

residences based on *invalid search warrants*, in violation of the Fourth Amendment."); ROI at 23–27 (faulting lack of probable cause in cases where Louisville "received a warrant", "obtained a warrant", and the "court issued the search warrant anyway"). The disconnect is palpable. Absent a *Franks* violation how is the officer and the local government at fault for a lack of probable cause *when a court expressly found that probable cause existed*? For the most part they are not. *See, e.g.*, *United States v. Leon*, 468 U.S. 897, 920–21 (1984) ("This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.")That is even more so in the context of the pattern or practice allegation here where an officer has *repeatedly* received judicial approval for the warrants now said to lack probable cause. After all, officers are certainly entitled to rely upon settled and repeated judicial decisions.

Thus, it appears that the Department's issue is less with Louisville and more with its judges. Despite this, the Proposed Consent Decree proposes any number of requirements for residential search warrants, ranging from injunctions that Louisville comply with the law (they are already complying with) (Proposed Consent Decree ¶¶ 156–63); limitations on sealing search warrants (apparently under the theory that transparency will increase accountability) (*id.* at ¶¶ 166–67); mandatory pre-submission review of search warrant applications by multiple levels of supervisors (with attendant documentation requirements) (*id.* at ¶¶ 168–70, 172); mandatory requirements for

review of warrants by prosecutors or consulting attorneys (again documented) (*id.* at ¶¶ 171, 173, 176); and prohibitions against forum-shopping for perceived favorable judges (*id.* at ¶ 177).  These requirements come with further provisions for robust data collection and electronic recording keeping regarding confidential informants (*id.* at 178–82) as well as provisions for training.  *Id.* at 183.  To be clear, the foregoing may all be well and good, and if implemented, would vastly improve both the quality of policing and public trust, but it is passing strange to punish the constable for repeated judicial error.

*Nighttime Residential Search Warrant Execution.*  The Department alleges that "LMPD executes warrants at unnecessarily late times and without taking appropriate measures to protect public safety.  They do this without court authorization or exigent circumstances that could merit such unreasonable executions."  Compl. at ¶ 35.  Spotting the Department that there is a legal requirement to take *some* safety related measures when executing a search warrant, the Department never explains why executing a warrant at night is infirm under federal or Kentucky law.  Kentucky law plainly permits such an execution.  *See Commonwealth v. Chapman*, No. 2023-CA-1221-MR, 2024 WL 4795919, at *3 (Ky App. Nov. 15, 2024).  Federal law only requires reasonableness as to time of execution.  *See, e.g.*, *United States v. Tucker*, 313 F.3d 1259, 1265–66 (10th Cir. 2002).  The best the Department can come up with is the ROIs', explanation that the Federal Rules of Criminal Procedure and putative best practices support drastically curtailing nighttime searches.  ROI at 29.  Yes, the ROI accurately recounts the Federal Rule of Criminal Procedure.  *See* Fed. R. Crim. Proc. 41(e)(2)(A)(ii) (must "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time"); *but see also* 21 U.S.C. § 879 (search relating to controlled substances warrant can be executed at any time).  But that does nothing for

the Department because the Federal Rules do not govern state action. *See, e.g.*, *United State v. Marales*, 10 Fed. App'x 268, 269 (6th Cir. 2001).

Despite all of this, the Proposed Consent Decree mandates that "LMPD policy will require officers to execute Residential Search Warrants between the hours of 6:00 A.M. and 10:00 P.M., absent exigent circumstances, unless officers provide reasonable cause in the application for the Residential Search Warrant that there is a need to execute the warrant during the hours between 10:00 P.M. and 6:00 A.M. and a court approves the timing." Proposed Consent Decree at ¶ 165; *id.* at ¶ 164. Again, the Joint Motion does not tie this remedy to the actual violation. Moreover, the Joint Motion does not address the most curious aspect of this provision: How can a federal consent decree mandate certain procedures in a state court? What happens if the state court simply refuses to accept an engrafted nighttime warrant requirement?

***High Crime Neighborhoods.*** In an apparent effort to mitigate what is seen as "a pattern or practice of making unlawful stops, searches, and arrests, in violation of the Fourth Amendment." (Compl. at ¶ 37), the Proposed Consent Decree orders that "LMPD policy will prohibit officers from describing large geographic areas such as entire neighborhoods, divisions, or beats as 'high-crime' areas." Proposed Consent Decree at ¶ 223. Although this provision is contained in the "Stops and Weapons Pat-Downs" section, it would appear to apply to any articulation of suspicion or probable cause. This provision is upside-down. Not only does it not remedy any articulable violation of law, it bans police officers from using a core metric in reasonable suspicion and probable cause determination that is well understood not only by law enforcement, but judges. For example, this Court has articulated cause to arrest based on "driving a stolen car, in a high-crime neighborhood, with a passenger who put on gloves and carried a rifle." *United States v. Durham*, No. 3:21-cv-12 (BJB), 2022 WL 1785294, at *3 (W.D. Ky. June 1, 2022). The Sixth Circuit has

