IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff,* v. LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, *Defendant.* | Case No. 3:24-cv-722 (BJB) |

**DECLARATION IN SUPPORT OF *AMICI CURIAE* BRIEF**

1.  My name is Jason Johnson, and I am the president of the Law Enforcement Legal Defense Fund, a non-profit that seeks to promote effective and constitutional policing through research and advocacy. Prior to this role, I served as a law enforcement officer for over two decades. I am also a member of the Maryland Bar and hold a juris doctor from the University of Maryland School of Law.

2.  From 1998 to 2016, I served the Prince George's County Police Department where I retired at the rank of Major having served as the commander of the Internal Affairs Division and head of the Office of Legal Affairs. In those roles, I oversaw all criminal and administrative investigations of departmental employees, police-involved shootings, and in-custody deaths, and prosecuted officers in departmental disciplinary hearings, and provided legal counsel to internal affairs investigators.

3.  From 2016 to 2018, I served as the deputy commissioner of the Baltimore Police Department where I led the Strategic Services Bureau overseeing the department's internal misconduct investigations, training and education, recruitment, human resources, fiscal

management, and policy and research portfolios. When I assumed my role, the Baltimore Police Department was under investigation by the Justice Department for a 2015 incident that preceded my tenure. I was the lead negotiator for the department in its ongoing negotiations with the Justice Department, working with the city solicitor's office and firsthand with Justice Department attorneys on a regular basis. Our discussions were often productive, but it was apparent that many of the Justice Department's representatives had a policy agenda in mind and little understanding of the mechanics of police work. They often dismissed substantive criticisms about the feasibility of their policy proposals.

4. While these negotiations continued throughout the latter half of 2016, the pressure to finish negotiations increased dramatically after the November election so that a settlement would be finalized before the Administration changed over. The federal judge in that case ratified the agreement before new Justice Department leadership could intervene. Attorney General Jeff Sessions sought to rescind the consent decree but was unsuccessful in doing so. Despite promises that Baltimore's consent decree term would be short and its remedies effective, the city is now in its seventh year under the decree and deemed in compliance with only five out of the seventeen sections. The twelve remaining sections are, by far, the most challenging to attain and mean the intervention will almost certainly last well over a decade.

5. As a law enforcement officer and attorney who has worked under, negotiated and implemented, and extensively researched federal policing consent decrees, I can attest that the Justice Department's remedy is neither the most appropriate nor most efficacious means to ensure Louisville Metro Police Department promotes public safety through constitutional policing. The proposed consent decree's remedies: (1) exceed the scope of the court and the Justice Department's statutory and constitutional authority; (2) derive from flimsy evidence and weak

inferences of a 'pattern or practice' of violations; (3) impose slow, burdensome, costly, and endlessly changing demands to attain compliance; (4) damage public safety and fail to improve police-community relations, and (5) represent the most coercive and least effective means to achieve constitutional policing.

6. In its March 2023 findings report on LMPD, the Justice Department cites its own January 2017 guidance outlining its investigations' extra-constitutional ambitions and plain intent to enact reforms beyond its statutory mandate[1]. It states the purpose of such investigations, and their resulting settlements, is to go "beyond the primary objective of eliminating constitutional violations in the specific law enforcement agency" to include areas "where federal action might help set a standard for reform" and are meant to reflect that "the Division is responsive to contemporary issues in policing and the law."

7. The 1994 statute specifically authorizes the Attorney General to pursue investigations and civil actions to remedy violations of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."[2] These violations usually include unlawful use of force, unlawful stops, searches, arrests and racial discrimination. Yet most of those claims of systemic violations are based on scant evidence or faulty inferences.

