**U.S. Department of Justice**

Civil Rights Division

Exhibit A Page 1

*Special Litigation Section – 4CON*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

March 20, 2022

**Via Electronic Mail**

Eric Graninger
Project Manager
Office of Mike O' Connell – Jefferson County Attorney
First Trust Centre
200 S. Fifth Street, Suite 300N
Louisville, KY  40202

Dear Eric:

This responds to your email of March 9, 2023, requesting that we provide you information about the examples of alleged improper conduct by LMPD officers that were included in the Department of Justice's report of the findings of our investigation into Louisville Metro Government and the Louisville Metro Police Department.  You request information that Louisville Metro and LMPD can use to identify LMPD's records of these examples.  You describe the purpose of your request as enabling LMPD to review the conduct of officers still employed by LMPD, and ensuring that Louisville Metro can respond appropriately to records requests from the press and members of the public.

Since we received your request, we have discussed it with you and LMPD to ensure that we understand the nature and purpose of the request.  Consistent with those discussions, we now provide the information in the attached Appendix to you, where doing so comports with the limitations on our ability to share information from our investigation, including the confidentiality of witnesses and the evidence they provided to us.  The information we are providing does not necessarily represent the entirety of relevant information on any particular incident, and it likewise does not represent the entirety of information we considered in assessing whether a particular incident violated federal law or the Constitution during our investigation.

A critical factor in our decision to provide this information is the highly collaborative approach that the Mayor and Interim Chief have taken to this investigation, including the Agreement in Principle that we have already entered into with Louisville Metro and LMPD.  Because of this commitment to reform, we are confident that we can engage in good-faith negotiations toward a consent decree that will resolve the violations of law and systemic deficiencies that we identified in our findings report.

We wish to highlight several issues that LMPD should consider in using the information that we are providing.  First, our investigation assessed whether officers' conduct violated

federal law or the Constitution. Where we identified a violation, we did not separately assess the involved officer's individual culpability for the violation.  Second, the incidents cited as examples in our report represent a portion of the evidence we uncovered during our investigation, and that evidence itself was often also based on a randomized sample of reports. Third, in using this information, LMPD must carefully guard against the potential for retaliation against witnesses and complainants.

       Please do not hesitate to contact me if I can provide any assistance on this or any other matter.

       Sincerely,

       Paul Killebrew
       Deputy Chief
       Special Litigation Section

## Appendix

| Incident Identifier<br>(e.g. BlueTeam report/Internal Affairs file number) | Section/Page Number in Findings Report |
|---|---|
| PSU-80-20-025730.0046629 | Section 1, Page 12 (last para.) |
| PSU-80-19-027002.0043995 | Section 1.a., page 13 (last para.) |
| PSU-80-19-023054.0043810 | Section 1.a., page 14 (para. 3) |
| PSU-80-18-029280.0041097 | Section 1.b., page 15 (para. 1) |
| PSU-80-18-005684.0042896 | Section 1.b., page 15 (para. 2) |
| PSU-80-16-073175.0036124 | Section 1.c., page 16 (para. 1) |
| PSU-80-17-100820.0039971 | Section 1.c., page 16 (para. 2) |
| PSU-80-19-066063.0044656 | Section 1.c., page 16 (para. 3) |
| PSU-80-17-058908.0038934 | Section 1.c., page 16 (para. 3) |
| PSU-80-19-068903.0044787 | Section 1.d., page 17 (para. 2) |
| PSU-80-21-010962.0048092 | Section 1.d., page 17 (para. 2) |
| PSU-80-18-036020.0041358 | Section 1.d., page 17 (para. 3) |
| PIU_16-054.0001 | Section 1.e., page 18 (para. 2) |
| PSU-80-19-018273.0043738 | Section 1.e., page 18 (para. 4) |
| Sealed Search Warrant 18-0817 | Section 2.a., page 23 (para. 4) |
| Search Warrant 19-2335 | Section 2.a., page 24 (para. 2) |
| Search Warrant 19-1981 | Section 2.a., page 24 (para. 3) |
| Sealed Search Warrant 19-0720 | Section 2.b., page 25 (para. 2) |
| Search Warrant 16-1608 | Section 2.b., page 25 (para. 3) |
| Search Warrant 17-1246 | Section 2.c., page 27 (para. 1) |

