UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>        **Plaintiff**<br><br>**v.**<br><br>**LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT,**<br><br>        **Defendant** | **Case No. 3:24-cv-722-BJB** |

## DEFENDANT'S RESPONSE TO COURT'S ORDER RE: PROPOSED CONSENT DECREE'S TRANSPARENCY & SUPPORT

Defendant Louisville/Jefferson County Metro Government ("Louisville Metro"), by counsel, for its Response to the Court's Order re: Proposed Consent Decree's Transparency and Support, issued January 18, 2025, (hereinafter "the Order") hereby states as follows:

### INTRODUCTION

On January 18, 2025, the Court issued an Order requesting the Parties respond to the following questions:

1. Ongoing Pattern and Practice
    a. Given that the parties agree the reforms contemplated in the decree are already underway, why is an injunction necessary to compel them?
    b. What authority authorizes the Justice Department to withhold, based on "litigation leverage," information relevant to the judicial decision the parties sought?
2. Fourth Amendment
    a. How many instances of excessive lethal force did the 2023 Findings reveal?
    b. How many instances of excessive non-lethal force did the 2023 Findings reveal? And what is the ratio of excessive force to lawful force during the same time period?
3. First Amendment

      a. To what extent do the parties maintain the Police Department has violated citizens' First Amendment rights since the year 2021?
 4. Americans with Disabilities Act
    a. How will dispatchers and officers determine whether a 911 call requires a police response, a mental-health response, or both?
    b. What legal standard determines whether "deflection" of 911 calls to a behavioral-health response team are "reasonable accommodations" required by the ADA?
 5. Safe Streets Act
    a. Why has the Justice Department refused to share its disparate-impact assessment with the Court or the City?
    b. On what legal basis could the Court impose injunctive relief to remedy a sex-discrimination allegation that the Complaint and Report have not even alleged? *See* 2023 Findings at 69; Complaint ¶ 17.[1]

Several of the questions posed by the Court request information that is only in the possession of Plaintiff, United States of America ("United States"), as they relate to the data that the United States has used to support its allegations against Louisville Metro. Because Louisville Metro does not have access to that specific data or the methodology for analyzing such data, Louisville Metro is unable to answer the Court's questions on those topics. However, Louisville Metro has available historical data that it has kept in the ordinary course of business, and which may shed some light on the questions posed by the Court. In an effort to be responsive to the Court, Louisville Metro will present this data in addition to responding to the remaining questions from the Court.

      **I. Ongoing Pattern and Practice[2]**

Louisville Metro is committed to implementing the reforms identified within the proposed Consent Decree. Since 2021, LMPD has created approximately 30 new positions within the department, both sworn and professional. In addition to those 30 positions, LMPD now has five legal advisors and two legal instructors where it previously only had one legal advisor.

---

[1] *See* DN 054.
[2] Consistent with its Answer, Louisville Metro continues to deny the United States' allegation that any unlawful conduct occurred frequently or routinely.

Additionally, Louisville Metro began implementing some of the proposed reforms in consultation with the United States prior to negotiations concluding. Based on the voluntary actions of Louisville Metro in implementing reforms, the Court has questioned the necessity of an injunction to compel the continued reform work of Louisville Metro.

Consistent with its prior practice in similar situations, the United States presented a consent decree as the only option available to Louisville Metro to avoid litigation over the allegations in its Findings Report. As Louisville Metro wanted to avoid costly and distracting litigation and focus resources on becoming the best police department possible, it was necessary for the city to sign an Agreement in Principle to negotiate a consent decree with the United States  After extensive negotiations, Louisville Metro was able to finalize a consent decree that fully satisfied Mayor Greenberg's criteria which included a well-defined exit path upon reaching substantial compliance with the decree's requirements. Louisville Metro continues to support entry of the proposed Consent Decree as it implements reforms to which Louisville Metro is committed and avoids costly and wasteful litigation. From Louisville Metro's perspective, the proposed Consent Decree is an effective mechanism to keep the reform process on track and to provide third-party validation of Louisville Metro's progress by means of an independent monitor that will report to the public.