*repeatedly* used a "high-crime neighborhood" as an important factor, easily applied by an officer on the beat in the heat of the moment, supporting reasonable suspicion for a *Terry* stop. *See, e.g.*, *United States v. McMullen*, 103 F. 1225, 1230–31 (6th Cir. 2024); *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). Yet the Proposed Consent Decree would turn all of this on its head, unquestionably confusing officers on the beat who must now apply a real but uncertain gloss onto the actual law governing their policing. Again, the Joint Motion says nothing to justify any of this, and again it simply is not warranted.

***Electrical Weapons ("CEWs").*** The Complaint asserts that Louisville has used Conducted Electrical Weapons ("CEWs") *in a manner that violates the Constitution*. *See* Compl. at ¶ 25 ("LMPD uses tasers against people who are not a threat, including using tasers against people who have submitted to an officer or are already restrained."); ECF No. 1-1 at 16 ("These taser uses are painful and dangerous, and they violate the law."). If a pattern and practice were proven at trial, Plaintiffs would only be entitled to have that unlawful conduct restrained and remedied; that is all the Complaint seeks. *See* Compl. at ¶ 106 (f).But the Proposed Consent Decree sweeps far more broadly:

> policy will require that officers Discharge CEWs only where grounds for Arrest or detention are present, and: (1) such force is necessary to protect the officer or another person from imminent physical injury; and (2) when less intrusive means have been or will likely be ineffective or increase the likelihood of greater harm to the officer, the Subject, or another party.

Proposed Consent Decree ¶ 42. (Less there be doubt the Proposed Consent Decree reiterates officers may "[n]ot Discharge a CEW solely on the basis that a person flees from an officer." *Id.* at ¶ 45(h)). Just one problem—that prohibition sweeps in a good deal of *lawful* conduct. As Judge Thapar explained earlier this year, "we've held that it's reasonable for officers to tase fleeing suspects." *Brown v. Giles*, 95 F.4th 436, 439 (6th Cir. 2024).

**B.    The Proposed Consent Decree Does not Reasonably Addressing Financial and Staffing Concerns.**

The Proposed Consent Decree is premised from its first paragraph that Louisville and the Department of Justice "share a commitment to lawful and effective public safety."  Proposed Consent Decree at ¶ 1.  The Parties' Joint Motion presumes the Proposed Consent Decree will achieve this aim with possible "financial costs," but that these costs are justified because "these reforms serve the public interest by allowing the Parties to expeditiously work to implement and continue improvements that will foster constitutional, lawful, and effective public safety and emergency response services for Louisville."  Joint Mot. at 6.  But the Joint Motion offers no factual basis to support this speculation and omits the on-going recruitment crisis Louisville faces.  That is the height of unreasonableness and a lack of fairness, especially in an area of "dictating" "local budget priorities" that presents "heightened" "[F]ederalism concerns."  *Horne*, 557 U.S. at 448.

In August 2024, then-interim Police Chief Paul Humphrey acknowledged Louisville is "short 250 plus officers."[20]  In that August graduating class only nine individuals graduated, while the police academy has the capacity for forty-eight.  The Proposed Consent Decree will likely worsen the police shortage both by introducing competition for the pool of potential applicants with the mandated "Deflection" program and by placing ever greater demands on an already understaffed department through increased monitoring requirements, data management and internal auditing, and diversion of patrol officers into new roles.

---

[20] David Mattingly, *LMPD recruiting numbers hit new low*, WAVE News (Aug. 30, 2024), https://www.wave3.com/2024/08/30/lmpd-recruiting-numbers-hit-new-low/ (last visited Jan. 10, 2025).

Regarding competition for qualified candidates, the LMPD competes with the "Deflection" unit. The Proposed Consent Decree specifies that the "Deflection" program's "Mobile Crisis Response Team" shall not be employees of LMPD. Proposed Consent Decree at ¶ 311(g). June 2024 reporting indicates that Deflection currently has forty-six full-time staff,[21] or nearly an entire police academy class. The Proposed Consent Decree requires "sufficient, well-trained staff and resources for the Behavioral Health Coordination and Oversight Council, MetroSafe, the Deflection program, and Advanced Behavioral Health Response Officers [] to comply with this Decree." Proposed Consent Decree at ¶ 473(d).