8. The Justice Department's findings reports' claims of systemic bias in Baltimore and Louisville were largely based on deeply contested "disparate impact theory" where the Supreme Court ruled that unconstitutional discrimination could not be solely deduced from a

---

[1] US Department of Justice (Civil Rights Division), "The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present," January 2017, pg. 6; https://www.justice.gov/crt/file/922421/download.   https://www.justice.gov/opa/pr/justice-department-finds-civil-rights-violations-louisville-metro-police-department-and

[2] 42 U.S. Code, § 14141. Cause of action (recodified at 34 U.S.C. 12601), https://www.govinfo.gov/link/ uscode/34/12601.

demographic imbalance³. Although the basic tenets of social science observe correlation is not causality or proof of nefarious intent, the alleged violations are often premised on disproportionate ratios to "prove" an institutional bias. Simply overlaying crime hotspots in Louisville would likely explain the differences almost entirely. It is telling that the Justice Department "refused to disclose its data set or methodology for determining disproportionate impact" even in settlement negotiations with Louisville.⁴

9. The Justice Department's findings in Louisville rest on anecdote and vagueness, and reflect policy aims. They include several egregious cases of police use-of-force but often omit whether or how those cases were addressed by the department internally, by the local prosecutor, or by any other agency. For example, in one case, a Louisville officer's misconduct led to an internal investigation which resulted in the officer being fired, but the Justice Department neglected to include those details in its findings.⁵ More generally, after release of the Justice Department's investigation, due to the vagueness of the Justice Department's description, Louisville requested and received a "list of 63 incidents referenced with identifying report numbers and information."⁶ In response, Louisville publicly released available documentation on these incidents.⁷ This list reveals that the Justice Department downplayed the extent Louisville

---

³ Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519 (2015), Opinion of the Court (Justice Anthony Kennedy) pg. 19-20, *"In a similar vein, a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create."*
⁴ *E.g.*, ECF No. 22 at ¶ 51.
⁵ Termination Letter of Katie Crews, Louisville Metropolitan Police Department, February 7, 2022, https://louisville-police.org/DocumentCenter/View/3119/katie-crews-term-20048-20049_Redacted
⁶ https://www.louisville-police.org/895/Information-in-Reference-to-DOJ-Findings
⁷ *Id.*

4

disciplines and polices its own officers.[8] This document reveals that events are not entirely as the Justice Department's investigation report describes. For example, the Justice Department's description of one of the first cases on page 12 of the report does not entirely comport with the body camera video (or reports) Louisville made public.[9]

10. In its 2013-2015 litigation against the Alamance County Sheriff's Office in North Carolina, the Justice Department asserted a 'pattern or practice' of racially discriminatory traffic stops on precisely the same premise that the federal government uses against LMPD – namely that since minority drivers were stopped more often than white drivers, systemic racial bias must be the cause. The federal judge in that case, Hon. Thomas D. Schroeder, scrutinized the studies and methodologies underlying the Justice Department's conclusions and found them to be unpersuasive (*i.e.*, an observer could not accurately determine the race or ethnicity of a passing motorist on a highway at night).[10]

11. The attorney for Alamance County explained the lack of pushback against the federal government by other jurisdictions, "[u]nfortunately, most law enforcement agencies are afraid to challenge the civil rights division, even when its claims are completely bogus."[11] Although many of the allegations are flimsy or misleading, Louisville, like Baltimore, is signing under duress with city leaders either eager to appease community demands without using the democratic process or powerless to push back against the might of the federal government. That perceived leverage has resulted in city after city acceding to nearly all the federal government's

---

[8] *Id.*
[9] *Id.* at line 1.
[10] MEMORANDUM OPINION AND ORDER signed by JUDGE THOMAS D. SCHROEDER on 08/07/2015; https://www.justice.gov/d9/alamance_opinion_8-7-15.pdf, pg. 129
[11] Washington Post. "What the Justice Department's Decades-Long Pursuit of Abusive Police Departments Has Actually Achieved," 2015.
https://www.washingtonpost.com/sf/ investigative/2015/11/13/forced-reforms-mixed-results/.

demands – reasonable or not – often with poor results. Surveys show that the morale of officers, weighed down by excessive paperwork and wary of undue scrutiny, plummets under consent decrees.[12] These burdens manifest in fewer cops patrolling the streets, making arrests, and investigating crimes. Many prefer to quit or retire.[13]