| | |
|---|---|
| https://lmpd.evidence.com/axon/evidence-search?limit=100&title=longfield&sort=-recordedOn%2Ctitle&view=table&date_search_type=record%2Cupload&start_date=2016-09-14T05%3A00%3A00.260Z&end_date=2016-09-15T04%3A59%3A59.262Z&status=active&type=audio%2Cvideo%2Cdocument%2Cimage%2CfiringLog%2Cother&user_type=uploadedBy%2Cowner&sources=body-worn%2Cfleet%2Ccew%2Cinterview%2Cother&restrictionLevel=0%2C1%2C2 | Section 3, page 30 (para. 2) |
| https://lmpd.evidence.com/axon/evidence?evidence_id=d451736bd0fb42df8aa8b0b1c26e27eb&partner_id=a1a320f442344723b1749253b9b6d923 | Section 3, page 30 (para. 3) |
| https://lmpd.evidence.com/axon/evidence?evidence_id=f6f43ec8f1414f1980f2bf9b1e028d51&partner_id=a1a320f442344723b1749253b9b6d923 | Section 3, page 30 (para. 4) |
| https://lmpd.evidence.com/axon/evidence?evidence_id=ae2623a243fa40b6a5a2e075231d1433&partner_id=a1a320f442344723b1749253b9b6d923 | Section 4, page 33 (para. 1) |
| Citation No. DJ06545 | Section 4, page 34 (para. 1) |
| PSU 19-058 | Section 4, page 34 (para. 2) |
| PSU 19-093 | Section 4, page 35 (last para.) |
| PSU 20-079 | Section 4, page 36 (para. 2) |
| PSU 19-020 | Section 4, page 36 (para. 4) |
| PSU 19-015 | Section 4, page 36 (last para.) |
| PSU 08-080, PSU 14-011 | Section 5.b., page 45 (para. 4) |
| PSU 19-016 | Section 5.b., page 47 (para. 2) |
| PSU 19-051 | Section 5.b., page 47 (para. 3) |
| PSU 18-243 | Section 5.b., page 47 (para. 4) |

| | |
|---|---|
| *Commonwealth v. Johnson-Trumbo*, 17-CR-002435 (Jefferson County, Ky. Cir. (Dec. 2018)) (Edwards, J.); PSU 19-039 | Section 5.b., page 47 (para. 4) |
| PSU 16-101 | Section 5.c., page 49 (para. 4) |
| PSU-80-17-062035 | Section 5.c., page 49 (para. 5) |
| PSU 19-097 | Section 5.c., page 50 (para. 1) |
| PSU-80-20-032563 | Section 5.c., page 50 (para. 2) |
| *United States v. Flynn*, 22-cr-47 (W.D.K.Y.)<br>Dep't of Justice Press Release, June 21, 2022, justice.gov/usao-wdky/pr/two-former-lmpd-officers-plead-guilty-conspiracy-violate-civil-rights-one-also-pleads | Section 5.c., page 50 (para. 3) |
| PSU-80-20-032080.0046931 | Section 6.a., page 55 (para. 3) |
| PSU-80-20-033239.0046738 | Section 6.a., page 55 (para. 4) |
| PSU-80-20-057949 | Section 6.a., page 55 (para. 4) |
| PSU-80-20-044926 | Section 6.b., page 56 (para. 2) |
| PSU-80-19-002029.0043905 | Section 6.b., page 56 (para. 3) |
| P114904 | Section 6.b., pages 56-57 (para. 4) |
| PIIF 20-008<br>DP92055 | Section 6.b., page 57 (para. 5) |
| PIIF 20-008 | Section 6.b., page 57 (para. 5) |
| PSU-80-21-021673 | Section 6.b., page 57 (para. 6) |
| P21359704 | Section 7.a., page 60 (para. 2) |
| PSU-80-20-054313 | Section 7.a.1., page 61 (last para.) |
| 2017 BWC:<br>https://lmpd.evidence.com/axon/evidence?evidence_id=9855742495b748538260b907c85938d1&partner_id=a1a320f442344723b1749253b9b6d923 | Section 7.a.1., page 62 (para. 2) |

3

| | |
|---|---|
| 2019 BWC:<br>https://lmpd.evidence.com/axon/evidence?evidence_id=7056679d4aca4a628c0872408e33c2ef&partner_id=a1a320f442344723b1749253b9b6d923<br><br>2019 BWC:<br>https://lmpd.evidence.com/axon/evidence?evidence_id=3cc878f17d7045169c2155cf86f631c5&partner_id=a1a320f442344723b1749253b9b6d923<br><br>2020 BWC:<br>https://lmpd.evidence.com/axon/evidence?evidence_id=206ce58a38834fe580ec6f589c83f3e6&partner_id=a1a320f442344723b1749253b9b6d923 | |
| PSU-80-20-005451 | Section 7.a.1., page 62 (last bullet) |
| https://lmpd.evidence.com/axon/evidence?evidence_id=277634cd378345da88caa7cc10cff01a&partner_id=a1a320f442344723b1749253b9b6d923 | Section 7.a.1., page 63 (bullet 2) |
| https://lmpd.evidence.com/axon/evidence?evidence_id=078893436dc5446b93b3734a2ff94d5b | Section 7.a.1., page 63 (bullet 3) |
| First incident BWC:<br>https://lmpd.evidence.com/axon/evidence?evidence_id=8b611081528a465cbdfb1738be591141&partner_id=a1a320f442344723b1749253b9b6d923<br>https://lmpd.evidence.com/axon/evidence?evidence_id=8b611081528a465cbdfb1738be591141&partner_id=a1a320f442344723b1749253b9b6d923<br><br>2022 incident:<br>https://lmpd.evidence.com/axon/evidence?evidence_id=5fb1c5974cb84b03aa39d42633b1e65b&partner_id=a1a320f442344723b1749253b9b6d923 | Section 7.a.1., page 64 (para. 1) |
| Incident # 8019010557 | Section 7.a.1., page 64 (bullet 1) |
| PIU 18-025 | Section 7.a.1., page 64 (bullet 2) |