Louisville Metro does not have any information to offer concerning the United States' authority to withhold information the Court seeks based on "litigation leverage." Louisville Metro has no objection to the United States' disclosure of such information.

## II. Louisville Metro Data and Response to Court's Inquiry on alleged Fourth Amendment Violations

The United States' pattern and practice investigation reviewed incidents that occurred between 2016 and 2021. Louisville Metro obtained the calls-for-service data, for the same time period, from MetroSafe, which is responsible for dispatching officers and managing the radio

3

traffic of LMPD officers. The calls-for-service data is comprised of LMPD officers' responses to 911 calls for assistance and officers' self-initiated activities. This data shows that from 2016 to 2021, LMPD officers had 3,054,922 interactions with citizens. Louisville Metro also reviewed this data for 2022-2024; during this time period, LMPD officers had 1,224,467 interactions with citizens. The following chart shows the breakdown of the calls for service by year and how many sworn officers were employed by LMPD as of July 1st of each year:

|  | DOJ Investigation | | | | | | Post DOJ Investigation | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Calls For Service | 537174 | 540234 | 541962 | 511846 | 450968 | 472738 | 423905 | 353332 | 447230 |
| Number of Officers as of July 1 every year | 1248 | 1303 | 1285 | 1250 | 1194 | 1048 | 1042 | 1062 | 1058 |

Louisville Metro also pulled the annual number of arrests, traffic stops, and reports completed for violent crimes,[3] homicides, and traffic fatalities for the years 2014 through 2024. Included alongside the Arrests, Traffic Stops, and Violent Crime Offenses data, the year-to-year percentage increase or decrease is noted.

|  | Arrests | | Traffic Stops(1099 only) | | Violent Crime Offenses | | Homicides | Traffic Fatalities |
|---|---|---|---|---|---|---|---|---|
| 2014 | 123494 |  | 79531 |  | 10181 |  |  |  |
| 2015 | 100539 | -19% | 56299 | -29% | 10949 | 8% | 78 | 82 |
| 2016 | 88036 | -12% | 43336 | -23% | 11560 | 6% | 117 | 88 |
| 2017 | 91052 | 3% | 56759 | 31% | 10914 | -6% | 99 | 91 |
| 2018 | 92843 | 2% | 67998 | 20% | 10120 | -7% | 77 | 68 |
| 2019 | 76098 | -18% | 48144 | -29% | 10882 | 8% | 89 | 93 |
| 2020 | 41700 | -45% | 25043 | -48% | 12386 | 14% | 164 | 114 |
| 2021 | 47548 | 14% | 33343 | 33% | 13213 | 7% | 178 | 111 |
| 2022 | 53580 | 13% | 40991 | 23% | 12342 | -7% | 157 | 117 |
| 2023 | 42805 | -20% | 31131 | -24% | 11125 | -10% | 145 | 117 |
| 2024 | 45597 | 7% | 35458 | 14% | 10799 | -3% | 142 | 105 |

---

[3] This captures the following types of crimes pursuant to National Incident-Based Reporting System (NIBRS): Aggravated Assault, Arson, Kidnapping/Abduction, Murder & Nonnegligent Manslaughter, Negligent Manslaughter, Rape, Robbery, Simple Assault, Sodomy, and Statutory Rape. It should be noted that these numbers reflect the reports taken for these incidents and do not reflect actual arrests made for these incidents. It should also be noted that on March 14, 2023, LMPD began using a new Computer-Aided Dispatch/Record Management System which codified these incidents according to NIBRS definitions whereas the previous system codified them according to the Kentucky Uniform Crime Report definitions. For this reason, the data may not be completely comparable.

The Court has requested the Parties to answer specific questions relating to the number of instances of lethal and non-lethal uses of force underlying the United States's 2023 Findings, and specifically what the ratio of excessive force to lawful force was during that same time period. As previously stated, the United States has not disclosed to Louisville Metro the data or methodologies it used as the basis for its allegations. However, in an effort to be as responsive as possible to the Court's Order, LMPD has provided certain use of force data collected in the ordinary course of business. Before delving into Louisville Metro's data, it is important to understand the different processes in which use of force investigations occur and are initiated.