In addition to fully staffing the above-cited programs, Louisville Metro and LMPD "must provide for adequate staffing and resources to satisfy all requirements of this Proposed Consent Decree, including:

      a.   A sufficient number of supervisors to provide close and effective supervision;
      b.   Sufficient, well-trained staff and resources to conduct timely and thorough investigations of uses of force and allegations of misconduct;
      c.   Sufficient, well-trained staff and resources to conduct timely and thorough investigations of reports of Sexual Assault, Sexual Misconduct, and Domestic Violence, consistent with Section IX, above; . . .
      e.   Sufficient, well-trained staff and resources to conduct trainings of LMPD personnel necessary to comply with this Decree; and
      f.   Sufficient, well-trained staff and resources to conduct timely and thorough data analysis, audits, policy development, and Proposed Consent Decree implementation tasks, as required by this Decree.

Proposed Consent Decree at ¶ 473.

That final component, staff and resources necessary to comply with the Proposed Consent Decree's requirements, has proven more burdensome than expected in other jurisdictions that have

---

[21]  Reyna Katko, *Louisville's 911 Crisis Call Diversion Program now available 24 hours a day* WDRB News (Jun. 27, 2024), https://www.wdrb.com/news/louisvilles-911-crisis-call-diversion-program-now-available-24-hours-a-day/article_63ff4c30-347d-11ef-9d1f-4b3ffa637e70.html (last visited Jan 10, 2025).

entered consent decrees.  Among other things, the compliance burden led the City of New Orleans to seek termination of its consent decree in 2022.  New Orleans argued that the court-approved Monitor shifted the task of designing, conducting, and analyzing audits onto the city.  *See* Memorandum in Support of Motion to Terminate Consent Decree by City of New Orleans, at 33–36, *United States v. The City of New Orleans*, 2:12-cv-1924 (SM) (DPC) (E.D. La. Aug. 18, 2022) (ECF No. 629-1).  That the Proposed Consent Decree here places the burden of conducting audits on Louisville Metro and LMPD from the onset is cold comfort.  *See* Proposed Consent Decree at ¶ 602.  The Monitor is under no obligation to accept Louisville Metro's audits during compliance assessments.  *See e.g.*, *id.* at ¶ 631 ("the Monitor will consider the conclusions of Louisville Metro and LMPD's own audits and may rely on such conclusions if the Monitor validates their accuracy and reliability using accepted and trustworthy means and methods"); id. at ¶ 640 ("Louisville Metro and LMPD will report self-assessment results to the Monitor and the United States, and the Monitor will evaluate their accuracy and reliability.  Such self-assessments will not serve as a basis for determining compliance with this Decree unless their accuracy and reliability have been validated by the Monitor using accepted and trustworthy means and methods.").  Thus, on this (anemic) record additional, likely substantial, resource drains can be expected to impact an already under resourced police department.  Because the Joint Motion ignores all of this it necessarily does not answer the resulting key factual question—will under resourcing hinder actual law enforcement?

### C.    The Proposed Consent Decree Fails to Account for the Substantial Voluntary Reforms Louisville Has Made.

The Proposed Consent Decree imposes the most drastic available sanction without considering whether a less aggressive remedy would be appropriate considering Louisville's substantial voluntary compliance.

33

1.    Consent Decrees are the most onerous form of oversight or assistance the Department of Justice can impose on a police department.  As the Declaration of Jason Johnson (Jan. 10, 2025) ("Johnson Declaration" or "Johnson Decl.") explains, there are two other methods the Department of Justice may utilize to assist police departments with reform and best practices. First, Technical Assistance ("TA") letters serve as "both  a guidance document and a 'warning' letter to a department [.]" Johnson Decl. at ¶ 17(18).  TA letters detail specific practices and outline suggested remedies, such as "partnerships between the subject department and an exemplar agency who can make reform implementation practicable." *Id*.  Second, Memoranda of Agreement ("MOA") "offer[] the Justice Department the ability to intervene in a less heavy-handed way than imposing a consent decree . . . since they are legally binding and, if necessary, can be litigated and have penalties imposed for non-compliance." *Id*.

2.    Here, a TA letter or MOA is a more appropriate vehicle to implement reform.  Both DOJ and Louisville acknowledge that Louisville began implementing reforms well before the Proposed Consent Decree was submitted to the Court.  *See* Joint Motion at 6 ("Indeed, the United States' investigation and the Parties' subsequent negotiations already have set in motion a process of reform within Louisville Metro and LMPD."); ROI at 2 ("To their credit, Louisville Metro and LMPD have not waited to make changes").  Indeed, the ROI catalogues these voluntary changes and length and repeatedly commends them:

> Since 2020, Louisville Metro and LMPD have made a number of changes. The city enacted Breonna's Law, which prohibits LMPD from seeking or executing judicially authorized no-knock search warrants.  The city commissioned a review of LMPD by the consulting firm Hillard Heintze, which published a report in January 2021 identifying a range of recommendations that Louisville Metro and LMPD have started implementing.  A limited pilot program has started sending behavioral health professionals to certain emergency calls.  The city opened an outdoor area, operated by a local nonprofit, where people experiencing homelessness can receive mental health resources, job training, and other services.  The city expanded community-based violence prevention services that were underfunded for years.  LMPD announced plans to revamp its training, support officers'

34

mental health and wellness, and establish internal auditing. A new inspector general and civilian review board are intended to provide external oversight. These efforts are commendable, and we credit Louisville Metro and LMPD for acknowledging that change is necessary.