12. This has hampered law enforcement's ability to protect public safety in many places where consent decrees were imposed. In many cities, crime rose and violence rose, often dramatically, in the two years after consent decrees were imposed. Seattle saw a 27% increase in violent crime, New Orleans experienced a 20% spike, and with already high levels of violence, Baltimore witnessed an 11% jump in violent crime.[14]

13. But these unintended consequences shouldn't stymie necessary reforms. Instead, changes must be both sensible and feasible. And these consent decrees can drag on for more than a decade. New Orleans (twelve years), Albuquerque (nine years), and Seattle (twelve years) long ago met the initial benchmarks of their agreements but the monitors keep moving the goalposts.[15]

---

[12] Community Resources for Justice, "Feedback from the Field: A Summary of Focus Groups with Baltimore Police Officers," Crime and Justice Institute, July 17, 2019, https://www.crj.org/publication/feedback-from-the-field-    a-summary-of-focus-groups-with-baltimore-police-
officers/.; David Korman, "'Culture Is Toxic, Morale Is Low': Survey of Seattle Police Officers Paints Bleak Picture," *Crosscut*, July 10, 2019, https://crosscut.
com/2019/07/culture-toxic-morale-low-survey-seattle- police-officers-paints-bleak-picture

[13] Colleen Heild, "APD Officers Leaving Force Cite DOJ Settlement," *Albuquerque Journal*, September 12, 2021, https://www.abqjournal.com/news/local/apd-officers- leaving-force-cite-doj-settlement/article_c30b3ac1-b248- 59d3-9f3f-d60bf3f37335.html

[14] Russell Contreras, "Crime jumps after court-ordered policing changes," Axios, May 14, 2021; https://www. axios.com/2021/05/14/police-consent-decrees-crime- jump-reforms;

[15] KIRO News, "Report: SPD Accomplished Much under the Consent Decree; Improvements Still Needed." KIRO 7 News Seattle. KIRO 7 News Seattle, May 14, 2022. https://www.kiro7.com/news/local/spd-accomplished-much-under-consent-decree-improvements-still-needed/YHCIE6FGRZE5LGYFJDUYUHTTZ4/.

14. For cities under consent decrees, the cost of implementation and monitoring is staggering. Seattle's decade-long saga has cost taxpayers $200 million. In Chicago, which had its original five-year agreement extended by three years in March 2023, officials anticipate it will cost more than $100 million. Louisville has allocated $8 to $10 million (which will certainly balloon) a year for its pending agreement, which is equal to 5% of the city's police budget.[16]

15. A critical sign that consent decrees rarely work is that residents rarely believe the department has improved under the decree. Many consent decree settlements require public surveys on local policing, but the results are far from a ringing endorsement of the Justice Department's program. Police legitimacy has dropped in Seattle while concern about social breakdown has risen dramatically.[17] Overwhelming majorities of Baltimoreans are less likely to engage the police, do not believe the police department is doing a good job serving the community, and do not feel safe.[18] In Chicago, surveys show that relations between young black and Latino

---

[16] Mike Carter, "Seattle, DOJ Call for End to Most Federal Oversight of 'Transformed' Police," The Seattle Times, March 28, 2023, https://www.seattletimes.com/seattle- news/law-justice/seattle-doj-expected-to-ask-judge-to- end-most-federal-oversight-of-spd/.; WTTW News. "Chicago Police Extending Consent Decree Timeline by 3 Additional Years," March 25, 2022. https://news.wttw. com/2022/03/25/chicago-police-extending-consent- decree-timeline-3-additional-years.; "Chicago Consent Decree: City given 3 More Years to Comply with Sweeping Police Reforms," NBC Chicago (NBC Chicago, March 25, 2022), https://www.nbcchicago.com/news/local/chicago- consent-decree-city-given-3-more-years-to-comply-with- sweeping-police-reforms/2792352./; Gil Corsey, "What's Next: Federal Probe Prompts Mandated Reforms in LMPD," WDRB, March 9, 2023, https://www.wdrb.com/ news/whats-next-federal-probe-prompts-mandated-reforms-in-lmpd/article_6f2aeb24-bdcc-11ed-86e7- 6f486c4b134a.html.