| PIU 18-032 | Section 8.a., page 69 (para. 4) |
|---|---|
| PIU 16-006/PSU 21-301 | Section 8.a., page 70 (para. 1) |
| Sex Crimes 18-273 | Section 8.b., page 71 (para. 5) |
| *United States v. Thomas*, 434 F. Supp. 3d 576 (W.D. Ky. 2020)<br><br>PSU 20-131 | Page 78 (para. 1) |
| Dep't of Justice Press Release, Feb. 1, 2022, https://www.justice.gov/opa/pr/former-louisville-kentucky-police-officer-sentenced-using-excessive-force | Page 79 (para. 3) |

| DOJ Line Item | Incident Number | Page | Paragraph | Section | BlueTeam (AIR) | PSU Case | PIU Case | Discipline |
|---|---|---|---|---|---|---|---|---|
| 1 | 80-20-025730 | 12 | last | 1 - Use of Force | Y - Sgt counseled officer on improperly positioning female in the back of the police vehicle. | N | N | N |
| 2 | 80-19-027002 | 13 | last | 1a - UoF - Neck Restraints | Y | 19-066 | N | Ofc 1 - Exonerated |
| 3 | 80-19-023054 | 14 | 3 | 1a - UoF - Neck Restraints | Y | N | N | N |
| 4 | 80-18-029280 | 15 | 1 | 1b - UoF - K9 | Y | N | N | N |
| 5 | 80-19-005864 | 15 | 2 | 1b - UoF - K9 | Y | N | N | N |
| 6 | 80-16-073175 | 16 | 1 | 1c - UoF - Taser | Y | N | N | N |
| 7 | 80-17-100820 | 16 | 3 | 1c - UoF - Taser | Y | N | N | N |
| 8 | 80-19-066063 | 16 | 3 | 1c - UoF - Taser | Y | N | N | N |
| 9 | 80-17-058908 | 16 | 3 | 1c - UoF - Taser | Y - Sgt counseled the officer on the proper placement of a drive stun when using the Taser. | N | N | N |
| 10 | 80-19-068903 | 17 | 2 | 1d - UoF - Takedowns/Strikes | Y | N | N | N |
| 11 | 80-21-010962 | 17 | 2 | 1d - UoF - Takedowns/Strikes | Y | N | N | N |
| 12 | 80-18-036020 | 17 | 3 | 1d - UoF - Takedowns/Strikes | Y | N | N | N |
| 13 | PIU 16-054 | 18 | 2 | 1e - UoF - Excessive | Y | Y | Y | Ofc 1 - Exonerated; Ofc 2 - 24-hour suspension (BWC) |
| 14 | 80-19-018273 | 18 | 4 | 1e - UoF - Excessive | Y - Sgt counseled officers on policy regarding emergency vehicle operations, speed, and the use of appropriate language | N | N | N |
| 15 | SW 18-0817 | 23 | 4 | 2a - SW - Lack PC | Y | N | N | N |
| 16 | SW 19-2335 | 24 | 2 | 2a - SW - Lack PC | N | N | N | N |
| 17 | SW 19-1981 | 24 | 4 | 2a - SW - Lack PC | N | N | N | N |
| 18 | SW 19-0720 | 25 | 2 | 2b - SW - Overly Broad | N | N | N | N |
| 19 | SW 16-1608 | 25 | 3 | 2b - SW - Overly Broad | Y | N | N | N |
| 20 | SW 17-1246 | 27 | 1 | 2c - SW - CIs | N | N | N | N |
| 21 | 80-16-079123 / 1421 Longfield SW | 30 | 2 | 3 - Knock and Announce | Y - Sgt counseled detective on the use of professional language. | N | N | N |
| 22 | 80-16-103008 / 3027 Greenwood SW | 30 | 3 | 3 - Knock and Announce | N | N | N | N |