There are three mechanisms in which use of force incidents are documented and investigated by LMPD: 1) Administrative Incident Report ("AIR") via BlueTeam; 2) Professional Standards Unit ("PSU"); and 3) Public Integrity Unit ("PIU").

The PSU is responsible for conducting internal administrative investigations of LMPD members for policy violations. A PSU investigation may be initiated at the request of the LMPD Chief of Police or by a citizen complaint. A citizen's complaint may be received through several modalities; however, a citizen's complaint may only be investigated by the LMPD if the requirements of KRS 67C.326[4] are met.

The PIU is responsible for conducting all criminal investigations of departmental members and other Metro employees or public officials. Additionally, the PIU conducts investigations of Level 4 uses of Reportable Force involving LMPD officers. A PIU investigation may be initiated

---

[4] KRS 67C.326 prohibits an administrative investigation from being conducted pursuant to a citizen's complaint unless the citizen's complaint is made in the form of a sworn affidavit. Absent a sworn affidavit from a citizen, LMPD is required to conduct an investigation into the citizen's complaint but may only charge an officer with a policy violation if LMPD can independently substantiate the allegations without the sworn affidavit from the citizen.

at the request of the LMPD Chief of Police or their designee, or through a complaint by members of the LMPD, Louisville Metro Government, other governmental entity, or a citizen.[5]

Pursuant to LMPD policy, any use of force greater than minimal force is classified as Reportable Force.[6] There are four levels of Reportable Force. The level of force used will determine the method and type of investigation that is conducted. However, each use of Reportable Force requires the completion of an AIR through the LMPD BlueTeam system. A Level 1 Use of Reportable Force requires the completion of an AIR by the involved officer and review for accuracy and policy compliance by an uninvolved, permanent-rank supervisor. Level 2 and Level 3 uses of Reportable Force require an uninvolved, permanent-rank supervisor to conduct the investigation and review of the use of force. This review is then sent through a division lieutenant for review before submission to the Force Investigations Review Unit (FIRU)[7], with a copy to the division major. The FIRU reviews all Level 2 and 3 uses of Reportable Force for accuracy and policy compliance. At each level of review, the reviewer will document their findings, including whether any violations of LMPD policy are observed. Importantly, at any point throughout the review process, a reviewer may request the Chief of Police initiate a PSU investigation if potential policy violations are identified. All Level 4 uses of Reportable Force are investigated by the Public Integrity Unit for any criminal allegations and by the Professional Standards Unit for any policy violations.

---

[5] To be clear, a sworn affidavit from a citizen is not required in order to initiate a PIU investigation.
[6] Attached as Exhibit 1 is the current LMPD Use of Force policy and Exhibit 2 is the previous iteration of the policy. It is relevant to note that the Reportable Force definition and structure was implemented in October of 2024 when the new LMPD Force Investigation Review Unit began its role. However, all types of Reportable Force were previously required to be reported pursuant to an AIR so for the purposes of this Response, there is no distinction between Reportable Force prior to October 2024 and reporting force prior to that time.
[7] The FIRU is comprised of a Lieutenant, Sergeant, and Legal Advisor.

For the pattern-and-practice investigation time period, there were a total of 2,288 documented uses of force by LMPD. Of those incidents, 213 PSU investigations were conducted for alleged use of force policy violations. Of those 213 PSU investigations, 41 were incidents involving the use of deadly force and 172 incidents involving use of non-lethal force. Of those investigations, three included incidents in which violations of the use of deadly force policy were sustained[8] and 54 included incidents in which violations of the non-lethal use of force policies were sustained. It is important to note that a violation of policy does not necessarily mean that a violation of law occurred.

In short, to provide information pertinent to the Court's questions, LMPD's data identifies three incidents in which the use of deadly force policy was violated and 54 incidents in which non-lethal use of force policies were violated. While Louisville Metro believes these data points are relevant to the Court's questions, it should be noted that the data assume that all uses of force were appropriately documented, investigated, and adjudicated – assumptions that the United States may contest.