ROI at 8; *see also id.* 2, 81.

The City's Answer states that it began reforms "prior to the DOJ beginning its investigation" and that "the current Administration has moved quickly by improving on those efforts and will continue to take the appropriate and necessary steps to provide the best public services possible, mindful of the fact that any instances of violations of constitutional or federal statutory rights would be unacceptable." ECF No. 22 at 1. The Answer indicates Louisville will make the reforms in the Proposed Consent Decree regardless of whether it is entered: "LMPD are committed to continued improvements, including those set forth in the proposed consent decree." *Id.* at 2. And as this Court has noted the Police Chief recently stated that MPD is LMPD is "already well on [its] way to implementing many of the requirements in this consent decree". Order at 6 (cleaned up). = As noted above, Louisville's Reforms have also not been confined to administrative action; they have come legislatively as well. For example, the Louisville Metro Council banned the use of no-knock search warrants with Breonna's Law in 2020. *See* Louisville, Ky., Metro Ord. No. 69-2020.

The question before the Court is why it must be inextricably caught up in the management of an urban police department for a minimum of five years when both Parties acknowledge that the Defendant has and continues to take steps toward the mutually acknowledged goal? Why would a TA letter or a MOU not suffice to ensure that those policies continue? The Join Motion's failure to address this issue is telling.

### D.    Past Experience Indicates the Proposed Consent Decree May Fail to Achieve Its Goals.

If the goal of the Proposed Consent Decree is a safer Louisville operating a police force that is more efficient and better trusted by its community, the past performance of Consent Decrees indicates that goal is unlikely to be met.

Police morale often plummets in jurisdictions subject to consent decrees, often leading to fewer police officers patrolling, making arrests, and investigating crimes.  *See* Johnson Decl. at ¶ 11.  Jurisdictions that have implemented recent consent decrees have seen spikes in violent in the two years following entry of a consent decree.  *See* Johnson Decl. at ¶ 13 ("Seattle saw a 27% increase in violent crime, New Orleans experienced a 20% spike, and with already high levels of violence, Baltimore witnessed an 11% jump in violent crime.").  The costs of implementing those consent decrees are stunning; Seattle's costs are estimated at $200 million, Chicago at $100 million.  *See* Johnson Decl. at ¶ 14.  Louisville's allocation of $8–10 million equates to five percent of the city's police budget with no guarantee that it remains at that level.  *See id.*  The five-year implementation period is ambitious and unlikely to be met.  New Orleans and Seattle have operated under a consent decree for twelve years, Albuquerque for nine years.  *See* Johnson Decl. at ¶ 13.

In sum, federal oversight does not appear to improve a community's opinions of its police force:

> Police legitimacy has dropped in Seattle while concern about social breakdown has risen dramatically.  Overwhelming majorities of Baltimoreans are less likely to engage the police, don't believe the police department is doing a good job serving the community, and don't feel safer.  In Chicago, surveys show that relations between young black and Latino men and the police have actually soured under reform.  And residents in some cities like Cleveland suffer from "consent decree fatigue"–that the reforms are not happening fast enough or at all or they are not the right reforms in the first place.

Johnson Decl. at ¶ 15.

Based on the foregoing, consent decrees appear to correlate to higher crime rates, declines in the number of police officers, lower community satisfaction with police and lower morale among police forces, and tremendous implementation costs while dragging on for years. Against this record, there is little recommend the Proposed Consent Decree when there are less onerous and potentially more efficacious mechanisms available to the Department of Justice and Louisville.

## CONCLUSION

The Proposed Consent Decree should be rejected, or in the alternative, this matter should be stayed or schedule such that the incoming Trump Administration can be heard.

Dated:  January 10, 2025                    Respectfully submitted,


                                            /s/ Samuel Everett Dewey

                                            SAMUEL EVERETT DEWEY
                                            (D.C. Bar No. 999979)
                                            Chambers of Samuel Everett Dewey, LLC
                                            Telephone:   (703) 261-4194
                                            Email:  samueledewey@sedchambers.com
                                            (admitted *pro hac vice*)

                                            ERIC NEAL CORNETT
                                            (Ky. Bar No. 96266)
                                            Law Office of Eric Neal Cornett
                                            Telephone:  (606) 275-0978
                                            Email:  neal@cornettlegal.com

                                            *Counsel for Plaintiffs*