[17] Gene Balk, "How Confident Are Seattleites in Their Police? Results of Survey Surprise Lead Researcher," The Seattle Times, April 26, 2021, https://www.seattletimes.com/ seattle-news/data/did-public-confidence-in-police-in- seattle-drop-in-2020-not-by-much-new-survey-data- shows/;

[18] Marcus Dieterle, "Survey Finds Majority of Baltimoreans Are Dissatisfied with Baltimore Police Department and Don't Trust Officers," Baltimore Fishbowl April 21, 2020, https://baltimorefishbowl.com/stories/survey-finds- majority-of-baltimoreans-are-dissatisfied-with-baltimore- police-department-and-dont-trust-officers/.

men and the police have actually soured under reform.[19] And residents in some cities like Cleveland suffer from "consent decree fatigue"–that the reforms are not happening fast enough or at all or they are not the right reforms in the first place.[20]

16. But alternatives to coercive consent decrees already exist and have been used by previous administrations to greater effect without the resulting negative impacts on public safety, morale, city budgets, and wasted effort. Those preferable tools include Technical Assistance (TA) letters and Memorandums of Agreement (MOA).

17. Issuing a TA letter, which acts as both a guidance document and a "warning" letter to a department, is the least intrusive mechanism available but can prove highly effective in achieving change. Law enforcement agencies of concern have their specific practices detailed and suggested remedies outlined, based on the Justice Department's and outside expertise. These should be drawn from strong evidence, unearthed in thorough investigations, and fixes should be based on real-world best practices and rigorous research. Remedies should extend to partnerships between the subject department and an exemplar agency who can make reform implementation practicable. Similarly, an MOA offers the Justice Department the ability to intervene in a less heavy-handed way than imposing a consent decree. But these MOAs represent a more substantial intervention than TA letters since they are legally binding and, if necessary, can be litigated and have penalties imposed for non-compliance.

---

[19] Madeline Buckley and Shanzeh Ahmad, "Report Paints 'Bleak Picture' of Perceptions of Chicago Police among Young Black and Latino Men," *Chicago Tribune*, September 2, 2022, https://www.chicagotribune.com/ news/criminal-justice/ct-chicago-police-consent-decree- report-20220902-wal56c2fjvgqjhggxyon6j4gwq-story.html;
[20] Mark Puente and Sarah Buduson, "Have Clevelanders Lost Interest in Police Reforms?" *Signal Cleveland*, March 20, 2023; https://signalcleveland.org/have-clevelanders- lost-interest-in-police-reforms/.

18. A more nuanced approach is particularly appropriate here where all of the political branches in Louisville have made reforms that the Justice Department deems "commendable" and where the Justice Department has "credit[ed] Louisville Metro and LMPD for acknowledging that change is necessary."[21] As this Court has noted, the Mayor of Louisville just publicly announced that Louisville is "already well on [its] way to implementing many of the requirements in this consent decree".[22]

19. While the sterner approach of a consent decree is justified when the agency's violations are so egregious that reforms are appropriately urgent and significant, remedies must focus on the most pressing concerns and be supported by rigorous evidence that they will work. That requires setting realistic benchmarks, allocating sufficient funding, and holding police (and city) leadership accountable for enacting them effectively, efficiently, and in a timely manner. But experience teaches us that Louisville's proposed consent decree will prove more of a boondoggle than an asset in promoting constitutional and effective policing.

I declare under the penalty of perjury that the foregoing is true and correct.

Date: January 10, 2025                         /s/ Jason Johnson
                                               Jason Johnson

---

[21] US Department of Justice (Civil Rights Division), "The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present," January 2017, pg. 8; https://www.justice.gov/crt/file/922421/download. https://www.justice.gov/opa/pr/justice-department-finds-civil-rights-violations-louisville-metro-police-department-andl; *see e.g., also id.* at 81 ("We commend Louisville Metro Government and LMPD for not waiting for the outcome of this investigation to make improvements. But they must do more to address the legal violations—and the root causes of those violations—identified in this report.").

[22] ECF No. 18 at 6 (cleaned up).