| 23 | unk report / 1211 Lincoln SW | 30 | 4 | 3 - Knock and Announce | N | N | PIIF 21-07 | N |
|---|---|---|---|---|---|---|---|---|
| 24 | no number / Shelby Park Ped Stop | 33 | 2 | 4 - Street Enforcement - 4A | N | N | N | N |
| 25 | citation DJ06545 | 34 | 1 | 4 - Street Enforcement - 4A | N | N | N | N |
| 26 | PSU 19-058 | 34 | 2 | 4 - Street Enforcement - 4A | N | 19-058 | N | Ofc 1 - 8-hour suspension (warrantless searches, stops) |
| 27 | PSU 19-093 | 35 | last | 4 - Street Enforcement - 4A | Y | Y | N | Ofc 2 - 16-hour suspension; Ofcs 4,7 - resigned, but would have received letter |
| 28 | PSU 20-079 | 36 | 2 | 4 - Street Enforcement - 4A | N | 20-079 | N | Ofcs 1,2,3,4- letter; Ofc. 5 - Exonerated |
| 29 | PSU 19-020 | 36 | 4 | 4 - Street Enforcement - 4A | Y - Sgt counseled Officer on the proper placement of the knee when controlling a subject. | 19-020 | N | Ofc 1- 80-hour suspension; Ofc 2 - 64-hour suspension; Ofc 3 - Exonerated |
| 30 | PSU 19-015 | 36 | last | 4 - Street Enforcement - 4A | Y | 19-015 | N | Ofc. 1 - 24-hour suspension |
| 31 | PSU 08-080, PSU 14-011 | 45 | 4 | 5b - Discrimination | N | 08-080, 14-011 | N | Lt.1 - Unk discipline (record retention), sustained |
| 32 | PSU 19-016 | 47 | 2 | 5b - Discrimination | N | 19-016 | N | CBE - resigned |
| 33 | PSU 19-051 | 47 | 3 | 5b - Discrimination | N | 19-051 | N | Letters of Reprimand |
| 34 | PSU 18-243 | 47 | 4 | 5b - Discrimination | N | 18-243 | N | Exonerated |
| 35 | PSU 19-039 | 47 | 4 | 5b - Discrimination | N | 19-039 | N | Exonerated |
| 36 | PSU 16-101 | 49 | 4 | 5c - Discrimination | N | 16-101 | N | CBE - Retired |
| 37 | 80-17-062035 | 49 | 5 | 5c - Discrimination | Y - Sgt counseled officers on the use of appropriate language. | N | N | N |
| 38 | PSU 19-097 | 50 | 1 | 5c - Discrimination | N | 19-097 | N | Exonerated |
| 39 | 80-20-032563 | 50 | 2 | 5c - Discrimination | Y - Sgt counseled one officer on courtesy and a performance observation was completed on another officer for their tactics. | 20-115 | N | Ofc. 1 - 80-hour suspension |
| 40 | U.S. vs. Flynn, 22-cr-47 | 50 | 3 | 5c - Discrimination | N | N | Y | Ofc. 1 - terminated |
| 41 | 80-20-032080 | 55 | 3 | 6a - First Amendment - Challenge Police | Y | 20-048,20-049 | Y | Ofc. 1 - terminated; Ofc. 2 - letter of reprimand |

| 42 | 80-20-033239 | 55 | 4 | 6a - First Amendment - Challenge Police | Y | 20-051 | Y | Ofc. 1 - resigned |
|---|---|---|---|---|---|---|---|---|
| 43 | 80-20-057949 | 55 | 3 | 6a - First Amendment - Challenge Police | Y | 21-009 | N | CBE - Retired |
| 44 | 80-20-044926 | 56 | 2 | 6b - First Amendment - Challenge Police not protest | Y | 20-122 | N | Ofc. 1 - 16-hour suspension |
| 45 | 80-19-002029 | 56 | 4 | 6b - First Amendment - Challenge Police not protest | Y - Sgt counseled officers on the use of appropriate language. | N | N | N |
| 46 | Citation P114904 | 56 | 4 | 6b - First Amendment - Challenge Police not protest | N | N | N | N |
| 47 | PIIF 20-008 | 57 | 5 | 6b - First Amendment - Challenge Police not protest | N | N | PIIF 20-008 | N |
| 48 | Repeat of Line 47 | | | | | | | |
| 49 | 80-21-021673 | 57 | 2 | 6b - First Amendment - Challenge Police not protest | Y | 21-018 | N | Exonerated |
| 50 | CAD P21359704 | 60 | 2 | 7a - ADA | N | N | N | N |
| 51 | 80-20-054313 | 61 | last | 7a1 - ADA | Y | N | N | N |
| 52 | 2017, 2019 and 2020 BWCs | 62 | 2 | 7a1 - ADA | Y - one in 2019, 80-19-011038 | N | N | N |
| 53 | 80-20-005451 | 62 | last bullet | 7a1 - ADA | Y - Sgt counseled officer on the use of appropriate language, conduct unbecoming, and the lack of de-escalation techniques used. | 20-029 | N | Ofc.1 - 16-hour suspension |
| 54 | 80-18-080449 | 63 | bullet 2 | 7a1 - ADA | Y - Sgt counseled officers on proper WVS activation, professionalism, courtesy, and the use of appropriate de-escalation techniques. | 18-331 | N | Ofc. 2 - letter of reprimand |
| 55 | 80-20-056300 | 63 | bullet 3 | 7a1 - ADA | Y - Sgt verbally counseled one officer on the use of appropriate language and another officer on the importance of explaining to a subject the "why" behind their actions | N | N | N |
| 56 | 2021, 2022 BWC | 64 | 1 | 7a1 - ADA | N | N | N | N |