For some perspective to see how LMPD has progressed since 2021, LMPD has also compiled its data from 2022 – 2024.[9] That data identifies a total of 907 AIRs completed for use of force incidents. It also identifies a total of 40 PSU investigations conducted for alleged use of force policy violations. Of these 40 investigations, 22 of the incidents involved the use of deadly force and 23 incidents involved the use of non-lethal force. Of these investigations, two incidents had a sustained violation of the use of deadly force policy and eight incidents had a sustained violation of the non-lethal use of force policies.

---

[8] An alleged policy violation is found to be "sustained" when there is sufficient evidence to prove by a preponderance of the evidence the allegation.

[9] It should be noted that in 2024, LMPD policy was expanded to begin capturing takedowns without injury, pointing of a firearm, and canine deployments with no bites as a reportable force incident.

The following chart provides a more detailed breakdown of this data. The chart also includes a breakdown of the PSU cases by number of allegations and number of officers investigated. A PSU case often looks at incidents as a whole; therefore, there may be more than one officer being investigated in one case and there may be more than just one allegation of a policy violation. For example, a PSU case may investigate an incident where an officer discharged their taser towards a subject three times and another officer pointed his firearm at the subject. That PSU case would include three allegations of policy violations against the first officer, one allegation for each taser discharge, and one allegation of a policy violation against the other officer for pointing a firearm.