| 57 | 80-19-010557 | 64 | bullet 1 | 7a1 - ADA | Y - Sgt counseled officers on allowing a handcuffed subj to remain on their chest in the prone position for an extended period of time. | N | N | N |
| 58 | PIU 18-025 | 64 | bullet 2 | 7a1 - ADA | Y | 18-110 | 18-025 | Ofcs. 1, 2 -Exonerated / Ofc. 3 - letter, sustained on BWC |
| 59 | PIU 18-032 | 69 | 4 | 8a - SA/DV - Ofc. Invlved | N | N | 18-032 | N |
| 60 | PIU 16-006 / PSU 21-301 | 70 | 1 | 8a - SA/DV - Ofc. Invlved | N | 21-301 | 16-006 | CBE - resigned; would have been sustained |
| 61 | SVU 18-273 / 80-18-089869 | 71 | 5 | 8b - SA/DV Investigations | N | N | N | N |
| 62 | PSU 20-131 | 78 | 1 | Supervision - IA Fails to Investigate | N | 20-131 | N | Unfounded |
| 63 | DOJ Press Release Feb. 1, 2022 | 79 | 3 | Supervision - IA Fails to Investigate | N | N | Y | Ofc. 1 - resigned |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Filed Electronically*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        **Plaintiff**<br><br>**v.**<br><br>**LOUISVILLE/JEFFERSON COUNTY<br>METRO GOVERNMENT,**<br><br>        **Defendant** | Case No. **3:24-cv-722-BJB** |

## AFFIDAVIT OF DEPUTY CHIEF EMILY MCKINLEY

Affiant, Emily McKinley, after first being duly sworn, states as follows:

1. I am over the age of 18 years old and submit this affidavit based on my own personal knowledge.

2. I joined LMPD on May 29, 2006, and I have been a sworn police officer for over 18 years.

3. I am the Deputy Chief of Police, Chief of Staff for the Louisville Metro Police Department ("LMPD"). I was appointed to this position on September 27, 2024. In this role, I oversee the Accountability and Improvement Bureau and the Support Bureau. The Accountability and Improvement Bureau includes the Training Division, Performance Division, and LMPD's Force Investigations Review Unit. The Support Bureau includes the Major Crimes Division, Criminal Interdiction Division, and the Special Operations Division. In June of 2024, when Chief Humphrey was named Acting Chief of LMPD, I assumed the role of lead negotiator for LMPD during consent decree negotiations.

4. Prior to my appointment as Deputy Chief, I served as Assistant Chief of Police over the Accountability and Improvement Bureau from August 2023 to September 2024. My responsibilities included overseeing the Training Division and the Performance Division. This included supervision of training, policy development, audit capabilities, use of force investigations, officer wellness, and performance improvement of LMPD. In this role, I also served as a member of the negotiating team for Louisville Metro during the consent decree negotiations. Since the beginning of the DOJ's investigation in 2021, I have been a part of the Louisville Metro team managing logistics and communications regarding the investigation, findings, and negotiations internally and externally. Additionally, I represented Louisville Metro during the negotiations of the current Collective Bargaining Agreement with the River City FOP Lodge 614, Inc.

5. From December of 2019 to August 2023, I served LMPD at the rank of Major. During this time, I was a Division Commander over a Patrol Division from December 2019 – July 2021. From July 2021 – August 2023, I was the Division Commander of the Administrative Services Division where I oversaw the department's Records Unit, Real-Time Crime Center, Technology Services Unit, Impound Unit, LMPD Fleet, Recruitment and Selection, and Strategic Planning which included the planning of the department's budget and renovation plans for the new LMPD Headquarters building.

6. On March 8, 2023, the Department of Justice (DOJ) released its Findings Report in which it discussed approximately 65 incidents in support of their conclusions reached in that report.

7. Following the public release of the report, LMPD and Louisville Metro received many questions from the media, elected officials, and the public about the incidents and officers

described but not identified in the report. Those questions included whether involved
officers were still employed by LMPD, if any discipline was imposed as a result of the
incident described, and whether any additional investigations would result from the
incident's inclusion in the Findings Report.

8. LMPD and Louisville Metro were unable to easily identify some of the incidents or
officers described from information in the Findings Report alone.

9. Louisville Metro requested information from the DOJ to conduct its own review of the
described incidents to better respond to the public's questions and concerns and
determine if any additional investigations were warranted.

10. Following the release of the report and upon request, the DOJ sent the attached letter
(Exhibit A) dated 03-20-23 providing identifying information for 63 incidents mentioned
in their report. They withheld information about some incidents to maintain witness
confidentiality.

11. Upon receipt of the above-mentioned letter, LMPD conducted a review of each of the 63
incidents. This included reviewing applicable and available body worn camera footage,
Administrative Incident Reports (aka BlueTeam Reports), Professional Standards Unit
investigative reports, Public Integrity Unit investigative reports, disciplinary letters,
search warrants, and other publicly available information. This review sought to identify
involved officers, verify which incidents were previously known to and investigated by
LMPD, identify discipline and/or corrective action already imposed on involved officers,
determine if additional administrative investigations were warranted, and to provide
additional context for the department and community regarding the incidents described in
the DOJ Findings Report.

12. Documents and recordings that provide additional context for each incident were assembled on a publicly accessible website, released May 26, 2023. The website can be found at https://www.louisville-police.org/895/Information-in-Reference-to-DOJ-Findings.