**THIS SPACE INTENTIONALLY LEFT BLANK**
**SEE CHART ON FOLLOWING PAGE**

|  |  | DOJ Investigation | | | | | | Post DOJ Investigation | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|  | Calls For Service | 537174 | 540234 | 541962 | 511846 | 450968 | 472738 | 423905 | 353332 | 447230 |
|  | Number of Officers as of July 1 every year | 1248 | 1303 | 1285 | 1250 | 1194 | 1048 | 1042 | 1062 | 1058 |
| Use of Force Incidents | Blue Team Entries | 442 | 481 | 438 | 376 | 314 | 237 | 226 | 233 | 448 |
|  | Percentage of Calls for Service | 0.08228% | 0.08904% | 0.08082% | 0.07346% | 0.06963% | 0.05013% | 0.05331% | 0.06594% | 0.10017% |
|  | % of UofF (BlueTeam) Investigated | 7.01% | 8.11% | 13.24% | 8.78% | 11.15% | 7.17% | 3.98% | 7.30% | 3.13% |
|  | % of UofF Sustained by Incident | 1.13% | 2.91% | 3.42% | 1.60% | 4.14% | 1.27% | 1.33% | 2.58% | 0.22% |
| PSU Use of Force Investigations | | | | | | | | | | |
| PSU Use of Force Investigations | | 31 | 39 | 58 | 33 | 35 | 17 | 9 | 17 | 14 |
| Initiation Case Type | Chief Initiated | 30 | 33 | 47 | 23 | 25 | 15 | 7 | 15 | 13 |
|  | Percent of Complaints | 97% | 85% | 81% | 70% | 71% | 88% | 78% | 88% | 93% |
|  | Citizen Affidavit | 1 | 6 | 11 | 10 | 10 | 2 | 2 | 2 | 1 |
|  | Percent of Complaints | 3% | 15% | 19% | 30% | 29% | 12% | 22% | 12% | 7% |
|  | Number of Officers Accused | 36 | 68 | 94 | 44 | 52 | 26 | 14 | 26 | 22 |
|  | # Ofcs Accused / # Ofcs Percentage | 2.88% | 5.22% | 7.32% | 3.52% | 4.36% | 2.48% | 1.34% | 2.45% | 2.08% |
|  | Number of Allegations | 37 | 77 | 100 | 47 | 68 | 30 | 18 | 30 | 26 |
| Type of Force Allegation by Charge Investigated | Use of Deadly Force Cases | 4 | 4 | 11 | 6 | 7 | 9 | 5 | 10 | 7 |
|  | Use of Deadly Force Allegations | 4 | 7 | 18 | 9 | 23 | 12 | 9 | 18 | 14 |
|  | Use of Deadly Force Officers Accused | 4 | 7 | 18 | 9 | 13 | 11 | 9 | 15 | 11 |
|  | Percentage of Deadly Force Cases | 13% | 10% | 19% | 18% | 20% | 53% | 56% | 59% | 50% |
|  | Percentage of Deadly Force Allegations | 11% | 9% | 18% | 19% | 34% | 40% | 50% | 60% | 54% |
|  | Use of Force Cases | 27 | 36 | 47 | 27 | 30 | 10 | 5 | 7 | 11 |
|  | Use of Force Allegations | 33 | 70 | 82 | 38 | 45 | 18 | 9 | 12 | 12 |
|  | Use of Force Officers Accused | 32 | 61 | 76 | 35 | 39 | 15 | 5 | 11 | 11 |
|  | Percentage of Use of Force Cases | 87% | 92% | 81% | 82% | 86% | 59% | 56% | 41% | 79% |
|  | Percentage Use of Force Allegations | 89% | 91% | 82% | 81% | 66% | 60% | 50% | 40% | 46% |
| Use of Deadly Force Sustainments | Sustained Cases | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 2 | 0 |
|  | Number of Sustained Officers | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
|  | Sustained Allegations | 0 | 0 | 0 | 0 | 13 | 1 | 0 | 2 | 0 |
|  | Pending Disposition by Case | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
|  | Percentage of Sustained Cases | 0% | 0% | 0% | 0% | 29% | 11% | 0% | 20% | 0% |
|  | Percentage of Sustained Allegations | 0% | 0% | 0% | 0% | 57% | 8% | 0% | 11% | 0% |
| Use of Force Sustainments | Sustained Cases | 5 | 15 | 15 | 6 | 11 | 2 | 3 | 4 | 1 |
|  | Number of Sustained Officers | 6 | 15 | 18 | 7 | 11 | 2 | 3 | 4 | 1 |
|  | Sustained Allegations | 6 | 15 | 18 | 7 | 13 | 2 | 5 | 4 | 1 |
|  | Pending Disposition by Case | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
|  | Percentage of Sustained Cases | 19% | 42% | 32% | 22% | 37% | 20% | 60% | 57% | 9% |
|  | Percentage of Sustained Allegations | 18% | 21% | 22% | 18% | 29% | 11% | 56% | 33% | 8% |
| All Use of Force Sustained Disposition | Sustainment Incidents by Cases | 5 | 14 | 15 | 6 | 13 | 3 | 3 | 6 | 1 |
|  | Sustainment by Allegations | 7 | 14 | 18 | 7 | 26 | 3 | 5 | 6 | 1 |
|  | Pending Disposition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
|  | Percentage of Sustained Allegations | 19% | 18% | 18% | 15% | 38% | 10% | 28% | 20% | 4% |
| Sustained Disposition of Corrective Action | # Sustained - Terminated | 0 | 2 | 0 | 0 | 4 | 0 | 1 | 0 | 1 |
|  | # Sustained - Suspended | 0 | 4 | 8 | 5 | 5 | 1 | 1 | 0 | 0 |
|  | # Sustained - Letter of Reprimand | 3 | 5 | 4 | 0 | 1 | 1 | 1 | 2 | 0 |
|  | # Sustained - Counseling | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | # Sustained - Remedial Training | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
|  | # Sustained - No Action | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | # CBE - Resignation | 1 | 0 | 2 | 2 | 5 | 1 | 0 | 2 | 0 |
|  | # CBE - Termination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | # CBE - Retirement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

### III. First Amendment

The Court requests information relating to the extent LMPD has violated citizens' First Amendment rights since 2021. It should be noted that there have been no widespread protests since

the events of 2020, resulting in a paucity of data on this issue. However, as previously mentioned, LMPD officers have had at least 1,224,467 interactions with citizens since the beginning of 2021. According to Louisville Metro's data, LMPD initiated two PSU investigations into alleged First Amendment-related policy violations in 2024; however, one of these investigations stems from an incident that occurred in 2020. Each of these investigations is ongoing.