13. A chart that I prepared which identifies whether any investigation, including a BlueTeam report, was conducted of each of the 63 incidents prior to the release of the report and whether the involved officers received discipline is tendered as Exhibit B to this affidavit. The documents available on the aforementioned website will be tendered to the Court on January 13, 2025 as Exhibit C to this affidavit.

14. I personally compiled and reviewed the documents and recordings regarding the incidents and coordinated their release for the public on the LMPD website. Prior to the public release on the website, documents and recordings for the 63 incidents were made available to the then-Chief of Police, members of the Executive Staff, select LMPD Command Staff, and select civilian Metro employees who assisted in the review process.

15. LMPD determined that each of the 63 incidents provided by the DOJ to Louisville Metro and described in the Findings Report occurred.  However, LMPD may dispute the characterization of facts as described by the DOJ for many of the individual incidents or whether the incident represented a violation of law or policy.

16. LMPD also determined that a vast majority of the incidents described in the Findings Report that warranted investigations had already been investigated at some level by LMPD and, if appropriate, discipline had already been imposed prior to the report's release.

17. To be clear, the documents assembled by LMPD for review of these incidents do not represent the entire universe of evidence or information that may be available or presented should this case move forward to trial.

18. Further the Affiant sayeth naught.

Deputy Chief Emily McKinley

STATE OF KENTUCKY      )
                                       ) ss:
COUNTY OF JEFFERSON  )

BEFORE ME, a Notary Public, in and for said County and State, appeared the above-named Emily McKinley who acknowledged that she did sign the foregoing instrument and that the same is true to the best of her knowledge and belief.

IN TESTIMONY HEREOF, I have hereunto set my hand and official seal this 10th day of January, 2025.

My Commission expires:    January 13, 2027

NOTARY PUBLIC
KYNP 64637

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Filed Electronically*

UNITED STATES OF AMERICA,

          Plaintiff

   v.

LOUISVILLE/JEFFERSON COUNTY METRO
GOVERNMENT,

          Defendant

Civil Action No. 3:24-cv-722-BJB

## AFFIDAVIT OF LMPD CHIEF PAUL L. HUMPHREY

\* \* \* \* \* \* \*

Affiant, Paul L. Humphrey, after first being duly sworn, states as follows:

1. I am over the age of 18 years old and submit this affidavit based on my own personal knowledge.

2. I have been the Chief of the Louisville Metro Police Department ("LMPD") since September 27, 2024. Prior to that, I was named Acting Chief on June 12, 2024 then Interim Chief on June 25, 2024.

3. I joined the LMPD as an officer in 2006. In 2014, I was promoted to the rank of Sergeant. During my time as a Sergeant, I held positions as a SWAT Team Leader, supervisor in a patrol division, and a Professional Standards Unit investigator. In 2017, I was promoted to Lieutenant and served as a Lieutenant in the 2nd Division Patrol and later as the SWAT Team Commander. In 2019, I was appointed to the rank of Major and oversaw the Training Division. In 2021, I was appointed to the position of Assistant Chief (Lieutenant

Colonel) over the Administrative Bureau. In that position, I became responsible for

managing the department's budget, fleet management, intelligence and crime analysts,

research and development, policy creation, as well as overseeing Training and

Recruitment. In March of 2022, I was appointed as the Deputy Chief of Police over the

Accountability and Improvement Bureau ("AIB"). After an Executive Command Staff

restructuring in 2022, I became responsible for leading and supervising both the

Administrative Bureau and the AIB, until I was made Acting Chief of Police in June

2024.

4. As of January 1, 2025, LMPD has 1035 sworn officers and 353 civilian employees.

   LMPD is authorized to employ 1328 sworn officers.

5. LMPD has jurisdiction in the entirety of Jefferson County and is made up of eight patrol

   divisions divided geographically throughout the county. In addition to the patrol

   divisions, there are eight investigative and administrative divisions which includes many

   specialty units.

6. LMPD has an established Community Engagement Unit to take part in many community-

   oriented events and initiatives, such as the Citizens Police Academy, the International

   Leadership Academy and the Police Activities League. Each patrol division has an

   advisory board made up of volunteer community members that meet with division

   leadership to collaborate on community concerns.

7. LMPD's annual budget for fiscal year 2025, spanning July 1, 2024 to June 30, 2025, is

   $240 Million.

8. On April 26, 2021, the United States Department of Justice ("DOJ") announced it was

   opening a pattern or practice investigation of the Louisville Metro Government and

LMPD pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34

U.S.C. § 12601 ("the pattern or practice investigation" or "DOJ's investigation"). Soon

thereafter, I was designated as LMPD's primary point of contact for the investigation.  In

conjunction with the County Attorney's Office, I was responsible for ensuring the DOJ

had access to the information requested for its investigation, facilitating the DOJ's

presence with the various divisions and command within the LMPD, and regularly

providing information to the members of LMPD regarding the DOJ's investigation.