### IV. Americans with Disabilities Act

#### a. Louisville Metro's Deflection Program

Louisville Metro's MetroSafe 911 Center is the primary Public Safety Answering Point for 911 emergency calls in Jefferson County, Kentucky. The 911 Center call-takers receive and assess incoming emergency calls, triage response, and dispatch what, if any, emergency services a caller is eligible for, including emergency medical services ("EMS"), fire department personnel, law enforcement, and now Deflection for certain behavioral health crisis calls. Attached as Exhibit 3 is a General Memorandum from Louisville Metro's 911 Center Assistant Director detailing the availability of Deflection crisis triage services and the criteria for an appropriate Deflection response.  A behavioral health crisis call would be excluded from Deflection if either (1) a public safety threat or (2) an emergency physical health condition is present requiring other appropriate emergency services. Currently, MetroSafe policy defines a public safety threat requiring a law enforcement response to include those situations in which a person experiencing the behavioral health crisis has physical possession of weapons, or he or she or another person on scene is currently exhibiting violent or threatening behavior or has a known history of violence.  An EMS response is required if the person experiencing the behavioral health crisis is under the influence of drugs or alcohol such that he or she requires medical intervention or if the person in crisis has injured or is in process of injuring themselves or another person.

Additionally, to triage these calls and send the appropriate response, the 911 Center only dispatches Deflection to first-party calls, where the caller is the person experiencing the behavioral health crisis, or second-party calls, where the caller is present with the person experiencing the behavioral health crisis. Third-party calls, where a caller is not present with the person in crisis, are deemed ineligible at this time because of the inability to assess the safety risks, medical needs, or the desire for the person in crisis to work with Deflection. These calls would typically result in a law enforcement response, if needed. Notably, if LMPD is the responding law enforcement agency, its officers can request Deflection after securing the scene and determining it would be an appropriate response for a person experiencing a behavioral health crisis.

### b. Legal Standard for Evaluating Deflection as a "Reasonable Accommodation"

The Attorney General has promulgated regulations in accordance with Title II of the Americans with Disabilities Act ("ADA") governing public services that require public entities to "make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[10]

A proposed modification complies with Title II's obligations if the modification permits the otherwise qualified disabled individual "meaningful access to the benefits of the services" provided by the public entity.[11] What meaningful access looks like and the "determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry."[12] This

---

[10] 28 C.F.R. § 35.130(b)(7)(i)
[11] *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 909 (6th Cir. 2004); *see also Alexander v. Choate*, 469 U.S. 287, 297 (1985).
[12] *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015), (quoting *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 844 (9th Cir. 2004)).

mixed question of law and fact requires an individualized inquiry into whether a proposed modification would be "reasonable *under the circumstances* as well as necessary *for that person*."[13] The qualified disabled individual need not prove that the specific modification is the only means to afford access to the service or benefit, only that it is sufficient to remove the barrier to meaningfully access the program, services and benefits.[14] Still, Title II does not give qualified disabled individuals unilateral authority to determine how a public entity may reasonably accommodate their disability. While individual preferences should be considered, a public entity's offered accommodation "need not be perfect or the one most strongly preferred by the plaintiff" to satisfy its obligations under the ADA, only that it preserves meaningful access.[15]

Public entities are further protected from overly burdensome modification requests if they can demonstrate the modification would fundamentally alter the nature of the service provided. Fundamental alteration is an affirmative defense that public entities may raise regarding otherwise-necessary modifications and is also a "fact-intensive inquiry."[16] The Supreme Court has presented two frameworks to analyze the fundamental alteration defense depending on whether the objection is based on the resources needed to implement the modification or whether the modification would change an essential part of the program, service or activity.

If the public entity objects to the resources necessary to implement a proposed modification, Justice Ginsberg's plurality opinion in *Olmstead v. LC ex rel. Zimring* suggests a balancing test for what modifications present a fundamental alteration. When considering the allocation of available resources, if the proposed modification for the individual would be

---

[13] *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001)(emphasis added).
[14] *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)
[15] *Wright v. NY Dept. of Corrections*, 831 F.3d 64, 72 (2d Cir. 2016) *quoting Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89,95 (2d. Cir. 2015)(internal citations and alterations omitted.)
[16] *Hindel v. Husted*, 875 F.3d 344, 347 (6th Cir. 2017) (quoting *Hindel v. Husted*, No. 2:15-cv-3061, 2016 WL 2735935 (S.D. Ohio May 11, 2016)).