9. Prior to the completion of the DOJ's investigation, I created LMPD's AIB. The AIB

includes LMPD's Performance Division, Training Division, Compliance Unit, Research

and Development Unit, as well as a specialized Force Investigations Review Unit. The

newly-created Performance Division includes internal auditors to assess officer

professionalism, body-worn camera compliance, and performance during stops, searches,

and seizures. The Division also houses the Wellness Unit, Inspections and Compliance

Unit, the Court Liaison Office and the Performance Review Board ("PRB"), which

reviews critical incidents to identify and recommend training, policy, or performance

improvements. As part of the creation of the AIB, there was a complete re-organization of

the Training Division, creating several positions such as doctorate-level academic

director, curriculum developers, doctorate-level researchers, and legal instructors. The

PRB and the Training Division together use the PRB's recommendations to develop

action items in response to any identified needs for improvement. The newly created

Force Investigations Review Unit is dedicated to reviewing use of force investigations.

10. Since the initiation of the DOJ's investigation, LMPD has created Command and

Executive Staff positions to oversee both organizational and facility improvements,

including renovation of a new headquarters and the creation of the Summit Wellness
Center. Since its opening in 2023, the Summit Wellness Center has become nationally
recognized as a model for employee wellness in law enforcement.

11. Along with its organizational restructuring and facility improvements, LMPD has
implemented significant policy updates prior to the filing of the tendered Consent Decree
including revising its Use of Force policies. These policy changes clarified expectations
for officer performance during encounters resulting in uses of force, revised requirements
for supervisors conducting and reviewing use of force investigations, and improved
documentation requirements for officers using force by requiring a more detailed
explanation of the facts and circumstances surrounding the use of force incident. The
DOJ reviewed the new Use of Force policies prior to their implementation.

12. LMPD received the DOJ's first proposal for a Consent Decree on February 20, 2024.
Negotiations between Louisville Metro Government and the DOJ began shortly
thereafter.

13. From the beginning of negotiations until being named Acting Chief of LMPD, I was the
lead negotiator on behalf of LMPD in the Consent Decree negotiations with the DOJ.

14. As the lead negotiator for LMPD, I spent countless hours evaluating the impact the
proposed Consent Decree, and any counterproposals, would have on the operations of the
police department.

15. During my evaluation of proposed provisions, I considered the feasibility of each
proposed requirement, including the proposed provisions:

    a. potential impact on our workforce including workload, administrative burden,
    morale, and manpower needs;

b.  estimated costs and other consequences for LMPD's budget;

c.  potential impact on public safety;

d.  our department's capacity to achieve requirements within our targeted timeline;
    and

e.  reasonable availability of technology required for a proposed provision.

16. I also evaluated whether the proposed provisions would be effective to achieve the shared
    goal of sustained constitutional policing practices. In doing this, I consulted with LMPD
    leadership, legal counsel, and subject matter experts, within and outside of the LMPD. I
    conducted my own research and review of various approaches to reform, emerging trends
    within law enforcement, and technology.

17. While many of our reforms to policy, staffing, and facilities align with provisions of the
    proposed Consent Decree, there is still more work to be done to achieve Substantial
    Compliance with the Consent Decree.  However, I am confident in our department's
    ability to achieve these goals within the projected five-year timeframe.

18. Leading a police department in a major city requires a continuous evaluation process to
    fulfill our mission to prevent crime and ensure public safety.  This requires regularly
    assessing and adjusting operations, refining processes, and changing and directing staff to
    meet the ever-changing needs of our community. Our services must be responsive to
    changing trends in crime, including violent crime, changes in available resources,
    including personnel and technology, and changes in the community's vision for its police
    department. The tendered Consent Decree touches on a small portion of that work.
    Importantly, if the Consent Decree is entered, I am still able to effectively manage the
    department to meet Louisville's needs. I maintain my ability to change policy and direct

operations in the many areas not touched by the tendered Consent Decree. In the topics covered by the tendered Consent Decree, its provisions provide guideposts for the operation of LMPD. The guideposts still allow me the ability to make the necessary and appropriate management decisions to best guide the operations of LMPD.

19. The Consent Decree provisions require LMPD to implement or maintain policies, procedures, and training to sustain constitutional policing practices. However, the requirements within the Consent Decree were drafted in a way that is flexible enough to permit LMPD to determine how to implement the requirements in a manner that I determine is best to sustain constitutional policing and prevent crime.

20. I recognize that many of the policy, training, performance, and accountability provisions within the tendered Consent Decree are the conventional reforms used in previous consent decrees to support sustained constitutional policing practices. However, I also recognize there may be other approaches, whether different policies, training, supervisory requirements, or technology that can assist LMPD in supporting sustained constitutional policing, perhaps even in a more efficient or effective manner. That is why it was critical to include an alternate method to demonstrate Substantial Compliance for termination of the tendered Consent Decree or a Discrete Section within it.

21. That alternative method, pursuant to ¶690 of the tendered Consent Decree, allows me to take actions or pursue reforms other than what is required by the Consent Decree in order to support sustained constitutional policing practices and seek termination of a Discrete Section or the tendered Consent Decree by documenting that achievement even without meeting the specified requirements of a Discrete Section.