inequitable given the broader responsibilities the public entity has to the needs of other individuals with disabilities served by the program, then it would be a fundamental alteration.[17] Budgetary concerns alone cannot sustain a fundamental alteration defense; many reasonable modifications require some investment of resources. Instead, the *Olmstead* test requires the public entity to show how the investment of those resources for a proposed modification would specifically harm other individuals with disabilities from receiving the services for which they are eligible. The reviewing court does not look at the cost of the modification for that individual alone in isolation, but requires the entity to demonstrate, through budgetary fund-shifting to cover the proposed modification, that it would result in fewer or lower quality services available to other eligible disabled individuals. If, instead, the public entity objects to the proposed modification because it alters an essential function of the service, program, or activity, the Court's opinion in *PGA Tour, Inc. v. Martin*, is instructive. When evaluating whether a modification of a rule in a golf tournament might constitute a fundamental alteration, the Supreme Court identified two circumstances such an accommodation would be unworkable: (1) if an alteration affected an essential aspect of the services or programs, even if applied to all participants equally; or (2) if a minor modification gave a disabled competitor an advantage over nondisabled participants, thereby fundamentally changing the character of the competition.[18]

But the public entities cannot wait for each disabled individual to request accommodations for access. The ADA places "an affirmative obligation" on public entities to prevent discrimination on the basis of disability.[19] The regulations also require public entities to evaluate current services, policies, and procedures that do not meet ADA requirements and make the necessary modifications

---

[17] *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 604 (1999)
[18] *PGA Tour,* 532 US at 682.
[19] *Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021), (quoting *Ability Ctr. Of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004)).

proactively.[20] To that end, the Attorney General has promulgated specific regulations that guide this evaluation process for common accommodations, including among others, mobility devices, service animals, communications systems, and architectural requirements to make public services readily accessible to individuals with disabilities.[21] But a public entity's obligation to self-evaluate its services and programs for accessibility issues and reasonable modifications is not limited to the enumerated regulations.[22] It also must evaluate its programs more generally for barriers to access and in doing so, solicit feedback from interested parties including individuals with disabilities and organizations serving them.[23]

Based on the legal framework set forth above, offering Deflection to individuals experiencing behavioral health crises would be a reasonable modification of Louisville Metro's policies and programs to ensure individuals with behavioral health disabilities have meaningful access to Louisville Metro's emergency services. A Deflection response, instead of a law enforcement, addresses the allegation of the United States that categorical exclusion of individuals with identified behavioral health disabilities from accessing emergency health responses violates Title II of the ADA.[24] The development of an alternative response pilot program now known as Deflection reflects Louisville Metro's engagement in the self-evaluation process. Even prior to the United States' release of the Findings Report, Louisville Metro identified policies that may impact meaningful access to its emergency services. The development and expansion of the program was informed by the feedback of both individuals with behavioral health disabilities and the local organizations serving them. Louisville Metro need not demonstrate Deflection is the only method

---

[20] 28 C.F.R. § 35.105(a)
[21] *See generally* 28 CFR § 35
[22] *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004).
[23] 28 C.F.R. § 35.105(b)
[24] *See* 72 USC § 12132

to improve accessibility. Louisville Metro could have modified other 911 center policies or trained other first responders to provide a health response. The ADA and its regulations do not require demonstrating that this modification to existing practice is the sole means to afford meaningful access to programs, only that it is sufficient to allow that access. Further, because Deflection is now an established program within Louisville Metro's 911 Center, predating the filing of this litigation, requiring its continuity through the Consent Decree is not a fundamental alteration to any essential aspect of Louisville's emergency services.

### c. Louisville Metro's Deflection Program Data

From July through December of 2023, the Louisville Metro Deflection program operated across all eight LMPD patrol divisions for 12 hours a day, from 10 am to 10 pm. During this time, 1,732 calls to MetroSafe were transferred to a crisis triage worker and the Mobile Crisis Response Team was deployed 732 times.