22. Further the Affiant sayeth naught.

Chief Paul L. Humphrey

STATE OF KENTUCKY          )
                           ) ss:
COUNTY OF JEFFERSON  )

BEFORE ME, a Notary Public, in and for said County and State, appeared the above-named Paul L. Humphrey who acknowledged that he did sign the foregoing instrument and that the same is true to the best of his knowledge and belief.

IN TESTIMONY HEREOF, I have hereunto set my hand and official seal this _10th_ day of January, 2025.

My Commission expires:          January 13, 2027

NOTARY PUBLIC
KINP 64637

## AFFIDAVIT OF RHONAL HEADY

Comes the Affiant, Rhonal Heady, and, after having first been duly sworn, states as follows:

1. I am over the age of 18 years old and submit this affidavit based on my own personal knowledge.

2. I am the Executive Director of Louisville/Jefferson County Metro Government ("Louisville Metro") Emergency Services Agencies. I have held this role since January of 2023.

3. As Executive Director, I provide top level oversight of the Emergency Services Division, which houses/manages the Crisis Call Diversion Program ("Deflection"). Deflection is Louisville Metro's program to respond to non-emergent behavioral health-related calls to its MetroSafe 911 Center.

4. The goal of Deflection is to divert certain non-emergent behavioral health-related calls previously dispatched to the Louisville Metro Police Department ("LMPD") towards a behavioral health hub located in the MetroSafe 911 Center.

5. Deflection was created on March 21, 2022 as a pilot program. It originally operated only from 2:00 p.m. to 10:00 p.m., seven days a week and provided coverage to residents located in LMPD's Fourth Division only. It was expanded in March 2023 to provide coverage for all eight LMPD patrol divisions. Additional expansions occurred in July 2023, February 2024, and June 2024 to provide greater availability and coverage hours.

6. Deflection has two components: Crisis Triage Workers to answer behavioral health-related calls and Mobile Crisis Response Teams to provide a community-based response for non-emergency behavioral health crises. Currently, Louisville Metro contracts with Seven

1

County Services, a community-based behavioral health service provider, to staff these programs.

7.  Crisis Triage Workers operate out of MetroSafe alongside Louisville Metro's 911 Calltakers and Dispatchers. Crisis Triage Workers receive eligible calls transferred directly from the 911 Calltakers when they identify the caller has a behavioral health need and there is not a public safety component requiring a law enforcement response. As of June 10, 2024, Crisis Triage Workers are available twenty-four hours a day, seven days a week.

8.  Upon receiving these calls, Crisis Triage Workers' core functions are diversion, consultation, and de-escalation. These core functions are intended to provide immediate and appropriate professional responses to behavioral health crises, decrease the number of LMPD dispatches to behavioral health issues, and decrease the total number of Louisville Metro residents that are incarcerated or hospitalized due to behavioral health issues.

9.  Crisis Triage Workers will evaluate the nature and scope of a call for service to determine the appropriate Deflection response. If there is no serious threat, the Crisis Triage Workers will attempt to problem solve and de-escalate the caller over the phone. If the situation requires a face-to-face intervention with the caller, and there is no known threat to safety, the Mobile Crisis Response Team may be dispatched by the Crisis Triage Worker. If a caller expresses an intent to harm themselves or others, or has access to a weapon, LMPD will be dispatched to address the public safety needs of that call.

10. Members of the Mobile Crisis Response Team are plain-clothed, unarmed, and arrive in unmarked vehicles. They respond in teams of two to three people. The goals of Mobile Crisis Response Teams are to continue the triage of the crisis face-to-face, focusing on

building trust with the individual seeking help and further assessing their immediate needs to help resolve the crisis.

11. If at any time the individual in crisis appears to become a public safety threat to the Mobile Crisis Response Team, themselves, or others during the response, the Mobile Crisis Response Team will contact LMPD for a law enforcement response.

12. If an individual experiencing a behavioral health issue requires transportation, Mobile Crisis Response Teams can take individuals anywhere within Jefferson County, including, but not limited to hospitals, respites, shelters, or other natural support systems such as family and/or friends if deemed safe and appropriate. This allows individuals experiencing a behavioral health crisis to receive support outside of incarceration or hospitalization, where appropriate.

13. Deflection can also provide connection to community resources post-crisis through short-term case management, decreasing the caller's need for emergency behavioral health services in the future.

14. The availability of Deflection services diverts a number of non-emergency calls previously dispatched to LMPD, freeing up LMPD to focus its officers on public safety issues that require an armed law enforcement response.

15. Further, the Affiant sayeth naught.

RHONAL HEADY

STATE OF KENTUCKY           }
                            }
COUNTY OF JEFFERSON         }

3

BEFORE ME, a Notary Public, in and for said County and State, appeared the above-named Rhonal Heady who acknowledged that he did sign the foregoing instrument and that the same is true to the best of his knowledge and belief.

IN TESTIMONY HEREOF, I have hereunto set my hand and official seal this _16ᵗʰ_ day of January, 2025.

Notary Public

January 13, 2027
My Commission expires

KYNP 64637
Commission No.