On February 4, 2024, the Diversion program expanded to operate for 16 hours a day, from 10 am to 2 am; then on June 6, 2024, the Diversion program began operating 24 hours a day. During the 2024 calendar year, there were 3,452 calls to MetroSafe transferred to the Crisis Triage Workers and the Mobile Crisis Response Team was deployed 1,099 times and transported individuals to receive the appropriate care 669 times.

## V. Safe Streets Act

### a. United States' Disparate-Impact Assessment

Louisville Metro has no information concerning why the United States has refused to share its disparate-impact assessment or what authority supports their position. Louisville Metro would find such information useful for its own purposes of continuous improvement.

### b. Legal Authority to Impose Injunctive Relief to Remedy Sex-Discrimination Allegation

The Court has questioned what authority permits it to impose injunctive relief to remedy a sex-discrimination allegation not raised in the Complaint and Report. The parties' consent "serves as the source of the court's authority to enter any judgment at all,"[25] even in circumstances when said relief would not be available to the plaintiff following judgment after trial. *In Local No. 93 v. Cleveland*, the Supreme Court explicitly rejected an argument raised by the intervening union that a consent decree may not offer greater relief than could be awarded at trial.[26] There, the Supreme Court readily endorsed that consent decrees have features of both voluntary contracts and judgments entered after litigation. But notably, Justice Brennan's opinion recognized that "the voluntary nature of a consent decree is its most fundamental characteristic."[27] This authority is not without limitations, though. Even if the parties agree, "[a] consent decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction..., must 'com[e] within the general scope of the case made by the pleadings,'…."[28] Still, so long as the nature of the agreement comes within the general scope of the case, this Court retains authority to enter such a decree.

It is readily apparent that many of the requirements for Section IX of the proposed Consent Decree, including policy updates, training, and supervisory requirements, fall generally within the claims raised by the United States' complaint. The United States expressed concerns that there are systemic deficiencies in policies, training, supervision, and accountability structures within Louisville Metro.[29] Louisville Metro does not have all the data upon which the United States relied in issuing its 2023 Findings; therefore, Louisville Metro cannot and does not concede the

---

[25] *Local 93*, 478 U.S. at 522.
[26] *Id.* at 524.
[27] *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 521-22 (1986); *see also United States v. ITT Cont'l Baking Co.*, 420 U.S 223, 235-37 (1975) *and United States v. Armour & Co.*, 402 U.S. 673 (1971).
[28] *Id.* at 525.
[29] DN 1, ¶ 19.

allegations in the Complaint regarding a pattern or practice. Louisville Metro, however, does support continuous evaluation and improvement and recognizes the importance of public trust and confidence in the progress of police reform. It is believed that the requirements contained within Section IX of the proposed Consent Decree address the allegations of the United States in a manner acceptable to Louisville Metro. Moreover, the parties have voluntarily consented to these terms to resolve the pending litigation. That consent affords the court the authority to enter the decree and impose injunctive relief.

## CONCLUSION

Louisville Metro respectfully submits the foregoing in response to the Court's Order of January 18, 2025 and requests that the Court grant the Joint Motion for Entry of the Consent Decree.

Respectfully Submitted,

MIKE O'CONNELL
JEFFERSON COUNTY ATTORNEY

*/s/ Annale R. Taylor*
ANNALE R. TAYLOR
ANDREW MILLER
ERIN C. FARNHAM
LISA S. JARRETT
Assistant Jefferson County Attorneys
First Trust Centre
200 S. 5th Street, Suite 300N
Louisville, KY 40202
*Attorneys for Louisville/Jefferson County Metro Government*

And

*/s/ Megan A. Metcalf*
MEGAN A. METCALF

*Deputy General Counsel*
*Office of Mayor Craig Greenberg,*
*Louisville/Jefferson County Metro Government*
*527 W. Jefferson Street*
*Louisville, KY 40202*
*(502) 574-7270*
*Megan.metcalf@louisvilleky.gov*
*Co-Counsel for Louisville/Jefferson County Metro Government*

## **CERTIFICATE OF SERVICE**

On February 18, 2025, the foregoing was served on the Court and all counsel via the Court's electronic filing system.

/s/ Annale R. Taylor
Annale R. Taylor
